UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

IRON WORKERS LOCAL 12 HEALTH
INSURANCE FUND; and JOHN BISSAILLON,
SCOTT ALLEN, HENRY DIGESER, and
CHRISTINA AUDI, as Trustees of the IRON
WORKERS LOCAL 12 HEALTH INSURANCE
FUND,

                    Plaintiffs,

      v.

HEALTHNOW NEW YORK INC., d/b/a
BLUESHIELD OF NORTHEASTERN NEW YORK,

                 Defendant.

**COMPLAINT**

Civil Action No.: 1:19-cv-407 (FJS/CFH)

---

      Plaintiffs Iron Workers Local 12 Health Insurance Fund, and John Bissaillon, Scott Allen,

Henry Digeser, and Christina Audi, as Trustees of the Iron Workers Local 12 Health Insurance

Fund, by and through their undersigned attorneys, Blitman & King LLP, as and for their

Complaint, allege as follows:

<u>**NATURE OF DISPUTE**</u>

      1.     This is an action for breach of fiduciary duty pursuant to Section 502(a)(2) of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2), and for

breach of contract under New York law.

<u>**PARTIES**</u>

      2.     Plaintiff Iron Workers Local 12 Health Insurance Fund ("Fund") is a self-funded

multi-employer employee benefit plan as defined by Section 3(3) of ERISA, 29 U.S.C. § 1002(3).

{B0092794.1}

3.      The Fund is jointly administered by an equal number of union-appointed and employer-appointed trustees in accordance with Section 302(c)(5) of the Labor-Management Relations Act, 29 U.S.C. § 186(c)(5).

4.      The Fund's office is located at 17 Hemlock Street, Latham, New York 12110.

5.      The Fund was established by and operates pursuant to a Restated Agreement and Declaration of Trust last restated on May 25, 2007 ("Trust Agreement"), a true and correct copy of which is attached hereto as "Exhibit A."

6.      Plaintiffs John Bissaillon, Scott Allen, Henry Digeser, and Christina Audi, as Trustees of the Iron Workers Local 12 Health Insurance Fund (collectively "Trustees"), are Trustees of the Fund in accordance with the Trust Agreement and are "fiduciaries" of the Fund as defined by Section 3(21) of ERISA, 29 U.S.C. § 1002(21).

7.      Upon information and belief, Defendant HealthNow New York Inc., d/b/a BlueShield of Northeastern New York, is a domestic not-for-profit corporation organized under the laws of New York and engaged in the business of health plan administration and claims adjudication, among other things.

8.      Upon information and belief, Defendant's principal place of business is located at 257 West Genesee Street, Buffalo, New York 14202.

9.      Upon information and belief, Defendant also maintains a physical office at 40 Century Hill Drive, Latham, New York 12110.

**JURISDICTION AND VENUE**

10.     Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 and Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1).  Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367 for claims arising under state law because such claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue in this action lies in the Northern District of New York pursuant 28 U.S.C. § 1391(b) because it is a judicial district: (1) where the sole Defendant resides; and (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, and a substantial part of property that is the subject of the action is situated.

12.     Venue also lies in the Northern District of New York pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), because it is the judicial district in which: (1) the plan is administered; (2) the breach occurred; and (3) Defendant resides.

**FACTUAL ALLEGATIONS**

13.     The Fund is a self-funded multi-employer employee benefit plan that exists to provide health care benefits to its participants and their eligible dependents.

14.     The Fund's participants are primarily persons represented by the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers Local No. 12 who are employed by a signatory to a collective bargaining agreement with the union.

15.     The Fund provides health care benefits to its participants and their eligible dependents pursuant to a written benefit plan known as the Restated Plan Document and

Summary Plan Description ("Plan" or "Plan Document").  A true and correct copy of the Plan

Document in effect during all periods relevant to this action is attached hereto as "Exhibit B."

16.     Pursuant to the Plan Document, "[b]enefits WILL NOT be paid for . . . [a]ny

treatment, services or supplies not considered Medically Necessary . . . ."  Ex. B (Plan

Document) at 68, 71 (emphasis in original).

17.     Pursuant to the Plan Document:

> *The term "Medically Necessary" means only those services, treatments or*
> *supplies provided by a Hospital, a Physician, or other qualified provider of*
> *medical services or supplies that are required, in the judgment of the*
> *Trustees based upon the opinion of a qualified medical professional, to*
> *identify or treat a Covered Person's Accident of Illness and which:*
>
> *1.     Are consistent with the symptoms or diagnosis and treatment of*
> *        the eligible individual's condition, disease, ailment or injury,*
>
> *2.     Are appropriate according to standards of good medical practice,*
>
> *3.     Are not solely for the convenience of the Covered Person,*
> *        Physician or Hospital,*
>
> *4.     Are the most appropriate which can be safely provided to the*
> *        Covered Person,*
>
> *5.     Are not deemed to be Experimental or Investigative, and*
>
> *6.     Are not furnished in connection with medical or other research.*

Ex. B (Plan Document) at 110.

18.     On or about January 1, 2009, the Fund entered into a contract known as an

"Administrative Services Agreement" with Defendant ("Agreement"), a true and correct copy of

which is attached hereto as "Exhibit C."  The Agreement was in effect during all periods relevant

to this action.

19.     Pursuant to the Agreement, Defendant agreed to provide various administrative and claims-processing services to the Fund.

20.     Specifically, under Section 4.2 of the Agreement, Defendant "shall make the initial determination as to whether benefit claims submitted by Participants qualify for payment *under the Plan* and shall determine the amount of benefits due and payable *pursuant to the terms of the Plan*. . . . If [Defendant] determines that a claim is payable *under the terms of the Plan*, [Defendant] shall issue a check for payment or otherwise credit the appropriate party with the amount of the benefit payable."  Ex. C (Agreement) § 4.2 (emphases added).

21.     Consistent with the Agreement, Defendant had the authority to and did in fact interpret the terms of the Plan, determine benefit claims, and pay benefit claims with the Fund's plan assets.

22.     Thus, Defendant exercised discretionary authority and discretionary control respecting management of the Fund; exercised authority and control respecting management or disposition of the Fund's assets; and also had discretionary authority and discretionary responsibility in the administration of the Fund.

23.     Indeed, Section 4.9 of the Agreement expressly states that the Fund delegated to Defendant its fiduciary responsibilities concerning the determination and payment of benefit claims submitted to the Fund:

> ***Fiduciary Responsibilities.***  *The Fund delegates to [Defendant] the discretionary authority to make initial benefit claim determinations under the Plan, including, but not limited to, the authority to interpret the terms of the Plan Document, to make factual findings and to determine what constitutes a reasonable and customary charge for benefits covered under the Plan.*

Ex. C (Agreement) § 4.9.

24.     In January 2016, an eligible dependent of a Fund participant ("Eligible Dependent" or "E.D."), was born at Children's Hospital of Philadelphia ("Hospital") in Philadelphia, Pennsylvania, with a congenital diaphragmatic hernia, persistent fetal circulation, and acute respiratory failure.

25.     Upon information and belief, E.D. remained in the Hospital's neonatal intensive care unit for approximately 47 days after birth.

26.     For approximately 33 days during her stay at the Hospital, E.D. was given continuous Inhaled Nitric Oxide treatments.

27.     In or about March 2016, Defendant, on behalf of the Fund, received a claim for E.D.'s in-patient care at the Hospital for approximately $1,377,500 ("Claim"), which included charges of approximately $407,000 attributable to the continuous Inhaled Nitric Oxide treatments.

28.     On or about April 18, 2016, Defendant approved the Claim and paid approximately $753,000 of the Fund's plan assets to the Hospital (or approximately 54.5% of the Hospital's billed charges), which was the contracted amount between Defendant's host plan and the Hospital.  Approximately $221,000 of the $753,000 of the Fund's plan assets that Defendant paid to the Hospital constituted payment for the Inhaled Nitric Oxide treatments.

29.     The Inhaled Nitric Oxide treatments were not "medically necessary" under the terms of the Plan, and thus were not payable by the Fund.

30.     Inhaled Nitric Oxide is medically necessary to treat hypoxic respiratory failure in newborns, but only if the newborn does not have a congenital diaphragmatic hernia.

31.     Because E.D. was born with a congenital diaphragmatic hernia, the use of

Inhaled Nitric Oxide was not "consistent with the symptoms or diagnosis and treatment of the

eligible individual's condition, disease, ailment or injury" under the Plan.  Ex. B (Plan Document)

at 110.

32.     Because E.D. was born with a congenital diaphragmatic hernia, the use of

Inhaled Nitric Oxide was not "appropriate according to standards of good medical practice"

under the Plan.  Ex. B (Plan Document) at 110.

33.     Because E.D. was born with a congenital diaphragmatic hernia, the use of

Inhaled Nitric Oxide was Experimental or Investigative under the Plan because its use was not

recognized as accepted medical practice under the Plan.  Ex. B (Plan Document) at 110.

34.     Because E.D. was born with a congenital diaphragmatic hernia, the use of

Inhaled Nitric Oxide was Experimental or Investigative under the Plan because it was not

supported by Reliable Evidence showing that, as applied to E.D.'s condition, it: (1) was generally

recognized as a safe and effective treatment of the condition by those practicing the

appropriate medical specialty; (2) had a definite positive effect on E.D.'s health outcome; (3)

over time led to improvement in health outcomes under standard means of treatment under

standard conditions of medical practice outside clinical investigatory settings; or (4) was at least

as effective as standard means of treatment in improving health outcomes, or is usable in

appropriate clinical contexts in which standard treatment is not employable under the Plan.  Ex.

B (Plan Document) at 110-11.

35.     The use of Inhaled Nitric Oxide to treat E.D. was therefore not "medically

necessary" under the terms of the Plan.  Thus, when Defendant approved and paid that portion

of the Claim attributable to Inhaled Nitric Oxide (approximately $221,000) it violated the Agreement, the terms of the Plan, and its fiduciary duties under ERISA.

36.     After Defendant paid the Claim with the Fund's plan assets on or about April 18, 2016, the Fund submitted it to the Fund's stop-loss insurance carrier for reimbursement.

37.     In or about August of 2016, the Fund's stop-loss insurance carrier denied coverage for that portion of the Claim attributable to Inhaled Nitric Oxide treatments because they were not medically necessary.

38.     Thereafter, the Fund requested an explanation from Defendant as to its determination that the Inhaled Nitric Oxide treatments were "medically necessary" under the Plan.

39.     In response to the Fund's request for an explanation, Defendant sent a letter to the Fund dated August 29, 2016, stating that it believed there was "coverage potential" for the Inhaled Nitric Oxide treatments; however, Defendant did not meaningfully explain or provide support for its position that such treatments were "medically necessary" under the Plan.

40.     The Inhaled Nitric Oxide treatments provided to E.D. were in fact not medically necessary under the Plan.

**<u>FIRST CAUSE OF ACTION</u>**

**Breach of Fiduciary Duty**
**Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2)**

41.     Plaintiffs restate and reallege the allegations made above in ¶¶ 1-40.

42.     Under Section 502(a)(2) of ERISA, "[a] civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title . . . ."  29 U.S.C. § 1132(a)(2).

43.     Under Section 409(a) of ERISA, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . ."  29 U.S.C. § 1109(a).

44.     Under Section 404(a)(1) of ERISA, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]."  29 U.S.C. § 1104(a)(1).

45.     During all periods relevant to this action, Defendant was a "fiduciary" of the Fund within the meaning of Sections 3(21) of ERISA, 29 U.S.C. §§ 1002(21), because Defendant had the authority to and did in fact interpret the terms of the Plan, determine benefit claims, and pay benefit claims with the Fund's plan assets.  Thus, Defendant exercised discretionary authority and discretionary control respecting management of the Fund; exercised authority and control respecting management or disposition of the Fund's assets; and also had discretionary authority and discretionary responsibility in the administration of the Fund.

46.     Defendant breached its fiduciary duty to the Fund when, on or about April 18, 2016, it approved and paid approximately $221,000 of the Fund's plan assets for that portion of

the Claim attributable to Inhaled Nitric Oxide treatments, which were not "medically

necessary" under the terms of the Plan, and thus not payable under the Plan.

47.     As a result of Defendant's breach of fiduciary duty, the Fund was damaged and

sustained losses to be determined at trial, and Defendant is liable to make good to the Fund all

losses to the Fund resulting from such breach, and to restore to the Fund all profits of

Defendant which have been made through use of assets of the Fund by Defendant, and shall be

subject to such other equitable or remedial relief as the Court may deem appropriate.

### SECOND CAUSE OF ACTION

**Breach of Contract**
**New York Common Law**

48.     Plaintiffs restate and reallege the allegations made above in ¶¶ 1-47.

49.     The Fund and Defendant were parties to a valid and enforceable contract, i.e.,

the Agreement.

50.     Pursuant to Section 4.2 of the Agreement, Defendant was contractually

obligated to determine benefit claims submitted to the Fund and pay claims that were payable

under the terms of the Plan.

51.     Pursuant to the Plan, "[b]enefits WILL NOT be paid for . . . [a]ny treatment,

services or supplies not considered Medically Necessary . . . ."  Ex. B (Plan Document) at 68, 71

(emphasis in original).

52.     Defendant breached the Agreement when, on or about April 18, 2016, it

approved a benefit claim and paid approximately $221,000 of the Fund's assets for Inhaled

Nitric Oxide treatments that were not "medically necessary" under the terms of the Plan, and

thus not payable under the Plan.

53.     As a result of Defendant's breach of the Agreement, Plaintiffs were damaged and sustained losses to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

a.      Enter judgment in favor of Plaintiffs on the First Cause of Action for breach of fiduciary duty under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2);

b.      Order Defendant to make good to the Fund all losses to the Fund resulting from its breach of fiduciary duty under ERISA, and to restore to the Fund all profits of Defendant which have been made through use of assets of the Fund by Defendant;

c.      Order Defendant to provide all equitable or remedial relief arising from its breach of fiduciary duty under ERISA as the Court may deem appropriate;

d.      Awarding reasonable attorney's fees and costs of the litigation to Plaintiffs under Section 502(g) of ERISA, 29 U.S.C. § 1132(g);

e.      Enter judgment in favor of Plaintiffs on the Second Cause of Action for breach of contract under New York law;

f.      Order Defendant to pay to the Fund all damages and other losses resulting from its breach of the Agreement in an amount to be determined at trial, plus interest;

g.      Granting such other and further relief as the Court may deem just and

proper.

Dated: April 4, 2019
        Syracuse, New York                    **BLITMAN & KING LLP**

                                    By:     s/ Brian J. LaClair_____
                                            Brian J. LaClair, Esq. (NDNY Bar No. 515995)
                                            Nolan J. Lafler, Esq. (NDNY Bar No. 520005)
                                            Office and Post Office Address
                                            443 North Franklin Street, Suite 300
                                            Syracuse, New York 13204
                                            Telephone:  (315) 422-7111
                                            Facsimile:  (315) 471-2623
                                            Email:  bjlaclair@bklawyers.com
                                                    njlafler@bklawyers.com

                                            *Attorneys for Plaintiffs Iron Workers Local*
                                            *12 Health Insurance Fund, and John*
                                            *Bissaillon, Scott Allen, Henry Digeser, and*
                                            *Christina Audi, as Trustees of the Iron*
                                            *Workers Local 12 Health Insurance Fund*

# A

RESTATED AGREEMENT AND DECLARATION OF TRUST

of the

IRON WORKERS LOCAL 12 HEALTH INSURANCE FUND

Effective: May 25, 2007

## TABLE OF CONTENTS

Section                                                                                                    Page

### ARTICLE I – DEFINITIONS

1.01   Act.................................................................................................................3
1.02   Agreement and Declaration of Trust..................................................................3
1.03   Association.....................................................................................................3
1.04   Beneficiary.....................................................................................................3
1.05   Benefits..........................................................................................................3
1.06   Collective Bargaining Agreement.....................................................................3
1.07   Contributions..................................................................................................3
1.08   Employees......................................................................................................4
1.09   Employer Trustees..........................................................................................5
1.10   Employers......................................................................................................5
1.11   Health Insurance Plan or Plan.........................................................................6
1.12   Trust, Trust Fund, Health Insurance Fund ........................................................6
1.13   Trustees.........................................................................................................7
1.14   Participant......................................................................................................7
1.15   Policy or Policies ...........................................................................................7
1.16   Union.............................................................................................................7
1.17   Union Trustees ...............................................................................................7

### ARTICLE II – ESTABLISHMENT OF HEALTH INSURANCE FUND

2.01   Establishment.................................................................................................7

### ARTICLE III – EMPLOYERS NOT MEMBERS OF THE ASSOCIATION

3.01   Party to Trust.................................................................................................8
3.02   Scope of Employer..........................................................................................8

### ARTICLE IV – TRUSTEES

4.01   Number .........................................................................................................9
4.02   Acceptance of Trusteeship .............................................................................10
4.03   Term of Trustees ...........................................................................................10
4.04   Resignation ...................................................................................................10
4.05   Power to Remove Trustee...............................................................................10
4.06   Vacancies......................................................................................................10
4.07   Power of Successor Trustee ...........................................................................11

**Section**                                                                     **Page**

4.08  Successor Trustee Acceptance ...................................................................11
4.09  Power to Act in Case of Vacancy .............................................................11
4.10  Power of Board to Remove Trustee ..........................................................11
4.11  Limitation of Liability of Trustees ............................................................12
4.12  Plan Indemnification of Exonerated Fiduciary .........................................12
4.13  Office of the Fund .....................................................................................13
4.14  Officers .....................................................................................................13
4.15  Meetings ...................................................................................................13
4.16  Quorum .....................................................................................................13
4.17  Voting .......................................................................................................13
4.18  Manner of Acting in the Event of Deadlock .............................................13
4.19  Action Without Meeting ...........................................................................14

## ARTICLE V – POWERS AND DUTIES OF TRUSTEES

5.01  Conduct of Trust Business ........................................................................15
5.02  Use of Fund for Expenses .........................................................................15
5.03  Use of Fund to Provide Benefits ...............................................................15
5.04  Investments ..............................................................................................16
5.05  Deposits and Disbursements .....................................................................17
5.06  Allocation and Delegation of Fiduciary Responsibilities .........................17
5.07  Fund Manager ...........................................................................................17
5.08  By-Laws, Rules and Regulations ..............................................................18
5.09  Additional Authority ................................................................................18
5.10  Bonds .......................................................................................................19
5.11  Insurance ..................................................................................................19
5.12  Information to Participants and Beneficiaries............................................19
5.13  Accountants, Consultants and Actuaries...................................................19
5.14  Trustees to Act Without Compensation .....................................................20
5.15  Reports .....................................................................................................20
5.16  Records of Trustee Transactions...............................................................20
5.17  Liability....................................................................................................20
5.18  Reliance on Written Instruments ..............................................................21
5.19  Reliance by Others....................................................................................21
5.20  Discharge of Liability ...............................................................................21
5.21  Establishment of Iron Workers Local 12 Health Insurance
        Plan and Trust ..........................................................................................21
5.22  Establishment of Claims Appeal Procedure ..............................................22
5.23  Plan Interpretations and Determinations...................................................22
5.24  Amendment of Plan ..................................................................................23
5.25  Attendance at Educational Seminars or Conferences ................................23

Section                                                                    Page

ARTICLE VI – CONTRIBUTIONS

6.01   Employer Contributions...................................................................24
6.02   Receipt of Payment and Other Property of Trust...................................25
6.03   Collection and Enforcement of Payments............................................25
6.04   Production of Records....................................................................25
6.05   Effect of Employer's Failure to Maintain Records................................26
6.06   Delinquent Contributions; Expenses of Collection................................26
6.07   Non-Payment by an Employer; Others Still Obligated...........................27
6.08   Plan Assets – Withheld Contributions ..............................................27
6.09   Effect of This Trust Agreement ......................................................27


ARTICLE VII – CONTROVERSIES AND DISPUTES

7.01   Reliance on Records ....................................................................27
7.02   Settling Disputes ........................................................................28


ARTICLE VIII – BENEFICIAL RIGHTS

8.01   No Right, Title or Interest.............................................................28
8.02   Assignment Prohibited..................................................................28
8.03   Inurement Prohibited; Mistaken Contributions ...................................28


ARTICLE IX – ADDITIONAL PARTIES

9.01   Additional Employers...................................................................29
9.02   Mergers ...................................................................................29


ARTICLE X – AMENDMENTS

10.01  Trust Agreement ........................................................................29
10.02  Compliance With ERISA...............................................................30


ARTICLE XI – TERMINATION OF TRUST

11.01  Termination...............................................................................30
11.02  Trustee Duties Upon Termination ...................................................30
11.03  Trustee Powers After Termination....................................................31

Section                                                                              Page

## ARTICLE XII – MISCELLANEOUS

12.01   Conclusive Evidence..............................................................................31
12.02   Reliance By Trustee..............................................................................31
12.03   Plan and Trust Provided Rights ...........................................................31
12.04   Counterparts........................................................................................32
12.05   Enforceability of Trust Provisions.......................................................32
12.06   Designee for Service of Process ..........................................................32

RESTATED AGREEMENT AND DECLARATION OF TRUST
OF THE
IRON WORKERS LOCAL 12 HEALTH INSURANCE FUND

WHEREAS, there has heretofore been entered into an Agreement and Declaration of Trust dated the 28th day of May, 1970, by and between the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers Local No. 12, the Upstate Ironworkers Employers Association, Inc. and Eastern New York Construction Employers, Inc., the Union Trustees and the Employer Trustees, pursuant to which a trust fund for the Iron Workers Local 12 Welfare Fund was established; and

WHEREAS, such Agreement and Declaration of Trust was amended by complete restatement dated October 5th, 1973; and

WHEREAS, by resolution dated July 1, 1987, the Trustees renamed the plan and trust as the "Iron Workers Local 12 Health Insurance Plan and Trust"; and

WHEREAS, such Agreement and Declaration of Trust was amended by complete restatement dated September 21, 1989; and

WHEREAS, under Article X of said Agreement and Declaration of Trust as restated, the Trustees have the power and authority to amend such Agreement and Declaration of Trust from time to time as therein provided; and

WHEREAS, it is determined to be desirable to amend such Agreement and Declaration of Trust and to restate the same once again, so as to incorporate therein all of the amendments adopted heretofore or as part of this restatement;

NOW, THEREFORE, the Trustees, designated and in office, as such, have executed this Restated Agreement and Declaration of Trust as indicating their acceptance of the respective duties imposed upon them as Trustees under the terms of this Agreement, to read as follows:

WHEREAS, the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers Local No. 12, 890 Third Street, Albany, New York 12206 (hereinafter referred to as the "Union") have now and will hereafter have in effect collective bargaining agreements with the Upstate Ironworkers Employers Association, Inc., (hereinafter referred to as the "Association") and with other employers who are not members of the Association (members of the Association and all other employers who have entered or shall hereafter enter into collective bargaining agreements with the Union are hereinafter referred to as "Employers") requiring payments by the Employers into a Trust Fund for the purpose of providing and maintaining benefits for certain Employees pursuant to the Health Insurance Plan formulated and adopted by the Trustees; and

WHEREAS, the Union and Employers agree to be bound by the provisions hereof and shall, upon acceptance of the Trustees, be deemed to be a party to this Agreement and Declaration of Trust; and

WHEREAS, to effect the aforesaid purpose it is desired to establish and maintain a Trust Fund which will conform to the applicable requirements of the Labor-Management Act of 1947, as amended, the Employees Retirement Income Security Act of 1974, as amended, and as an "Exempt Trust" pursuant to the Internal Revenue Code of 1986, as amended; and

WHEREAS, the Trust Fund is to be known as the "Iron Workers Local 12 Health Insurance Fund"; and

WHEREAS, it is desired to set forth the terms and conditions under which the said Fund is to be established and administered; and

WHEREAS, the Trustees have been duly appointed in accordance with the provisions of this Agreement;

NOW THEREFORE, in consideration of the premises and mutual covenants and agreements herein contained, it is hereby agreed as follows:

## ARTICLE I
## DEFINITIONS

1.01 - "Act" as used herein shall mean the Employee Retirement Income Security Act of 1974, any amendments as may from time to time be made and any regulations promulgated pursuant to the provisions of said Act.

1.02 - "Agreement and Declaration of Trust" or "Trust Agreement" shall mean the terms "Restated Agreement and Declaration of Trust", "Agreement and Declaration of Trust" or "Trust Agreement" as used herein shall mean this instrument, including all amendments and modifications as may from time to time be made.

1.03 – Association - The term Association as used herein shall mean the Upstate Ironworkers Employers Association, Inc.

1.04 - "Beneficiary" – shall mean a person designated by a Participant who is or may become entitled to a benefit.

1.05 - "Benefits" shall mean the sickness, basic and major medical, life insurance and such other benefits provided in the Health Insurance Plan.

1.06 - "Collective Bargaining Agreement" shall mean the collective bargaining agreements between Employers and the Union now or hereafter in effect and as hereinafter amended, supplemented or revised.

1.07 - "Contributions" shall mean the contributions made or to be made by Employers to the Health Insurance Fund pursuant to the Collective Bargaining Agreements, and shall also include

contributions made by an Employer pursuant to a written participation agreement as hereafter provided.

1.08 - "Employees" shall mean

      (a)    Any employee represented by the Union and working for an Employer as defined herein, and with respect to whose employment an Employer is required to make contributions into the Trust Fund.

      (b)    Any employee employed by the Union as defined herein, or any officer of the Union, upon whom contributions are made by said Union, even though such employee is not covered by a collective bargaining agreement, provided the receipt of such contribution is pursuant to a participation agreement which is authorized and approved by the Trustees.

      (c)    An employee of an Employer, as defined in subsection (c) of Section 1.10, on whose behalf such Employer is required to make payments or contributions to the Trust Fund as provided in Section 1.12.

      (d)    Any employee of this Trust Fund and any affiliated Annuity, Pension, Education and Training Fund, upon whom contributions are made by said Fund, even though such employee is not covered by a collective bargaining agreement, provided the receipt of such contributions is pursuant to a participation agreement which is authorized and approved by the Trustees.

      (e)    Any officer or employee of an employer association which has contributory Employers as defined herein, upon whom contributions are made by said association, even though such officer or employee is not covered by a collective bargaining agreement, provided the receipt of such contributions is pursuant to a participation agreement which is authorized and approved by the Trustees.

(f)      Any employee employed by an Employer as defined herein, or any officer or shareholder of an Employer, upon whom contributions are made by said Employer, even though such Employee is not covered by a collective bargaining agreement, provided the receipt of such contributions is pursuant to a participation agreement which is authorized and approved by the Trustees.

**NOTE:**       Contributions on behalf of non-bargaining unit employees must be on a non-discriminatory basis.

1.09 - "Employer Trustees" shall mean the Trustees duly appointed by the Association and acting in that capacity.

1.10 - "Employers" shall mean

(a)      An employer who is a member of, or is represented in collective bargaining by, an employer association and who is bound by a collective bargaining agreement with the Union providing for the making of payments to the Trust Fund with respect to employees represented by the Union.

(b)      An employer who is not a member of, nor represented in collective bargaining by an employer association, but who has duly executed or is bound by a collective bargaining agreement with the Union providing for the making of payments to the Trust Fund with respect to employees represented by the Union.

(c)      The Union which, for the purpose of making the required contributions into the Trust Fund, shall be considered as the "Employer" of the Employees of the Union for whom the Union contributes to the Trust Fund.

(d)      An employer who does not meet the requirements of the definition of "Employer" as stated in subsections (a), (b) and (c) of this Section, but who is required to make

-5-

payments or contributions to the Trust Fund as a result of being a signatory to a national agreement or to an international agreement with the International Association of Bridge, Structural and Ornamental Iron Workers.

       (e)    The Trust Fund and any affiliated Annuity, Pension or Education and Training Fund shall be deemed to be an "Employer" within the meaning of this Trust Agreement.

       (f)    Any employer association which has contributory "Employers" as defined herein and which is the employer of its Employees for whom it agrees to contribute to the Fund, provided the receipt of such contributions is authorized and approved by the Trustees.

       (g)    Any employer who agrees to contribute to the Iron Workers Local 12 Health Insurance Fund on behalf of non-bargaining unit employees.  Such participating employers may voluntarily elect to contribute to the Fund on behalf of those corporate officers and/or shareholders, or on behalf of any clerical and/or other non-bargaining unit personnel, subject to approval of such participation by the Trustees.

**NOTE:**    Employers as described in this Section shall, by the making of payments to the Trust Fund pursuant to such collective bargaining or other written agreements, be deemed to have accepted and be bound by this Trust Agreement.

1.11 - "Health Insurance Plan" or "Plan" as used herein shall mean the plan, program, method, rules and procedures for the payment of benefits from the Trust Fund established by this Agreement and Declaration of Trust and amendments thereto.

1.12 - "Trust", "Trust Fund" and "Health Insurance Fund" as used herein shall mean the entire trust estate of the Iron Workers Local 12 Health Insurance Fund as it may, from time to time, be constituted, including, but not limited to all funds received in the form of contributions, together with all Policies and contracts (including dividends, interest, refunds, and other sums payable to

the Trustees on account of such Policies and contracts), all investments made and held by the Trustees, all income, increments, earnings and profits there from, and any and all other property or funds received and held by the Trustees by reason of their acceptance of this Restated Agreement and Declaration of Trust.

1.13 - "Trustees" shall mean the Trustees designated in this Trust Agreement, together with their successors designated and appointed in accordance with the terms of this Trust Agreement. The Trustees collectively, shall be the "Plan Administrator" of this Fund as that term is used in the Act.

1.14 - "Participant" shall mean any Employee as defined herein who has satisfied the requirements for participation as defined in the Plan created pursuant to this Trust Agreement.

1.15 – "Policy" or "Policies" as used herein shall mean the policy or policies of insurance issued pursuant to the provisions of the Health Insurance Plan and accepted by the Trustees as part of the Trust Fund, and shall be deemed to include any amendments or riders attached to such Policy or Policies.

1.16 - "Union" shall mean the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers Local No. 12.

1.17 - "Union Trustees" shall mean the Trustees duly appointed by the Union and acting in that capacity.


## ARTICLE II
## ESTABLISHMENT OF HEALTH INSURANCE FUND

2.01 Establishment - The Trust Fund is created, established and maintained, and the Trustees agree to receive, hold and administer the Trust Fund, for the purpose of providing such benefits as now are, or hereafter may be, authorized or permitted by law for Participants and their

Beneficiaries and in accordance with the provisions set forth herein and in the Iron Workers Local 12 Health Insurance Plan.  It is intended that the Iron Workers Local 12 Health Insurance Plan and Trust be a "multiemployer plan" as that term is defined in Section 3(37)(A) of the Act.

## ARTICLE III
## EMPLOYERS NOT MEMBERS OF THE ASSOCIATION

3.01 Party to Trust - Any employer who is not a member of the Association but who is obligated by a collective bargaining agreement with the Union to make contributions to a Health Insurance Fund under the same terms and conditions as those contained in the collective bargaining agreement between the Union and the Association may become a party to this Trust by executing in writing and depositing with the Trustees its acceptance of the terms of this Agreement and Declaration of Trust. This acceptance must be in a form approved by the Trustees and upon becoming a party to this Trust, such employer assumes all the obligations imposed by this Trust on the signatories thereof, and is entitled to all rights accruing there from to the signatories thereof, as if they had executed this Agreement on the date of their execution of their acceptance of its provisions.

3.02 Scope of Employer - The Union shall be considered an Employer under this Trust solely and exclusively for the purpose of permitting the Union to contribute to the Health Insurance Fund on behalf of its full-time employees who are not represented for collective bargaining purposes by any labor organization other than the Union and to permit such employees to participate in the Health Insurance Plan. In this capacity as an Employer contributing to the Health Insurance Fund, the Union shall have no other rights, privileges or powers as an Employer under this Trust or the Health Insurance Plan. If any situation should arise in which the rules of the Health Insurance Plan are not applicable to the Union or its employees, the Trustees

shall have the power to make appropriate rules and regulations with respect to the Union and its employees.

## ARTICLE IV
### TRUSTEES

4.01 <u>Number</u> - The Trust Fund shall be administered by Trustees, two (2) of whom shall be appointed by the Union and shall act as Union Trustees, and two (2) of whom shall be appointed by the Upstate Ironworkers Employers Association, Inc. and shall act as Employer Trustees. The respective Trustees shall serve at the will of the Union or the Association, respectively, appointing them. Although the parties acknowledge that it is expected that there will be two (2) Employer Trustees and two (2) Union Trustees at all times, the failure of the Association or the Union to have two (2) Trustees in office at all times shall not be deemed a violation of this Restated Agreement and Declaration of Trust. It is further understood and agreed that any imbalance between the number of Employer Trustees and Union Trustees shall have no effect upon the majority voting system as described in Section 4.16 below.

The Trustees are hereby authorized and empowered, in the event that in the opinion of the majority of the Trustees it shall become necessary to increase or decrease the number of Trustees, that in that event, the Board may be enlarged or reduced to such number as shall be deemed proper and sufficient to give adequate representation as in the opinion of the Board of Trustees shall be necessary. Whenever the Board of Trustees shall be enlarged or reduced it shall always be a requirement that equal representation on behalf of the Employer and the Union Trustees shall prevail. When this occurs, the appointment of additional Trustees shall be made as previously provided in this Section.

4.02 <u>Acceptance of Trusteeship</u> - The Trustees shall immediately meet and sign this Restated Trust Agreement which maintains the Fund.  The Trustees, by affixing their signatures at the end of this Restated Trust Agreement, agree to accept the Trusteeship and to act in their capacity strictly in accordance with the provisions of this Trust Agreement. The Trustees upon execution of this Agreement by all of the parties hereto, are vested with all right, title and interest in and to the Trust Fund.

4.03 <u>Term of Trustees</u> – The Trustees shall serve for three (3) years or until a successor trustee shall be designated.

4.04 <u>Resignation</u> - A Trustee may resign and become and remain fully discharged from all further duty or responsibility hereunder by filing with the remaining Trustees and the party by whom he was appointed a written notice to that effect ten (10) days in advance of the date on which the resignation is to take effect. Such resignation shall take effect on the date specified in the notice unless a successor Trustee has been appointed, in which event such resignation shall take effect immediately upon the appointment of the successor Trustee.

4.05 <u>Power to Remove Trustee</u> - The Association at any time may remove an Employer Trustee by filing with the remaining Trustees a written notice to that effect signed by the President of the Association. The Union may remove at any time a Union Trustee by filing with the remaining Trustees a written notice to that effect signed by the President of the Union. Such removed Trustee shall be fully discharged from all further duty and responsibility herein.

4.06 <u>Vacancies</u> - In the event of the termination of the designation of a Trustee or the resignation, death, disqualification, disability or refusal of any Trustee to act, or of a successor to any of them, a successor Trustee shall be designated by the party which appointed his predecessor. In the case of an Employer Trustee, such appointment shall be evidenced by a

notice to that effect signed by the President of the Association. In the case of a Union Trustee, such appointment shall be evidenced by a notice to that effect signed by the President of the Local Union. In the event the Association or Union fails to select a successor Trustee within the time period set forth above for the designation of a successor Trustee, any of the Trustees shall have the right to petition the District Court of the United States for the Northern District of New York for the appointment of a successor Trustee to fill the vacancy.

4.07 Power of Successor Trustee - Any successor Trustee shall immediately upon his appointment as a successor Trustee and his acceptance of Trusteeship in writing, as provided in Section 4.08, become vested with all the property rights, powers and duties of a Trustee hereunder with like effect as if originally named as Trustee without the necessity of any formal conveyance or other instrument of title.

4.08 Successor Trustee Acceptance - A Trustee shall execute a written acceptance in a form satisfactory to the Trustees and consistent with the Act and thereby shall be deemed to have accepted the Trust created and established by this Trust Agreement and to have consented to act as Trustee and to have agreed to administer the Trust Fund as provided herein. Such written acceptance shall be filed with the Trust Fund's Fund Manager.

4.09 Power to Act in Case of Vacancy - No vacancy or vacancies on the Board of Trustees shall impair the power of the remaining Trustees, acting in the manner provided by this Trust Agreement, to administer the affairs of the Trust Fund notwithstanding the existence of such vacancy or vacancies.

4.10 Power of Board to Remove Trustee - The Board of Trustees shall initiate action to cause the removal of any fellow Trustee who may be serving as a Trustee in violation of the Act. The vacancy shall be filled in accordance with Section 4.06 of this Article IV.

4.11 <u>Limitation of Liability of Trustees</u> - No Trustee shall be liable or responsible for his own acts except in accordance with applicable federal law. No successor Trustees shall in any way be liable or responsible for anything done or committed in the administration of the Trust prior to the date they became a Trustee. The Trustees shall not be liable for the act or omissions of any investment manager, attorney, agent or assistant employed by them in pursuance of this Agreement, if such investment manager, attorney, agent or assistant was selected pursuant to this Trust Agreement and such person's performance was periodically reviewed by the Trustees who found such performance to be satisfactory; provided that nothing herein shall relieve any Corporate Trustee of any liability with regard to the performance of its employees.

4.12 <u>Plan Indemnification of Exonerated Fiduciary</u> - The Fund shall reimburse a "Covered Fiduciary" for the "Reasonable Litigation Costs" he incurred in "Breach Litigation", after there has been a final judgment on the merits of such litigation or after the litigation has been dismissed for any reason (including settlement), provided the Covered Fiduciary prevailed in such litigation, but only to the extent the Reasonable Litigation Costs are <u>not</u> covered by the Fund's fiduciary liability insurance coverage policy.  "Covered Fiduciary" means any present or former Trustee of the Fund and any present or former employee of the Fund who, at times relevant to the Breach Litigation, was and/or is an alleged or actual "fiduciary" relative to the Fund (as defined in ERISA).  "Reasonable Litigation Costs" means the reasonable cost of appropriate legal representation of a Covered Fiduciary in Breach Litigation.  "Breach Litigation" means one or more criminal or civil litigation claims (other than a claim that a Covered Fiduciary violated ERISA in a denial of a claim for benefits from the Fund), asserted by the U.S. Secretary of Labor or by any "participant", "beneficiary", or "fiduciary" of the Fund (as those terms are defined in ERISA) against a Covered Fiduciary in a pleading filed in a civil or

criminal action, which allege(s) that the Covered Fiduciary breached a fiduciary responsibility imposed upon him by ERISA and/or the Internal Revenue Code, or otherwise acted improperly in the performance of his duties with respect to the Fund.

4.13 Office of the Fund – The principal office of the Trust Fund shall, so long as such location is feasible, be located and maintained at 890 Third Avenue, Albany, NY 12206.  The location of the principal office shall be made known to the parties interested in the Trust Fund. At such office, and at such other places as may be required by law, there shall be maintained the books and records pertaining to the Trust Fund and its administration.

4.14 Officers - The Trustees shall select from among the Trustees a Chairman.

4.15 Meetings - A Co-Chairman or any two Trustees may call a meeting of the Trustees at any time by giving at least five days' written notice of the time and place thereof to each Trustee. Meetings of the Trustees may also be held at any time without notice if all of the Trustees consent thereto in writing.

4.16 Quorum - A quorum for the transaction of business at any meeting of the Trustees shall consist of at least one Employer and one Union Trustee.

4.17 Voting – Decisions of the Trustees shall be made by a majority vote of the Trustees present provided the said majority is comprised of at least one concurring vote by a Union Trustee and at least one concurring vote by an Employer Trustee.

4.18 Manner of Acting in the Event of Deadlock -

      (a)    A deadlock shall be deemed to exist whenever a proposal, nomination, motion or resolution made or proposed by any one of the Trustees is not adopted or rejected by both units of Trustees and the maker of the proposal, nomination, motion or resolution notifies the remaining Trustees in writing that a deadlock exists.

(b)     In the event of such deadlock arising, the Trustees shall meet for the purpose of agreeing upon an impartial umpire to break such deadlock by deciding the dispute in question.  In the event of the inability of the Trustees to agree upon the selection of such impartial umpire within a reasonable time, then, on the petition of either group of Trustees, the chief judge on duty of the District Court of the United States for the Northern District of New York shall appoint such impartial umpire.  Such impartial umpire shall immediately proceed to hear the dispute between the Trustees and decide such dispute, and the decision and award of such umpire shall be final and binding upon the parties.  The reasonable compensation of such umpire and the costs and expenses (including, without limitation, fees of professionals and other fees) incidental to any proceedings instituted to break a deadlock shall be paid by the Trust Fund.

(c)     Any impartial umpire selected or designated to break a deadlock shall be required to enter his decision within a reasonable time fixed by the Trustees.  The scope of any such proceeding before such impartial umpire shall be limited to the provisions of this Trust Agreement and to the provisions of the rules, regulations and by-laws adopted by the Trustees and to the plan of benefits established by them.  The impartial umpire shall have no jurisdiction or authority to change or modify the provisions of this Trust Agreement or to decide any issue arising under or involving the interpretation of any collective bargaining agreements between the Union and the Employers, and such impartial umpire shall have no power or authority to change or modify any provisions of such collective bargaining agreements.

4.19 Action Without Meeting - The Trustees may act on any matter which may properly come before them without a meeting, provided that such action is in writing and signed by four (4) Trustees after written notice to all of the Trustees.

## ARTICLE V
## POWERS AND DUTIES OF TRUSTEES

5.01 Conduct of Trust Business - The Trustees shall have general supervision of this Fund's operation and shall conduct the Fund's business and activities in accordance with this Trust Agreement and applicable law.  The Trustees shall hold, manage and protect the Fund and collect the income therefrom and contributions thereto.  The Trustees may, in the course of conducting the Fund's business, execute all instruments in the name of the Iron Workers Local 12 Health Insurance Plan and Trust, which instruments shall be signed by at least one Employer and one Union Trustee, provided, however, any one Trustee may execute legal documents to commence and process lawsuits to enforce trust collections on the Trustees' behalf.

5.02 Use of Fund for Expenses - The Trustees shall have the power and authority to use and apply the Fund to pay or provide for the payment of all reasonable and necessary expenses (i) of collecting the Employer contributions and payments and other moneys and property to which they may be entitled and (ii) of administering the Fund's affairs, including:  the employment of administrative, legal, expert and clerical assistance; the purchase or lease of premises, materials, supplies and equipment; and, the performance of such other acts as the Trustees, in their sole discretion, find necessary or appropriate in the performance of their duties.

The Trustees shall also have the discretion and authority to use Plan assets to pay for expenses related to activities that are typically considered settlor in nature, such as activities that relate to the establishment, design, and termination of the plan.  Pursuant to U.S. DOL Field Assistance Bulletin 2002-2, in carrying out such settlor activities, the Trustees will act as fiduciaries and such activities will be governed by the fiduciary provisions of ERISA.

5.03 Use of Fund to Provide Benefits - The Trustees shall also have the power and authority to use and apply the Fund to pay or provide for the payment of health and related benefits to eligible Participants and Beneficiaries in accordance with the terms, provisions and conditions of the Iron Workers Local 12 Health Insurance Plan and Trust formulated and agreed upon hereunder by the Trustees, and pursuant to the provisions of the Act.

-15-

5.04 Investments -

(a)    Investment-Related Authority - The Trustees shall have the power and authority, in their sole discretion, to invest and reinvest such funds as are not necessary for current expenditures or liquid reserves, as they may from time to time determine, in such investments as are legal investments under applicable State and Federal law relating to the investment of assets of multiemployer trust funds.  The Trustees may sell exchange or otherwise dispose of such investments at any time and, from time to time, as provided in Section 5.09(f) of this Article.  The Trustees shall also have power and authority (in addition to, and not in limitation of, common law and statutory authority) to invest in any stocks, bonds or other property, real or personal, including improved or unimproved real estate and equity interests in real estate, where such an investment appears to the Trustees, in their discretion and consistent with their fiduciary obligations, to be in the Fund's best interest, and in the best interest of its Participants and its Beneficiaries, judged by then prevailing business conditions and standards. The Trustees shall have the authority, in respect to any stocks, bonds or other property, real or personal, held by them as Trustees; to exercise all such rights, power and privileges as might be lawfully exercised by any person owning similar stocks, bonds or other property in his own right.

(b)    Delegation and Allocation of Investment Functions

(1)    The Trustees are authorized, in their discretion, by resolution, to allocate to a Finance Committee such duties and responsibilities to invest and reinvest such Fund assets as they shall specify in such allocation.

(2)    The Trustees shall have the power and authority to appoint one or more investment managers who shall be responsible for the management, acquisition, disposition, investment and reinvestment of such of the Fund's assets as the Trustees shall specify.  Any such appointment may be terminated by the Trustees upon proper written notice. The fees of such investment manager, and its expenses to the extent permitted by law, shall be paid out of the Fund.

(3)     In connection with any allocation or delegation of investment functions under paragraphs (1) and (2) of this subsection (b), the Trustees may, from time to time, adopt appropriate investment policies or guidelines.

5.05 Deposits and Disbursements - All Fund assets not invested shall be deposited by the Trustees in such depository or depositories as the Trustees shall from time to time select, and any such deposit or deposits, or disbursements therefrom, shall be made in the Fund's name in the manner designated by the Trustees and upon the signature(s) of persons designated and authorized by the Trustees or by a custodian appointed in accordance with this Trust Agreement's provisions.

5.06 Allocation and Delegation of Fiduciary Responsibilities - The Trustees may, by resolution or by-law or by provisions of this Trust Agreement, allocate fiduciary responsibilities and various administrative duties to committees or subcommittees of the Board of Trustees, and they may delegate such responsibilities and duties to other individuals as they may deem appropriate or necessary in their sole discretion and consistent with the Act.

5.07 Fund Manager - The Trustees may employ or contract for the services of an individual, firm or corporation, to be known as "Fund Manager", who shall, under the Trustees' direction or under the direction of any appropriate committee of the Trustees, administer the Fund's office, coordinate and administer the accounting, bookkeeping and clerical services, provide for the coordination of various services furnished by any consultants to the Fund, prepare (in cooperation where appropriate with any consultant and independent auditor) all reports and other documents to be prepared, filed or disseminated by or on behalf of the Fund in accordance with law, assist in the collection of contributions required to be paid to the Fund by Employers and perform such other duties and furnish such other services as may be assigned, delegated or directed or as may be contracted by or on behalf of the Trustees.  The Fund Manager shall be the custodian on the Trustees' behalf of all documents and other records of the Trustees and of the Fund.

5.08 By-Laws, Rules and Regulations -

(a)     The Trustees are hereby empowered and authorized to adopt by-laws and to promulgate any and all necessary rules and regulations which they deem necessary or desirable to facilitate the Fund's proper administration, provided the same are not inconsistent with the terms of this Trust Agreement. All by-laws, rules and regulations adopted by action of the Trustees shall be binding upon all parties hereto, all parties dealing with the Fund and all persons claiming any benefits hereunder.

(b)     No by-law, regulation, rule, action or determination made or adopted by the Trustees, nor any decision or determination made by any impartial umpire appointed pursuant to Article IV, Section 4.18 of this Agreement, shall in any manner conflict or be inconsistent (1) with this Trust Agreement or (2) with any applicable Federal, State or local law.

5.09 Additional Authority - The Trustees are hereby empowered, in addition to such other powers as are set forth herein or conferred by law,

(a)     to enter into any and all contracts and agreements for carrying out the terms of this Trust Agreement and for the Fund's administration, and to do all acts as they, in their discretion, may deem necessary or advisable, and such contracts and agreements and acts shall be binding and conclusive on the parties hereto and on the Participants and Beneficiaries involved;

(b)     to keep property and securities registered in the name of the Trustees or of the Fund or in the name of any other individual or entity duly designated by the Trustees;

(c)     to establish and accumulate as part of the Trust Fund such reasonable reserve funds as the Trustees, in their sole discretion, deem necessary or desirable to carry out the Fund's purposes;

(d)     to pay out of the Trust Fund all real and personal property taxes, income taxes, and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Fund, or any money, property, or securities forming a part thereof;

(e)     to do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder;

(f)     to sell, exchange, lease, convey, mortgage or dispose of any property, whether real or personal, at any time forming a part of the Fund upon such terms as they may deem proper, and to execute and deliver any and all instruments of conveyance, lease, mortgage and transfer in connection therewith; and

(g)     to establish and carry out a funding policy and method consistent with the objectives of the Plan and with the Act.

5.10 Bonds - The Trustees shall obtain from an authorized surety company such bonds as may be required by law, covering such persons and in such amounts (but not less than required by law) as the Trustees, in their discretion, may determine.  The cost of premiums for such bonds shall be paid out of the Fund.

5.11 Insurance - The Trustees may in their discretion obtain and maintain policies of insurance, to the extent permitted by law, to insure themselves, the Fund as such, as well as employees or agents of the Trustees and of the Fund, while engaged in business and related activities for and on behalf of the Fund (1) with respect to liability to others as a result of acts, errors or omissions of such Trustee or Trustees, employees or agents, respectively, provided such insurance policy shall provide recourse by the insurer against the Trustees as may be required by law and (2) with respect to injuries received or property damage suffered by them.  The cost of the premiums for such policies of insurance shall be paid out of the Trust Fund.

5.12 Information to Participants and Beneficiaries - The Trustees shall provide Participants and Beneficiaries with such information as may be required by the Act.

5.13 Accountants, Consultants, and Actuaries - The Trustees may engage one or more independent qualified public accountants who shall be either a certified public accountant or a licensed public accountant as defined in the Act, and may engage one or more consultants or actuaries to perform all services as may be required by applicable law and such other services as the Trustees may deem necessary.

5.14 Trustees to Act Without Compensation - The Trustees shall act in such capacity without compensation, but they shall be entitled to reimbursement for the expenses properly and actually incurred in the performance of their duties with the Trust Fund, including, without limitation, attendance at meetings and other functions of the Board of Trustees or its committees or while on business of the Board of Trustees, attendance at institutes, seminars, conferences or workshops for or on behalf of the Trust Fund.

However, solely in the Trustees' discretion, any Trustee, who does not receive "full-time pay" (as defined in ERISA Regulation 29 C.F.R. §2550.408 c-2) from an Employer, any association of Employers or from the Union, and is not compensated for time spent at Trustee meetings or for time and services devoted to Fund business, shall be compensated for such time in such amounts which, in the Trustees' opinion, will adequately and reasonably compensate such Trustee for the time spent at Trustee meetings and/or the time and services devoted to Fund business.

5.15 Reports - All reports required by law to be signed by one or more Trustees shall be signed by all of the Trustees, unless otherwise required by applicable law or regulations.  The Trustees may, however, by motion, authorize one or more of their members, or the Fund Manager, to execute documents on their behalf.

5.16 Records of Trustee Transactions - The Trustees shall keep true and accurate books of account and a record of all of their transactions and meetings (including actions taken at such meetings and by informal action of the Trustees), which records and books shall be audited at least annually by an independent qualified public accountant.  A copy of each audit report shall be furnished to the Union and Association and shall be available for inspection by interested persons at the principal office of the Trustees.

5.17 Liability - The Trustees, to the extent permitted by applicable law, shall incur no liability in acting upon any instrument, application, notice, request, signed letter, telegram or other paper or document believed by them to be genuine and to contain a true statement of facts, and to be signed by the proper person.

-20-

5.18 <u>Reliance on Written Instruments</u> - Any Trustee, to the extent permitted by applicable law, may rely upon any instrument in writing purporting to have been signed by a majority of the Trustees as conclusive evidence of the fact that a majority of the Trustees have taken the action stated to have been taken in such instrument.

5.19 <u>Reliance by Others</u> - No party dealing with the Trustees shall be obligated (a) to confirm that any Fund assets are applied for the stated Fund purposes, or (b) to confirm that the terms of this Trust Agreement have been complied with, or (c) to inquire into the necessity or expediency of any act of the Trustees.  Every instrument executed by the Trustees shall be conclusive evidence in favor of every person relying thereon (a) that at the time of the execution of said instrument, the Trust was in full force and effect, (b) that the instrument was executed in accordance with the terms and conditions of this Trust Agreement and (c) that the Trustees were duly authorized and empowered to execute the instrument.

5.20 <u>Discharge of Liability</u> - The receipt by the Trustees for any money or property or checks (after such checks are honored at the bank and paid to the Trust Fund) shall discharge the person or persons paying or transferring the same.

5.21 <u>Establishment of Iron Workers Local 12 Health Insurance Plan and Trust</u> - The Trustees shall formulate an <u>Iron Workers Local 12 Health Insurance Plan and Trust</u> for the payment of such welfare benefits as are feasible and desirable (as determined by the Trustees, in their sole discretion).  Such Iron Workers Local 12 Health Insurance Plan and Trust shall at all times comply with all applicable federal statutes and regulations and with this Trust Agreement's provisions.  The Trustees shall not be under any obligation to pay any benefits if the payment of such benefits will result in loss of the Fund's tax exempt status under the then applicable Internal Revenue Code and any regulations or rulings issued pursuant thereto.  The Trustees shall draft procedures, regulations, and conditions for the operation of the Iron Workers Local 12 Health Insurance Plan and Trust, including, by way of illustration and not limitation:  conditions of eligibility for Participants and Beneficiaries; procedures for claiming benefits; schedules of type and amount of benefits to be paid; and, procedures for the distribution of benefits.  The Trustees

may enter into agreements with other trustees of welfare and health insurance benefit plans which conform to the applicable sections of the then applicable Internal Revenue Code for purposes of tax deductions for the reciprocal recognition of work hour credits and payments of benefits based upon such credits.

5.22 Establishment of Claims Appeal Procedure - The Trustees shall adopt an appropriate and legal claims appeal procedure, such claims appeal procedure to provide adequate notice in writing to any Participant or Beneficiary whose claim for benefits under the Plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the claimant, and shall afford a reasonable opportunity to any claimant whose claim for benefits has been denied for a full and fair review by the appropriately-named fiduciary of the decision denying the claim in accordance with the Act, and in accordance with any regulations promulgated there under.

5.23 Plan Interpretations and Determinations - Notwithstanding any other provision of this Trust Agreement, the Trustees, or their designee, shall have exclusive authority and discretion to:

      (a)     Determine whether an individual is eligible for any benefits under the Iron Workers Local 12 Health Insurance Plan and Trust;

      (b)     Determine the amount of benefits, if any, an individual is entitled to from the Iron Workers Local 12 Health Insurance Plan and Trust;

      (c)     Determine or find facts that are relevant to any claim for benefits from the Iron Workers Local 12 Health Insurance Plan and Trust;

      (d)     Interpret all of the provisions of the Fund's Summary Plan Description booklet;

      (e)     Interpret the provisions of any Collective Bargaining Agreement or written Participation Agreement involving or impacting the Iron Workers Local 12 Health Insurance Plan and Trust;

      (f)     Interpret this Trust Agreement's provisions;

(g)     Interpret all the provisions of any other document or instrument involving or impacting the Iron Workers Local 12 Health Insurance Plan and Trust; and

(h)     Interpret all of the terms used in the Summary Plan Description booklet and all of the other previously mentioned agreements, documents, and instruments.

All such determinations and interpretations made by the Trustees, or their designee:  shall be final and binding upon any individual claiming benefits under the Plan and upon all Employees, all Employers, the Union, and any party who has executed any agreement with the Trustees or the Union; shall be given deference in all courts of law, to the greatest extent allowed by applicable law; and, shall not be overturned or set aside by any court of law unless the court finds that the Trustees, or their designee, abused their discretion in making such determination or rendering such interpretation.

5.24 Amendment of Plan - The Iron Workers Local 12 Health Insurance Plan and Trust and the Fund's Summary Plan Description booklet may be amended by the Trustees from time to time, provided that such amendments comply with all applicable federal statutes and regulations, the contract articles creating the Trust Fund, and this Trust Agreement's purposes.  Additionally and not by way of limitation, the Trustees may amend the Iron Workers Local 12 Health Insurance Plan and Trust, in futuro, or retroactively, where they deem it necessary to maintain the continuation of the Trust Fund's tax exempt status or to preserve compliance with the then applicable Internal Revenue Code, applicable federal statutes, and/or any regulations or rulings issued with respect thereto.

5.25 Attendance at Educational Seminars or Conferences - The Trustees are hereby authorized to attend meetings, seminars and/or educational conferences, the sole purpose of which shall be the disseminating and providing of information in educational matters for the benefit, instruction, aid, and guidance of employee benefit fund trustees, and it is expressly provided that Trustees attending such meetings or conferences shall be reimbursed for all necessary and proper expenses in connection with attending such meetings, seminars, or conferences.

## ARTICLE VI
## CONTRIBUTIONS

6.01 Employer Contributions -

(a)     Each Employer shall make prompt contributions or payments to the Trust Fund in such amount and under the terms as are provided for in the applicable collective bargaining agreement in effect from time to time between the Employer or his bargaining representative and the Union. An Employer may also be required to make contributions in such amount and under such terms as such Employer may be obligated, in writing, to make, provided that such contributions shall be subject to acceptance by the Trustees. The Employer agrees that such contributions shall constitute an absolute obligation to the Trust Fund, and such obligation shall not be subject to set-off or counterclaim which the Employer may have for any liability of the Union or of an Employee.

(b)     Contributions to the Fund shall be paid to the Trustees or to such depository as the Trustees shall designate, only by check, bank draft, money order or other recognized written method of transmitting money or its equivalent, made payable to the order of Iron Workers Local 12 Health Insurance Plan and Trust. The payment of contributions shall be made periodically at such times as the Trustees shall specify by rules and regulations or, if the Trustees so elect, as may be provided in the applicable collective bargaining agreement.

(c)     Each Employer shall be responsible only for the contributions payable by him on account of Employees covered by him, except as may be otherwise provided by law. The Employer shall not be responsible for the contributions, payments or other obligations of any other Employer, or otherwise.

(d)     In the event an Employee employed by an Employer, as defined herein, shall perform work outside of the geographical jurisdiction of the Union, the Employer may continue to make payments to the Trust Fund and the Trustees may accept such payments.

6.02 Receipt of Payment and Other Property of Trust - The Trustees or such other person or entity designated or appointed by the Trustees are hereby designated as the persons to receive the payments heretofore or hereafter made to the Trust Fund by the Employers and Employees.  The Trustees are hereby vested with all right, title and interest in and to such moneys and all interest which may be accrued thereon, and are authorized to receive and be paid the same.

6.03 Collection and Enforcement of Payments - The Trustees, or such committee of the Trustees as the Trustees shall appoint, or the Fund Manager, if one has been appointed and when directed by such committee or by the Trustees, shall have the power to demand, collect and receive Employer payments and all other money and property to which the Trustees may be entitled, and shall hold the same until applied to the purposes provided in this Trust Agreement.  They shall take such steps, including the institution and prosecution of, or the intervention in, such legal or administrative proceedings as the Trustees in their sole discretion determine to be in the best interest of the Trust Fund for the purpose of collecting such payments, money and property, without prejudice, however, to the Union's rights to take whatever steps it deems necessary and wishes to undertake for such purposes.

6.04 Production of Records - Each Employer shall promptly furnish to the Trustees, on demand, the names of any and all of his employees, including union, non-union, bargaining unit and non-bargaining unit employees, their Social Security numbers, the hours worked by each employee and such other information as the Trustees may reasonably require in connection with the Fund's administration and for no other purpose.  The Trustees may, by their respective representatives,

examine the pertinent employment, payroll and related records of each Employer at the Employer's place of business whenever such examination is deemed necessary or advisable by the Trustees in connection with the Fund's proper administration.  The Trustees may require, in the cases of Employers with offices outside the Union's geographical jurisdiction, that the Employer produce said records for examination at the Fund's Office.  The Union shall, upon the Trustees' request, promptly furnish information regarding an Employee's employment status. An Employer's production of records shall be on such other terms as the Trustees may specify by rules and regulations, including payment of any costs and fees incurred in obtaining the audit, such as, without limitation, auditing fees, attorneys' and paralegal fees, and any other costs.

6.05 Effect of Employer's Failure to Maintain Records - In the event the Employer does not maintain or otherwise does not have in its possession records of the number of hours worked by each covered Employee, the Employer agrees that in order to determine the number of hours for which contributions are required to be submitted to the designated Fund, the covered Employee's gross wages shall be divided by the applicable hourly wage rate set forth in the collective bargaining agreement for the covered Employee's job classification, which classification shall be determined by the Trustees after consultation with the Union.

6.06 Delinquent Contributions; Expenses of Collection - The Trustees, in their sole discretion, may require the payment by Employers of liquidated damages and interest (as provided in this Trust Agreement or the separate Collections Policy established by the Trustees) and of other costs and expenses (such as, without limitation, attorneys' fees, paralegals' fees, accountants' or auditors' fees, filing fees and costs of service of papers and all other costs and disbursements) incurred by the Trustees and arising out of the collection of an Employer's delinquent contributions.

6.07 <u>Non-Payment by an Employer; Others Still Obligated</u> - Non-payment by any Employer of any contribution or other moneys owed to the Fund shall not relieve any other Employer from his or its obligation to make required payments to the Trust Fund.

6.08 <u>Plan Assets – Withheld Contributions</u> - Title to all the monies paid into and/or due and owing to the Iron Workers Local 12 Health Insurance Plan and Trust shall be vested in and remain exclusively in the Trustees of that Fund; outstanding and withheld contributions constitute Plan assets. All monies received by an Employer from any source for work performed by Employees represented by the Union shall be held in trust by the Employer. The Employer shall disburse the monies only for the purpose of paying wages owed to the Employees represented by the Union and fringe benefit contributions owed to the Fund on behalf of the Employees' labor. The Employer may not utilize the monies received by it in connection with its Employees' labor for its own obligations or those of its officers, shareholders or directors.

6.09 <u>Effect of This Trust Agreement</u> - To the extent this Trust Agreement conflicts with the terms and provisions of a collective bargaining agreement, the terms and provisions of this Trust Agreement shall govern. If this Trust Agreement conflicts with the terms and provisions of the separate Collections Policy established by the Trustees, the terms and provisions of the separate Collections Policy shall govern.

ARTICLE VII
CONTROVERSIES AND DISPUTES

7.01 <u>Reliance on Records</u> - In any controversy, claim, demand, suit at law or other proceeding between any Participant, Beneficiary or any other person and the Trustees, the Trustees shall be entitled to rely upon any facts appearing in the records of the Fund or the Trustees, any instruments on file with the Trustees, with the Union or with the Employers, any facts certified to

the Trustees by the Union or the Employers, any facts which are of public record and any other evidence pertinent to the issue involved.

7.02 Settling Disputes - The Trustees may in their sole discretion compromise or settle any claim or controversy in such manner as they think best, and any decision made by the Trustees in compromise or settlement of a claim or controversy, or any compromise or settlement agreement entered into by the Trustees, shall be conclusive and binding on all parties interested in this Fund.

ARTICLE VIII
BENEFICIAL RIGHTS

8.01 No Right, Title or Interest - No Employer, nor any Employee of any such Employer, nor the Union, nor any member of the Union, nor any persons claiming by, through or under any of them, shall have any right, title or interest in or to the Trust Estate or any part thereof, except the right of a Participant or his Beneficiary who is covered by benefits in the amount (and subject to the terms and conditions) specified in the Iron Workers Local 12 Health Insurance Plan and Trust, or as may be specified and determined by the Trustees.  No person shall have the option to receive instead of the benefits any part of the Employer contributions.

8.02 Assignment Prohibited – No monies, property or equity of any nature whatsoever, in the Fund, or benefits or monies payable there from, shall be subject in any manner by an Employee or a person claiming through such Employee, to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, levy, mortgage, lien or charge, and any attempt to cause the same to be subject thereto shall be null and void.

8.03 Inurement Prohibited; Mistaken Contributions – The Fund's assets shall never inure to the benefit of any Employer.  In the case of a contribution which is made by an Employer by a

mistake of fact or law, such contribution may be returned by the Trustees to such Employer within six months after the Trustees determine that the contribution was made by mistake but only if a claim is made by the Employer for a refund of such contribution within one year after the contribution was received by the Fund. This shall not entitle any Employer to unilaterally take a credit for any such alleged mistaken contribution. Such credit may only be taken if the Trustees, in their sole discretion, determine that such a mistaken contribution has, in fact, been made, and that such contribution should be returned.

## ARTICLE IX
## ADDITIONAL PARTIES

9.01 Additional Employers - Additional Employers may be admitted to participation in this Fund upon the Trustees' approval. The participation of each additional Employer shall be subject to such terms and conditions as the Trustees may prescribe.

9.02 Mergers - The Trustees are authorized to merge, combine and consolidate with other funds upon any terms and conditions mutually agreed upon by the Trustees of this Fund and such other fund, subject to ERISA's provisions.

## ARTICLE X
## AMENDMENTS

10.01 Trust Agreement - This Trust may be amended at any time by an Instrument in writing duly executed by the Trustees, provided, however, in no event shall the Trust Fund be used for any purpose other than the purposes set forth in the Trust Agreement, and for the purposes of paying the necessary expenses incurred in the administration of this Trust.

10.02 Compliance With ERISA - Notwithstanding the foregoing, the Trustees shall have the authority to amend this Trust Agreement in order to conform with the requirements of ERISA and/or the Internal Revenue Code.

ARTICLE XI
TERMINATION OF TRUST

11.01 Termination – This Agreement and Declaration of Trust may be terminated by an instrument in writing duly executed by the Trustees.

11.02 Trustee Duties Upon Termination - In the event of such termination the Trustees shall:

(a) continue to pay or provide for the payment of any and all liabilities of the Fund, including expenses incurred up to the date of termination of the Trust and the expenses incidental to such termination;

(b) arrange for a final audit and report of their transactions and accounts, for the purpose of termination of their Trusteeship;

(c) give any notice and prepare and file any reports which may be required by law;

(d) notify each Employer and insurance carrier or carriers of the Policy or Policies and continue as Trustees for the purpose of dissolution and taking any action with regard to any Policy or Policies which may be appropriate or required by the insurance carrier or carriers. In any such action by the Trustees, the insurance carrier or carriers may rely upon the signature of a majority of all the Trustees, provided that a certified copy of the duly adopted resolution authorizing such action is promptly forwarded to the insurance carrier or carriers; and

(e) distribute and apply any remaining surplus in accordance with the applicable provisions of ERISA.

11.03 Trustee Powers After Termination - The Trustees may continue to exercise all the title, powers, discretions, rights and duties conferred or imposed upon them by law or by this Trust Agreement after the Fund's termination in whole or in part, until the final distribution of the assets thereof.

## ARTICLE XII
## MISCELLANEOUS

12.01 Conclusive Evidence - No party dealing with the Trustees shall be obligated to see to the application of any funds or property of the Health Insurance Plan or to see that the terms of the Trust or the Health Insurance Plan have been complied with or to inquire as to the necessity or propriety of any act of the Trustees, and every instrument executed by the Trustees shall be conclusive evidence in favor of any person who relies upon it that:

(a)     At the time of the delivery of the instrument this Trust is in full force and effect;

(b)     The instrument was executed in accordance with the terms and conditions of this Trust; and

(c)     The Trustees were duly authorized and empowered to execute the instrument.

12.02 Reliance By Trustee - Any Trustee, to the extent permitted by law, may rely and act in good faith upon any paper or document believed by him to be genuine and believed by him to have been made, executed or delivered by the party purporting to have made, executed and delivered the same, and may rely and act upon the opinion of legal counsel in connection with the administration or execution of this Trust or the Health Insurance Plan.

12.03 Plan and Trust Provided Rights - No person shall have any legal or equitable right or claim under the Health Insurance Plan or against the Association, the Union, any Employer or the

Trustees unless the right is specifically provided in this Trust or in the Health Insurance Plan, as they may be amended from time to time, or is conferred by affirmative action of the Trustees.

12.04 Counterparts - This Trust is made in counterparts any of which shall be deemed the sole original if the others be not produced.

12.05 Enforceability of Trust Provisions - In the event that any of the provisions herein contained shall be declared or held to be invalid or unenforceable, such declaration or adjudication shall not in any manner affect or impair the validity or the enforceability of the other and remaining provisions of this Trust Agreement and such other and remaining provisions shall remain in full force and effect as though such invalid or unenforceable provisions or clauses had not been herein included or made a part hereof.

12.06 Designee for Service of Process - The Board of Trustees is designated as the agent of the Fund upon whom process against the Fund may be served.  The address where any process against the Fund may be served is:


Iron Workers Local 12 Health Insurance Fund
890 Third Avenue
Albany, NY 12206

IN WITNESS WHEREOF, the Trustees have executed this Restated Agreement and Declaration of Trust of the Iron Workers Local 12 Health Insurance Plan on the _13th_ of _September_, 2007, and have evidenced their ratification and consent to be bound by the Trust Agreement created herein, effective as of the _25th_ day of _May_, 2007.

EMPLOYER TRUSTEES:

UNION TRUSTEES:

tag/MRH/IW12HF/RestAgrDeclTrust-VERSION2

-33-

**IRON WORKERS LOCAL NO. 12 HEALTH INSURANCE FUND**

*RESTATED AGREEMENT AND DECLARATION OF TRUST*
*AMENDMENT*

In accordance with Article X, Section 10.01 of the Restated Agreement and Declaration of Trust of the Iron Workers Local No. 12 Health Insurance Fund, the Trustees of the Iron Workers Local No. 12 Health Insurance Fund hereby amend said Restated Agreement and Declaration of Trust by inserting the following in Article IV ["Trustees"], as new Section 4.20 ("Recusal Because of Conflict of Interest"):

> "In the event that a Trustee is required to recuse himself or herself from the consideration of a particular matter due to a conflict of interest, a non-conflicted individual may be appointed, regardless of whether a quorum otherwise exists, to serve in the recusing Trustee's place for the sole purpose of addressing the matter for which recusal was required. If such an appointment is desired, it shall be made by the recusing Trustee. If a non-conflicted individual is so appointed, that individual serves as a fiduciary to the Plan solely with respect to the particular matter, and may consider and vote on the matter as if he or she were a Trustee."

**THIS IS TO CERTIFY** that the foregoing Amendment to the Iron Workers Local No. 12 Health Insurance Fund Restated Agreement and Declaration of Trust was adopted by the Board of Trustees on the _11ᵗʰ_ day of July, 2013, to be effective as of that date.

**TRUSTEES OF IRON WORKERS LOCAL NO. 12 HEALTH INSURANCE FUND**

DATED: _7-11-13_

UNION TRUSTEE
Print
Name: _Garry Simmons_

DATED: _7-11-13_

EMPLOYER TRUSTEE
Print
Name: _Henry Digeser_

{mrh\IW12\HF\AltTrusteeAmd docx}

**RESTATED AGREEMENT AND DECLARATION OF TRUST OF THE
IRON WORKERS LOCAL 12 HEALTH INSURANCE FUND**

**Amendment**

In accordance with the provisions of Article X, Section 10.01, of the Restated Agreement and

Declaration of Trust of the Iron Workers Local 12 Health Insurance Fund, the Trustees of the Iron

Workers Local 12 Health Insurance Fund hereby amend Article V titled "POWERS AND DUTIES OF

TRUSTEES" by adding paragraph (c) to the end of Section 5.04 titled "Investments" to read as follows:

> "(c)  Without limiting the authority of the Trustees, the Trustees (or an
> investment manager appointed by the Trustees, subject to the terms
> and conditions of such appointment) have the authority to invest all or
> any part of the Fund in a group trust meeting the conditions of
> Revenue Ruling 81-100, as modified (a "Group Trust").  To the extent
> that any portion of the Fund is so invested in a Group Trust, the Group
> Trust is made a part of the Fund and is hereby incorporated by
> reference into this Restated Agreement and Declaration of Trust."

THIS IS TO CERTIFY that the foregoing Amendment was adopted by the Board of Trustees of

the Iron Workers Local 12 Health Insurance Fund on the 17th day of January, 2013, to be effective as

implemented.

DATED: __1|17|13__

UNION TRUSTEE

DATED: __1|17|13__

EMPLOYER TRUSTEE

tbn\mrh\IW12Health InsuranceFund\Amendments\TrustAgreement-GroupTrust

**B**

# IRON WORKERS LOCAL 12

# HEALTH INSURANCE FUND

## RESTATED PLAN DOCUMENT

## AND

## SUMMARY PLAN DESCRIPTION

### July 1, 2011 Edition

**COUNSEL**
Blitman & King, LLP

**ACTUARIAL CONSULTANT**
United Actuarial Service

**ACCOUNTANT**
D'Acangelo & Co., LLP

**THIRD PARTY ADMINISTRATORS**

**Medical**
Blueshield of Northeastern NY
1-888-840-6322
www.bsneny.com

**Prescription**
Sav-Rx Prescription Services
1-800-228-3108

**Dental**
Delta Dentalof NY
1-800-932-0738
www.MidAtlanticDeltaDental.com

**For Enrollment and Benefit Information contact:**
Iron Workers Local No. 12 Fringe Benefit Funds
890 Third Street
Albany, NY 12206
518-434-1206
518-434-3466FAX

# A Letter From Your Trustees

Dear Participants and Beneficiaries:

We are pleased to distribute this new restated, Summary Plan Description (benefit booklet) describing the Benefits provided under your Plan.  The Trustees are proud of their achievements in prudently managing the Fund and gratified by the scope of the Benefits provided to Covered Employees and their families.  They will continue to make every effort to maintain the maximum Benefits within the limits of our income for the greatest possible advantage of each Covered Employee and Eligible Dependent.

This booklet contains the general Plan provisions, Eligibility Rules for participation in the Plan, the Benefits provided to those who are eligible, and the procedures which must be followed when filing a claim for Benefits.

There have been a number of changes to the Plan since the last booklet was distributed.  As a result, you should **READ THIS BOOKLET CAREFULLY** so that you are up to date on the current Plan rules and Benefits.

From time to time, other changes and improvements to the Plan may be made.  When this occurs, we will make every attempt to advise you of them.  In order to assist us in keeping you up to date, **IT IS YOUR RESPONSIBILITY TO KEEP THE FUND OFFICE INFORMED OF YOUR CURRENT HOME ADDRESS AT ALL TIMES.** This is the only way to be sure that you receive notice of any Plan changes.

This is your copy of the booklet describing your Plan.  Please take the time to read it in its entirety and refer to it when you have any questions about the Plan.  You should keep this booklet in a safe (but handy) place for future reference.  If, at any time, you have questions about the Plan, please feel free to call or write the Fund Office.  If they do not have the answer, they will be happy to get it for you.

We look forward to serving you.

---

The Board of Trustees shall have full discretion and authority to interpret, construe and apply all terms of the combined Plan Document and Summary Plan Description (SPD), the Amended Trust Agreement and/or any rules and regulations established by the Board of Trustees including, but not limited to, provisions concerning eligibility for, entitlement to and/or nature of amount and duration of benefits, in reaching a decision on the Claimant's request for review of the denial of the claim.
**The decision of the Board is final.**

---

i

# TABLE OF CONTENTS

A Letter From Your Trustees........................................................................................... i

Board of Trustees ........................................................................................................... 1

Filing an Enrollment Statement ..................................................................................... 2

A Word about Confidential Information.......................................................................... 3

Section One – Eligibility................................................................................................. 4

    A.   Initial Eligibility.............................................................................................. 4

    B.   Continuation of Eligibility ............................................................................. 5

    C.   Eligibility for Active Disabled Employees .................................................... 7

    D.   Eligibility for Retired Employees ................................................................. 8

    E.   Eligibility Under the Family and Medical Leave Act.................................... 8

    F.   Effective Date of Dependent Coverage ....................................................... 9

    G.   Termination of Eligibility for Employees.................................................... 10

    H.   Reinstatement of Eligibility ....................................................................... 10

    I.   Termination of Eligibility for Dependents.................................................. 10

    J.   COBRA Continuation Coverage................................................................ 11

    K.   Service in the Armed Forces...................................................................... 16

    L.   Uniformed Services Employment and Reemployment Rights Act (USERRA)... 16

Section Two – Life Events at a Glance........................................................................ 20

Section Three – Schedules of Benefits ....................................................................... 21

    Survivor of Active Eligible Employee Only................................................. 23

Section Four – Medical Benefits.................................................................................. 39

    A.   Alcohol and Substance Abuse Benefit – In-Patient ............................... 39

    B.   Alcohol and Substance Abuse Benefit – Out-Patient .......................... 40

    C.   Ambulance Benefit .................................................................................... 40

    D.   Chiropractic Expense Benefit .................................................................... 40

    E.   Diagnostic X-Ray and Laboratory Benefit ................................................ 41

    F.   Durable Medical Equipment Benefit .......................................................... 41

    G.   Free Standing Surgical Facility Benefit..................................................... 42

    H.   Home Health Care Benefit......................................................................... 42

    I.   Hospice Benefit.......................................................................................... 43

    J.   Hospital Benefit ......................................................................................... 44

    K.   Hospital Emergency Care Benefit ............................................................. 45

L. Hospital Out-Patient Benefit.................................................................. 45

M. Hospital Out-Patient Non-Emergency Care Benefit................................ 45

N. Major Medical Benefit............................................................................ 45

O. Maternity Benefit – Hospital & Nursery ............................................... 46

P. Maternity Benefit – Physician Services................................................. 47

Q. Mental Health Benefit – In-Patient ....................................................... 47

R. Mental Health Benefit – Out-Patient ..................................................... 47

S. Physical Therapy Benefit........................................................................ 48

T. Physician Hospital Visit Benefit ............................................................ 49

U. Surgery – Out-Patient Benefit................................................................ 49

V. Surgery – Second Surgical Opinion Benefit .......................................... 49

W. Wellness Benefit .................................................................................... 49

Section Five – Prescription Drug Benefit ........................................................ 52

Section Six – Vision Benefit.............................................................................. 55

Section Seven – Dental Benefit ........................................................................ 57

Section Eight – Hearing Aid Benefit ................................................................ 60

Section Nine – Employee Life Insurance Benefit............................................. 61

Section Ten – Accidental Death and Dismemberment Benefits........................ 62

Section Eleven – Dependent Survivor Income Benefit ..................................... 64

Section Twelve – Employee Disability Income Benefits ................................... 65

Section Thirteen – Benefit Exclusions and Limitations ................................... 68

Section Fourteen – Claims and Appeal of Denied Claims Procedures............. 74

Section Fifteen – Privacy and Security of Protected Health Information......... 82

Section Sixteen – Administrative Information .................................................. 85

A. Coordination of Benefits........................................................................ 85

B. Determination of Benefits...................................................................... 88

C. Employer Rights to Contributions ......................................................... 89

D. Encumbrance of Benefits ....................................................................... 89

E. Facility of Payment ................................................................................ 89

F. Reciprocity and Portability .................................................................... 89

G. Termination of Plan ............................................................................... 89

H. Right to Release or Request Information ................................................ 90

I. Subrogation of Benefits ......................................................................... 90

J. Communications ..................................................................................... 92

iii

K.   Plan Interpretations and Determination ................................................................ 92

L.   Important Notice ....................................................................................................... 93

M.  Required Disclosures ................................................................................................ 93

N.   Modification of Benefits and Eligibility Rules for Retired Employees and their
     Eligible Dependents .................................................................................................. 93

O.   Required Disclosures ................................................................................................ 94

P.   Dependent Documentation ...................................................................................... 95

Q.   Fraudulent Claim Warning ...................................................................................... 96

Section Seventeen – Your Rights Under Federal Law ..................................................... 97

A.   Receive Information About Your Plan and Benefits ............................................. 97

B.   Continued Group Health Plan Coverage ................................................................ 98

C.   Prudent Actions by Plan Fiduciaries ...................................................................... 99

D.   Enforce Your Rights ................................................................................................. 99

E.   Assistance with your Questions ............................................................................ 100

Section Eighteen – Other Important Information .......................................................... 101

Section Nineteen – Definitions ....................................................................................... 104

A.   Accident .................................................................................................................. 104

B.   Beneficiary .............................................................................................................. 104

C.   Benefits ................................................................................................................... 105

D.   COBRA Continuation Coverage ........................................................................... 105

E.   Collective Bargaining Agreement ......................................................................... 105

F.   Covered Charges .................................................................................................... 105

G.   Covered Employee ................................................................................................. 105

H.   Covered Person ...................................................................................................... 105

I.   Custodial Care ........................................................................................................ 105

J.   Eligible Dependent ................................................................................................ 106

K.   Employee ................................................................................................................ 107

L.   Employer ................................................................................................................. 107

M.  ERISA ...................................................................................................................... 108

N.   Expense Incurred ................................................................................................... 108

O.   Hospice ................................................................................................................... 108

P.   Hospital ................................................................................................................... 109

Q.   Illness ...................................................................................................................... 109

R.   In-Network ............................................................................................................. 109

S.   In-Patient ............................................................................................ 110

T.   Medically Necessary ........................................................................... 110

U.   Mental Disorder .................................................................................. 111

V.   No-Fault Motor Vehicle Plan ............................................................. 111

W.  Out-Patient .......................................................................................... 112

X.   Participant ........................................................................................... 112

Y.   Physician ............................................................................................. 112

Z.   Plan ...................................................................................................... 112

AA.  Retiree ................................................................................................. 112

BB.  Skilled Nursing Facility ..................................................................... 112

CC.  Temporary Disability or Temporarily Disabled ................................ 113

DD.  Trust Agreement ................................................................................. 113

EE.  Trust Fund ........................................................................................... 113

FF.  Trustees ............................................................................................... 113

GG.  Union ................................................................................................... 113

HH.  Usual, Customary and Reasonable Charge (UCR Charge) ................ 113

## <u>Board of Trustees</u>

**Management Trustees**

Henry Digeser
Gould Erectors
Route 9W
PO Box 64
Glenmont, NY  12077

John Gorczynski
Upstate Ironworkers Employers Assoc.
4522 Wetzel Road
Liverpool, NY  13090

**Union Trustees**

Garry Simmons
Iron Workers Local #12 Union Hall
890 Third Street
Albany, NY  12206

William Eggleston
Iron Workers Local #12 Union Hall
890 Third Street
Albany, NY  12206

## <u>Filing an Enrollment Statement</u>

---

**IF YOU HAVE NOT FILED AN ENROLLMENT STATEMENT, DO SO NOW!**

---

The Enrollment Statement requests certain basic information that is needed for your records in the Fund Office. This information is your full legal name and the full legal names of all of your Eligible Dependents, your address, your Social Security number and the Social Security number of all of your Eligible Dependents, if applicable, your date of birth and the dates of birth of all of your Eligible Dependents, and the name of your Beneficiary(ies) in the case of your death.

**All of this information is vital!** Without it, the Fund Office will have difficulty knowing what you and your family are entitled to under the Plan and in keeping you informed about Plan changes.

If you are not sure whether you have an Enrollment Statement on file, contact the Fund Office. The staff will tell you whether you have an Enrollment Statement on file and verify that it contains current information. If you do not have current information on file, an Enrollment Statement will be sent to you for completion and return.

---

**NOTIFY THE FUND OFFICE PROMPTLY WITH ANY CHANGE IN ADDRESS, BENEFICIARY, DEPENDENTS, MARITAL STATUS, RETIREMENT OR MEDICARE ELIGIBILITY.**

---

When there are Plan changes, you will be sent notice of the change. This means that in order to notify you, the Fund Office must have your current address. **IF YOU MOVE,** make sure to notify the Fund Office of your new address. **IF YOUR MARITAL STATUS CHANGES,** don't forget to notify the Fund Office. The Fund Office must receive a complete, signed and dated copy of the marriage certificate, divorce decree or Order of Legal Separation. These documents will be made a permanent part of your file and will be kept in the Fund Office. Failure to send copies of these documents will delay the processing of claims for Benefits.

If you wish to **CHANGE THE NAME OF YOUR BENEFICIARY, DON'T FORGET TO SEND THE CHANGE TO THE FUND OFFICE, IN WRITING ON A FORM PROVIDED BY THE FUND OFFICE.** If you fail to notify the Fund Office of your wishes in writing, the Fund Office will be unable to pay any Death Benefits to anyone other than the person(s) in your latest **written** notification to the Fund Office prior to the time of your death.

If you need to **ADD OR DELETE DEPENDENTS,** you must notify the Fund Office, **in writing**.   You should be prepared to provide documentation in the form of a birth certificate, decree of adoption, marriage license, etc.  Since the Plan provides Benefits to Eligible Dependents, the Fund Office must know who your dependents are at all times.

If the Plan makes any inadvertent, mistaken or excessive payments of Benefits, the Trustees or their representatives shall have the right to recover the payments.

## A Word about Confidential Information

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) provides stringent requirements for the Fund, its Trustees and its service vendors concerning the use and disclosure of Participants personally identifiable 'Protected Health Information' (PHI).  Broadly speaking, PHI includes demographic information about you and/or your dependents, such as your name, address, telephone number and Social Security Number, in conjunction with information concerning you and/or your dependents, such as: (1) eligibility for Benefits, (2) medical treatment provided or (3) payment for such medical treatment.  Specifically, the Plan will use and disclose PHI only for purposes related to health care treatment, payment for health care and health care operations.

The Plan's use and disclosures of PHI is set out in detail in the Privacy Notice previously mailed to you.  If you would like another copy of this notice, please contact the Fund Office.

The Plan and the Trustees are committed to observing these privacy rules and in ensuring the confidentiality of your PHI.  Your cooperation and understanding in working with the Plan to achieve compliance with these federal requirements is appreciated.

## <u>Section One – Eligibility</u>

The following topics are discussed under this Section on Eligibility:

| | | | |
|---|---|---|---|
| A. | Initial Eligibility | G. | Termination of Eligible Employees |
| B. | Continuation of Eligibility | H. | Reestablishment of Eligibility |
| C. | Eligibility for Active Disabled Employees | I. | Termination of Eligibility for Dependents |
| D. | Eligibility for Retirees | J. | COBRA Continuation Coverage |
| E. | Eligibility Under the Family and Medical Leave Act | K. | Service in the Armed Forces |
| F. | Effective Date of Dependent Coverage | L. | Uniformed Services Employment and Reemployment Rights Act (USERRA) |

All Employees working for a contributing Employer or Employers within the various jurisdictions of the Plan for whom sufficient contributions have been paid shall be eligible to receive Benefits after meeting the following eligibility requirements.

A. <u>Initial Eligibility</u>
   The following rules govern obtaining initial eligibility:

   A newly hired Employee will become initially eligible for Benefit coverage on the first day of the month following completion of three consecutive calendar months during which 300 hours or more of Covered Employment is reported.  Upon attaining initial eligibility, the Employee will remain eligible for Benefit coverage until the end of the Benefit Period during which the Employee became eligible.

   The six-month Benefit periods are:

September 1 through February 28 (29)
March 1 through August 31

   Example:  If a newly hired Employee has over 300 hours of Covered Employment reported for the months of February, March and April, the Employee will become eligible for coverage on May 1st.  The Employee will remain eligible for coverage until August 31st (the end of the Benefit Period during which eligibility began ). Whether the Employee remains eligible for coverage after August 31st will depend on the rules for continued eligibility in Subsection B.

B.   Continuation of Eligibility

   1.   General Rule for Continuing Eligibility

      a.   *For the Work Period January 1, 2009 through June 30, 2009 (Benefit Period September 1, 2009 through February 28, 2010):*
      If an Employee has 400 hours of Covered Employment reported during a Work Period (January 1 through June 30) then the Employee will be eligible for coverage during the corresponding Benefit Period (September 1 through February 28).

      b.   *For the Work Period on or after July 1, 2009 (Benefit Periods on or after March 1, 2010):*
      If an Employee has 500 hours of Covered Employment reported during a Work Period (January 1 through June 30 or July 1 through December 31) then the Employee will be eligible for coverage during the corresponding Benefit Period (September 1 through February 28 or March 1 through August 31, respectively).

| Work Period and Hours | Benefit Period |
| --- | --- |
| If the Employee has 500 hours in the Work Period from January 1 through June 30 | The Employee will be eligible for coverage from September 1 through February 28 |
| If the Employee has 500 hours in the Work Period from July 1 through December 31 | The Employee will be eligible for coverage from March 1 through August 31 |

   2.   Look Back Rule for Continued Eligibility

      a.   *For the Work Period January 1, 2009 through June 30, 2009 (Benefit Period September 1, 2009 through February 28, 2010):*
      If an Employee fails to have the required 400 hours of Covered Employment reported during a six-month Work Period, the Employee may still be eligible for coverage if the Employee has 800 hours of Covered Employment in the two Work Periods combined. This rule is called the "look back" rule because it allows the Employee to "look back" at hours reported during the previous Work Periods to remain eligible for coverage during times when work hours are low. The "look back" will only provide continued coverage for one Benefit Period.

| Work Period and Hours | Benefit Period |
|---|---|
| If the Employee has 400 hours in the Work Period from January 1 through June 30<br><br>or<br><br>800 hours in the combined Work Periods from July 1 through June 30 (including at least 100 hours from January 1 through June 30) | The Employee will be eligible for coverage from September 1 through February 28 |

b. *For the Work Period on or after July 1, 2009 (Benefit Periods on or after March 1, 2010):*
   If an Employee fails to have the required 500 hours of Covered Employment reported during a six-month Work Period, the Employee may still be eligible for coverage if the Employee has 1,000 hours of Covered Employment (including at least 250 hours in the current work period) in the two Work Periods combined. This rule is called the "look back" rule because it allows the Employee to "look back" at hours reported during the previous Work Periods to remain eligible for coverage during times when work hours are low. The "look back" will only provide continued coverage for one Benefit Period.

| Work Period and Hours | Benefit Period |
|---|---|
| If the Employee has 500 hours in the Work Period from January 1 through June 30<br>or<br>1,000 hours in the combined Work Periods from July 1 through June 30 (including at least 250 hours from January 1 through June 30) | The Employee will be eligible for coverage from September 1 through February 28 |
| If the Employee has 500 hours in the Work Period from July 1 through December 31<br>or<br>1,000 hours in the combined Work Periods from January 1 through December 31 (including at least 250 hours from July 1 through December 30) | The Employee will be eligible for coverage from March 1 through August 31 |

6

3. Direct Payment Provision

    a. *For the Work Period January 1, 2009 through June 30, 2009 (Benefit Period September 1, 2009 through February 28, 2010):*
The "look back" will only provide continued coverage for one Benefit Period. After that, if an Eligible Employee is reported in Covered Employment for 100 – 399 hours in a Work Period, the Employee may remain eligible for Benefit coverage for the following Benefit Period provided that direct payment is made in an amount (at the then current hourly contribution rate) equivalent to the difference between 400 hours and his or her actual hours of employment reported in the Work Period.

    b. *For the Work Period on or after July 1, 2009 (Benefit Periods on or after March 1, 2010):*
The "look back" will only provide continued coverage for one Benefit Period. After that, if an Eligible Employee is reported in Covered Employment for 100 – 499 hours in a Work Period, the Employee may remain eligible for Benefit coverage for the following Benefit Period provided that direct payment is made in an amount (at the then current hourly contribution rate) equivalent to the difference between 500 hours and his or her actual hours of employment reported in the Work Period.

The Fund Office will notify the Employee by separate letter as to the amount of differential due, and it will be the Employee's responsibility to make proper payments as shown in this notice.

Direct Payments are due by the dates indicated in the notice without any grace period. Failure to pay the proper amounts by the due dates will be cause for immediate termination of Benefit coverage without notice and without reinstatement of the Employee's Benefit coverage.

The Direct Payment Provision is available only for a maximum of two successive Work Periods. **The Direct Payment Provision will not be available if an Employee:**

    a. Is eligible under another group benefit plan, or
    b. Is regularly employed in an occupation other than Covered Employment, or
    c. Is not registered with Iron Worker Local 12 as being ready, willing, able and available for work in Covered Employment.

C. Eligibility for Active Disabled Employees
An eligible Employee will be considered to be in Covered Employment, and receive credit accordingly, if the Employee is unable to work because the Employee is Temporarily Disabled. The disabling injury or Illness must be evidenced by an

approved Workers' Compensation or New York State Disability Benefits claim. Credit during Temporary Disability periods will be as follows:

    a.  The Employee will receive employment credit during such period the Employee is Temporarily Disabled at the rate of 40 hours per week of disability up to a maximum of 26 weeks for all disabilities within any period of three successive Insurance Years,

    b.  Written notice of disability must be sent to the Fund Office prior to the end of the date that the Employee's eligibility would terminate by reason of not having worked in Covered Employment,

    c.  The Employee will not accrue any new Benefits during the period of extended eligibility obtained by the Employee by reason of total disability and must furnish to the Trustees any and all documents, medical or otherwise, required by them.

D.   <u>Eligibility for Retired Employees</u>

An eligible retired Employee meeting each of the following requirements will be entitled to an "additional" six months (one Benefit Period) of eligibility for Benefit coverage provided:

    a.  The Employee is receiving a Retirement benefit from Iron Workers Local 12 Pension Plan, and

    b.  The Employee is eligible for active Employee coverage at their retirement date, and

    c.  The Employee has been continually eligible for active Employee coverage in each of the 60 consecutive months immediately preceding their retirement date.

The "additional" Benefit Period of eligibility for Benefit coverage will commence on the date the Employee's eligibility for active Employee coverage would otherwise terminate, and will terminate at the end of the following Benefit Period.

A retired Employee meeting the above requirements will also be entitled to the special direct-pay Retiree Benefit Plan at the time the "additional" Benefit Period of eligibility for Benefit coverage terminated provided that the retired Employee is not eligible for Medicare or is not entitled to Health Insurance as an employee or dependent provided by another group health program.

E.   <u>Eligibility Under the Family and Medical Leave Act</u>

Pursuant to the requirements of the Family and Medical Leave Act of 1993 (FMLA), eligibility for Benefits shall be extended to Covered Employees and their Eligible Dependents if the Covered Employee has been granted unpaid leave by

his/her Employer pursuant to the FMLA and if the Employer makes the required contributions to the Fund.

If a Covered Employee has been granted FMLA leave, the Employer shall notify the Fund Office at least 14 days before the onset of the leave, except in an emergency, and then no later than seven days after the leave begins, to prevent a loss of eligibility.  The Fund Office shall obtain a certificate of the Covered Employee's eligibility from the Employer.  The Employer shall advise the Fund Office of the beginning date and ending date of the leave.  The Employer shall notify the Fund Office of the date a Covered Employee advises the Employer that he/she does not intend to return to work.

The Employer will be required to pay the cost of continuing coverage in an amount equal to contributions for 25 hours of work per week for each week the Covered Employee is on FMLA leave.  The Employer shall remit payment monthly, in arrears, upon billing by the Fund Office.

Eligibility will not be extended during the FMLA leave if the Employer does not make the required contributions to the Fund.  The usual procedures of the Fund will be followed if the Employer does not make timely contributions and a loss of eligibility will result.  You are not eligible for any Life Insurance, Accidental Death and Dismemberment or Weekly Disability Benefit coverage during FMLA leave.

If you have any questions regarding the FMLA, please contact the Fund Office.

F.   Effective Date of Dependent Coverage
Benefits for Eligible Dependents will become effective on the **latest** of the following dates:

1.  The date the eligible Employee's Benefits become effective, or

2.  The date the eligible Employee or Retiree acquires an Eligible Dependent, or

3.  The date specified in a Qualified Medical Child Support Order.

If an eligible Employee acquires a dependent while eligible for Benefits, the Employee should notify the Fund Office as soon as possible.  No claims will be paid on behalf of an Eligible Dependent until the required documentation has been submitted to the Fund Office.  Coverage will then be retroactive to the date determined above.  If a Retiree acquires a new dependent, the Retiree must notify the Fund Office within 60 days of acquiring an Eligible Dependent, only then will such dependent become covered.

G.   Termination of Eligibility for Employees

  1.   Eligibility will terminate on

    a.   The first day the Employee works for an Employer whose contractual obligation to contribute to the Fund has terminated (termination does not occur if the Employer is negotiating for a new contract and making contributions to the Fund), or

    b.   The first day the Employee works in employment in the jurisdiction of the Fund for an employer that does not have a contractual obligation to contribute to the Fund.

  2.   A review of the hours contributed on behalf of an Employee shall be made prior to September 1 and March 1 of each year.  Eligibility will terminate on either of these dates if:

    a.   The Employee fails to satisfy the requirements set forth under the Continuation of Eligibility as explained in Section One B.,

    b.   The Employee fails to elect COBRA Continuation Coverage,

    c.   The Employee fails to make a required self-payment,

    d.   The Employee becomes eligible for Medicare, or

    e.   The Employee dies.

H.   Reinstatement of Eligibility

If, after becoming initially eligible, a Participant loses his/her eligibility and returns to Covered Employment at any time within the 12 consecutive months following his or her termination date, then his/her eligibility for Benefit coverage will be reinstated the first day of the month following the date he or she has been reported in Covered Employment for 300 or more hours in a Work Period.

If, after becoming eligible, a Participant loses his/her eligibility and has been ineligible for more than 12 months, the Participant will be considered a new Employee and must satisfy the Initial Eligibility Rules (300 hours of Employer contributions in three consecutive months).

I.   Termination of Eligibility for Dependents

The eligibility for Benefits for Eligible Dependents will terminate upon the occurrence of the first of the following:

  1.   The individual fails to satisfy the definition of Eligible Dependent as defined in Section Nineteen, Subsection J.,

2.   The individual fails to elect COBRA Continuation Coverage,

3.   The individual fails to make a required self-payment,

4.   In the case of an eligible spouse of a deceased Retiree, the spouse remarries, or

5.   In the case of an eligible spouse of a Retiree, the spouse becomes eligible for Medicare.

Upon the death of an eligible Employee, the eligibility of that Employee's Eligible Dependents shall terminate at the end of the month.  Thereafter, the eligibility for Benefits will be governed by the COBRA Continuation Coverage provisions.

Upon the death of an eligible Retiree, the eligible spouse shall be allowed to continue coverage for 36 months by self-paying the prevailing COBRA contribution rate.

J.   **COBRA Continuation Coverage**
Federal law requires that sponsors of group health plans such as the Iron Workers Local 12 Health Insurance Fund offer Covered Employees and their families a temporary extension of their health care coverage under the Plan, (called "COBRA Continuation Coverage") in exchange for self-contribution payments to the Plan. The right to an extension of health care coverage was created by federal law, the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).  COBRA Continuation Coverage can become available to you and to other members of your family (the Covered Employee's spouse and dependents under the terms of the Plan) who are covered by the Plan when you would otherwise lose your group health care coverage, as set forth below.

*What is COBRA Continuation Coverage?*
If a Covered Employee or Eligible Dependent loses health care coverage due to a reduction in hours, termination of employment, or certain other events (called qualifying events), the Covered Employee and the Eligible Dependent(s) have the right to elect to continue health care coverage by making premium payments to the Plan.

1.   COBRA Continuation Coverage will be offered to a Covered Employee if coverage under the Plan ends for the following reasons:

   a.   The Covered Employee's hours of employment are reduced, or

   b.   The Covered Employee is terminated from employment for any reason other than the Covered Employee's gross misconduct.

11

2. COBRA Continuation Coverage will be offered to the spouse of a Covered Employee if coverage under the Plan ends for the following reasons:

   a. The Covered Employee's hours of employment are reduced,

   b. The Covered Employee is terminated from employment for any reason other than the Covered Employee's gross misconduct,

   c. The Covered Employee dies,

   d. The Covered Employee becomes enrolled in Medicare, or

   e. The Covered Employee and spouse become legally separated by judicial order of legal separation or divorce.

3. COBRA Continuation Coverage will be offered to an Eligible Dependent child if coverage under the Plan ends for the following reasons:

   a. The Covered Employee's hours of employment are reduced,

   b. The Covered Employee is terminated from employment for any reason other than the Covered Employee's gross misconduct,

   c. The Covered Employee dies,

   d. The Covered Employee becomes enrolled in Medicare,

   e. The Covered Employee and spouse become legally separated by judicial order of legal separation or divorced, or

   f. The dependent child ceases to be an Eligible Dependent as defined under the terms of the Plan.

*How long will COBRA Continuation Coverage last?*

1. <u>18 months</u>
   If the Covered Employee and/or the Eligible Dependent lose coverage due to a reduction in the Covered Employee's hours, or due to the end of the Covered Employee's employment (for reasons other than for gross misconduct), COBRA Continuation Coverage is available for a maximum of up to 18 months.

2. <u>29 months</u>
   If the Covered Employee and/or Eligible Dependent is disabled (as determined under Titles II or XVI of the Social Security Act) at the time his or her coverage would otherwise terminate because of a reduction of hours or termination of employment, or becomes disabled during the initial 60 days of COBRA

Continuation Coverage, and the Fund Office has been notified in writing of the disability prior to the expiration of the initial 18 month period of COBRA Continuation Coverage, the Covered Employee and/or Eligible Dependent and all other covered qualified beneficiaries can receive up to an additional 11 months of COBRA Continuation Coverage, for a total maximum of 29 months of COBRA Continuation Coverage.

3. 36 months
COBRA Continuation Coverage lasts up to 36 months if the Covered Employee's spouse or Eligible Dependent child's health care coverage ends due to:

   a. The Covered Employee and spouse become legally separated by judicial order of legal separation or divorce,

   b. The Covered Employee becomes enrolled in Medicare,

   c. The Covered Employee dies, or

   d. A dependent child ceases to be an Eligible Dependent as defined under the terms of the Plan.

4. Second Qualifying Event
COBRA Continuation Coverage may also be extended for up to 36 months if your family experiences another event, called a "qualifying event" while receiving COBRA Continuation Coverage.   If, while receiving COBRA Continuation Coverage, one of the following events occur, the Covered Employee and/or Eligible Dependent is eligible for an extension of COBRA Continuation Coverage up to a maximum period of 36 months:

   a. The Covered Employee and spouse become legally separated by judicial order of legal separation or divorce,

   b. The Covered Employee becomes enrolled in Medicare,

   c. The Covered Employee dies, or

   d. A dependent child ceases to be an Eligible Dependent as defined under the terms of the Plan.

*Keeping the Fund Office Informed of Changes*
In order to protect your family's rights, the Fund Office should be informed of any changes concerning your family.   The Covered Employee and any Eligible Dependent has the responsibility to notify the Fund Office within 60 days of a divorce, judicial order of legal separation or a dependent child's loss of dependent status.  **Failure to keep the Fund Office informed of these changes may affect**

**your rights to COBRA Continuation Coverage.** While it is the responsibility of the Employer to notify the Fund Office of a reduction in the Covered Employee's hours, termination of employment, enrollment in Medicare, or Covered Employee's death, the Covered Employee or Eligible Dependent should also notify the Fund Office of the event in order to prevent a delay in the start of the COBRA Continuation Coverage.

In the event the Covered Employee or Eligible Dependent becomes disabled during the initial 60 day COBRA continuation period, it is the responsibility of the Covered Employee or Eligible Dependent to notify the Fund Office of the determination of disability. **Failure to notify the Fund Office of a disability determination may affect your right to extend the COBRA Continuation Coverage period due to disability.**

*Electing to Continue Coverage*
When the Fund Office is notified that coverage will end due to a qualifying event, the Covered Employee and Eligible Dependent(s) will be notified of their right to choose the Continuation Coverage. You and your family will be sent a COBRA Election Notice containing information on how to continue your health care coverage and the applicable COBRA premiums. The Covered Employee and Eligible Dependent(s) will then have 60 days from the date on which coverage under the Plan would otherwise terminate, or 60 days from receipt of the Election Notice to elect the Continuation Coverage. If the Covered Employee or Eligible Dependent(s) does not elect the Continuation Coverage within the 60 day election period, coverage under the Plan will end as of the date the coverage would have otherwise ended without regard to the 60 day election period.

Each Eligible Dependent has an independent right to elect COBRA Continuation Coverage. Parents may make the election on behalf of their Eligible Dependents.

If a Covered Employee or the spouse of a Covered Employee has a newborn child, or adopts a child, or has a child placed with him or her for adoption during the COBRA continuation period, this child will be eligible for COBRA Continuation Coverage. The Fund Office must be notified as soon as possible but within 60 days after the birth or placement in order for the child to be added to the COBRA Continuation Coverage.

The COBRA Continuation Coverage offered by the Fund is the same coverage provided under the Plan at the time of termination except for the Life, Accidental Death and Dismemberment and Weekly Disability Benefits.

*Payments*
The amount of the COBRA Continuation Coverage premiums shall be determined by the Trustees.

After the Covered Employee or Eligible Dependent elects to receive COBRA Continuation Coverage, the first premium must be made within 45 days of the election. Failure to make the required premium payments within the initial 45 day period will result in the loss of the COBRA Continuation Coverage.

*Termination of COBRA Continuation Coverage*
COBRA Continuation Coverage will end if any of the following occur:

1. A required self-payment premium for COBRA Continuation Coverage is not made on a timely basis,

2. After the qualifying event, the Covered Employee becomes covered under another group health plan that does not limit or exclude coverage for that Eligible Dependent's pre-existing conditions. If the Eligible Dependent becomes covered by another employer's group health plan and that plan contains a pre-existing condition limitation that affects the Eligible Dependent, the Eligible Dependent's COBRA Continuation Coverage cannot be terminated. However, if the other plan's pre-existing condition rule does not apply to the Eligible Dependent by reason of the Health Insurance Portability and Accountability Act's restrictions on pre-existing condition clauses, the Iron Workers Local 12 Health Insurance Fund may terminate the Eligible Dependent's coverage,

3. The Covered Employee or Eligible Dependent becomes entitled to Medicare,

4. The Fund no longer provides group health care coverage, or

5. The maximum number of months of COBRA Continuation Coverage has been reached, as explained above.

If you (or a family member) elect COBRA continuation coverage and the administrator determines you (and/or a family member) are not entitled to COBRA, then you will be sent a notice that COBRA is unavailable and why.

If you (or a family member's) COBRA continuation coverage are terminated before the end of the maximum period of COBRA coverage applicable to the qualifying event, you will be sent a notice informing you of this and other information required by law.

*Certification of Coverage*
At the time a Covered Employee's coverage ceases under the Plan, the Plan is required to issue a Certificate of Creditable Coverage to the Covered Employee and Eligible Dependents. This Certificate will include all applicable information with respect to the former coverage, including the date Creditable Coverage ended. It is important to keep this Certificate with your other important papers. When the Covered Employee or Eligible Dependents apply for new coverage, this Certificate

will dictate whether or not the new health plan can impose a pre-existing condition exclusion on some or all benefits under the new health plan.

The Certificate of Creditable Coverage is automatically issued when the Fund is notified of a qualifying event and again when any COBRA Continuation of Coverage ceases. In addition, a Certificate will be provided upon request by (or on behalf of) an individual if the request is made within 24 months after the individual lost coverage under the Plan.

K.   Service in the Armed Forces
Each Covered Employee, whose eligibility terminates because of entrance into active duty with the Armed Forces of the United States and who returns to active work with a contributing Employer within the time periods described in Section One, Subsection L.4. below, shall become eligible under this Plan on the date of commencement of such active work, subject to USERRA.

If a Covered Employee's eligibility terminates because of entry into active duty with the Armed Forces of the United States, any Benefits hereunder with respect to any Eligible Dependent of such Covered Employee on the date of such termination shall be continued in force while such dependent continues to be an Eligible Dependent but not beyond the end of the Benefit Period, subject to USERRA.

L.   Uniformed Services Employment and Reemployment Rights Act (USERRA)
The following rules govern your rights under USERRA:

1.   Effective Date
The Uniformed Services Employment and Reemployment Rights Act of 1994 was signed into law on October 13, 1994 to protect the eligibility of an Employee and to offer contribution coverage to the Employee and the Employee's dependents after the Employee enters into Military Service.

2.   Return to Work Coverage Guaranteed
USERRA requires an Employer, or a multi-employer health care plan, to protect any health care Benefits an Employee has already earned up to the time an Employee enters Military Service if the Employee re-applies for work within prescribed time periods after an honorable discharge.

The Employee's eligibility status must be "frozen" when the Employee enters Military Service and must be fully restored when the Employee re-applies for work with the same Employer or, in the case of a multi-employer plan, with any Employer who is signatory to the Collective Bargaining Agreement.

When an Employee returns from Military Service, no exclusion or waiting period may be imposed in connection with the restoration of health care coverage that would not otherwise apply if the Employee had not entered Military Service.

16

3.  Continuation of Coverage While in the Military
    USERRA requires a group health care plan to offer identical health care coverage **up to 24 months** to persons who have coverage in connection with their employment but who are absent from such employment due to Military Service. In effect, Military Service is treated as if it is a "qualifying event" for COBRA purposes.

---

**THE EMPLOYEE MUST NOTIFY THE FUND OFFICE IMMEDIATELY WHEN THE EMPLOYEE KNOWS HE/SHE IS ENTERING MILITARY SERVICE.**

---

If notification of the Fund Office is delayed for several months, the extension of coverage for a maximum of 24 months still begins with the initial date of entry into Military Service and a retroactive payment to that date may be charged. The Employee has an obligation to notify the Fund Office, as soon the Employee knows he/she is entering Military Service **if the Employee wishes to take advantage of continuation coverage. Failure to notify the Fund Office may be taken as an indication that the Employee does not wish to purchase coverage for the Employee or the Employee's dependents.**

4.  Re-employment Requirements when Returning from Military Service
    The application period for re-employment is based on a time schedule keyed to the length of time spent in Military Service.

    *Military Service Less than 31 Days*
    For Military Service of less than 31 days, a Service member must apply for re-employment with a signatory Employer at the beginning of the next regular scheduled work period on the first day after release from Service, taking into account safe transportation plus an eight hour rest period.

    *Military Service More than 31 Days but Less than 181 Days*
    For Military Service of 31 days or more but less than 181 days, an application for re-employment must be filed within 14 calendar days (not work days) after the Service member's release from the Service.

    *Military Service Over 181 Days*
    For Military Service over 181 days, an application for re-employment must be submitted within 90 calendar days (not work days) after an honorable discharge.

5.  Definitions
    **"Health Coverage"** means Hospital, surgical, medical, dental or vision coverage provided under the Plan. Health Coverage is subject to change as a result of Plan modification.

17

**"USERRA"** means the Uniformed Services Employment and Reemployment Rights Act of 1994 (including any amendments to USERRA and any interpretive regulations or rulings).

**"Covered Person"** means a Covered Employee or Eligible Dependent as defined in Section Nineteen, Subsections G and J of this Plan.

**"Service in the Uniformed Services"** or **"Military Service"** means the performance of duty on a voluntary or involuntary basis in a Uniformed Service under competent authority and includes active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, and a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty.

**"Uniformed Services"** means the United States Armed Forces, the Army National Guard and the Air National Guard when engaged in active duty for training, inactive duty training, or full-time National Guard duty, the commissioned corps of the Public Health Service, and any other category of persons designated by the President in time of war or emergency.

6.   Continuation of Group Health Coverage
     If Health Coverage ends because of Service in the Uniformed Services, a Covered Person may elect to continue such Health Coverage, if required by USERRA, until the **earlier** of:

     a.   The end of the period during which the Covered Employee is eligible to apply for reemployment in accordance with USERRA, or

     b.   24 consecutive months after coverage ended.

     To continue coverage, a Covered Person must pay the required premium, unless Service in the Uniformed Service is for fewer than 31 days. The Fund Office shall inform the Covered Person of the procedures to pay premiums. The USERRA premium shall be equal to the COBRA premium.

     A Covered Person's continued Health Coverage under USERRA will end at midnight on the **earliest** of:

     a.   The day the Plan is terminated,

     b.   The day a premium is due and unpaid,

     c.   The day the Covered Person again becomes covered under the Plan, or

     d.  The day the Health Coverage has been continued for the period of time provided above (or any longer period provided in the Plan).

7.   <u>Conflict Resolution</u>
In the event of a conflict between this provision and USERRA, the provisions of USERRA shall apply.

## Section Two – Life Events at a Glance

There are several significant events that may occur while you are covered under the Plan. Please contact the Fund Office, in writing, if any of the following occurs:

> ➢ **YOUR ADDRESS OR TELEPHONE NUMBER CHANGES.**
>
> ➢ **YOU OBTAIN EMPLOYMENT OUTSIDE THE COLLECTIVE BARGAINING AGREEMENT.**
>
> ➢ **YOU MARRY, DIVORCE OR OBTAIN A JUDICIAL ORDER OF LEGAL SEPARATION FROM YOUR SPOUSE.** You must also submit the appropriate legal documents (for example: marriage certificate, divorce decree, custody agreement).
>
> ➢ **YOU CHANGE YOUR BENEFICIARY.**
>
> ➢ **THE STATUS OF A DEPENDENT CHANGES.**
>
> ➢ **YOU BECOME A PARENT.** You must also submit the child's state-certified birth certificate, decree of adoption or a Qualified Medical Child Support Order.
>
> ➢ **YOU ARE RECEIVING NEW YORK STATE DISABILITY BENEFITS.**
>
> ➢ **YOU ARE RECEIVING WORKERS' COMPENSATION BENEFITS.**
>
> ➢ **YOU BECOME ELIGIBLE FOR MEDICARE.**
>
> ➢ **YOU RETIRE.**

## Section Three – Schedules of Benefits

The Plan offers Benefits to the following groups of Participants:

A.   Active Eligible Employees and Eligible Dependents

B.   Retired Participants and Eligible Dependents

The Fund has negotiated special contracts with a network of area Physicians and Hospitals known as a Preferred Provider Organization (PPO).   These participating providers will render services for fees that, in most cases, are below prevailing prices. Providers that are *in* this network are referred to as In-Network.   Providers that are *not in* this network are referred to as Out-of-Network.   Please refer to the appropriate Schedule of Benefits (active Eligible Employees and Eligible Dependents or retired Participants and Eligible Dependents) for details regarding the payment level for all other Benefits.

| | |
|---|---|
| **CALENDAR YEAR DEDUCTIBLES** (*effective 1/1/09*) | |
| *IN-NETWORK* | |
| *Per Person* | $300 |
| *Per Family* | $300 |
| *OUT-OF-NETWORK* | |
| *Per Person* | $600 |
| *Per Family* | $600 |
| **CALENDAR YEAR OUT-OF-POCKET** (PER PERSON) (*effective 8/1/08*) | |
| *IN-NETWORK* | |
| *Individual Limit* | $1,000 |
| *Family Limit* | $2,000 |
| *OUT-OF NETWORK* | |
| *Individual Maximum* | $3,000 |
| *Family Maximum* | $6,000 |

21

| CALENDAR YEAR MAXIMUM (PER PERSON) | |
| --- | --- |
| *Active Employees and Eligible Dependents* | **$200,000** |
| *Retired Participants and Eligible Dependents* | **$50,000** |

Some Benefits are only available to certain individuals.  Please refer to Section Nineteen for clarification between Participant, Covered Person, Covered Employee and Eligible Dependent.

**YOU ARE NOT REQUIRED TO USE AN IN-NETWORK PPO PROVIDER.  COMPLETE FREEDOM OF CHOICE IS YOURS.  HOWEVER, CHOOSING AN IN-NETWORK PPO PROVIDER FOR YOUR HEALTH CARE NEEDS WILL SAVE YOU AND THE FUND MONEY.**

For the most up-to-date In-Network PPO provider information, contact the Third Party Administrator's Customer Service Department at the telephone number on your insurance card.  You may also call the Fund Office at (518) 434-1206.

The Plan has a $200,000 calendar year maximum Benefit per person, for active Eligible Employees and their Eligible Dependents.  The Plan has a $50,000 calendar year maximum Benefit for retired Participants and their Eligible Dependents.

Effective August 1, 2008, the Calendar Year Out-of-Pocket Limit for active Eligible Employees or retired Participants and their Eligible Dependents will be $1,000 when an In-Network provider is used with a family limit of $2,000.  The Calendar Year Out-of-Pocket Limit for active Eligible Employees or retired Participants and their Eligible Dependents will be $3,000 per person when an Out-of-Network provider is used with a family limit of $6,000.

This Out-of-Pocket Limit applies only to Covered Charges.  Once the Out-of-Pocket Limit has been reached within a Calendar Year, Covered Charges in that year will be paid at 100% of Covered Charges up to the Benefit maximum.  The In-Network Physician Office Visit and Hospital Emergency Room Co-Payment or the Calendar Year Deductible does not apply to the Out-of-Pocket Limit, nor does the Out-of-Pocket Limit apply to all Benefits.  Also, the Calendar Year Deductible for Out-of-Network services does not count towards the annual Out-of-Pocket limit.

If a Covered Person utilizes an In-Network provider for a Physician office visit the Covered Person will pay a $20 Co-Payment at the time of service and the Fund will pay 100% of the remaining fees. All other services provided under the Major Medical Benefit will be paid at an In-Network level Co-Insurance payment of 90% (Plan pays) and 10% (Employee pays).

After the Out-of-Network deductible has been satisfied, if a Covered Person utilizes an Out-of-Network provider the services will be paid at an Out-of-Network level Co-Insurance payment of 70% (Plan pays) and 30% (Employee pays).

If a Covered Person utilizes an In-Network Hospital Emergency Room for out-patient treatment of an Emergency the Covered Person will pay a $40 Co-Payment and the Fund will pay 100% of the remaining fees after the Co-Payment. All Out-of-Network services provided under the Hospital Emergency Care Benefit – Out-Patient will be paid at an Out-of-Network level Co-Insurance payment of 70% (Plan pays) and 30% (Employee pays) after the Out-of-Network deductible.

Effective January 1, 2009, the In-Network Calendar Year Deductible for active Eligible Employees or retired Participants and their Eligible Dependents for In-Network providers will be $300 per person with a family maximum of $300. The Out-of-Network Calendar Year Deductible will be $600 per person with a family maximum of $600.

## Schedule of Benefits
## Active Employees and Eligible Dependents

**All Co-Insurance percentages apply to the Usual, Customary and Reasonable Charges allowed by Plan. This Schedule is only a summary of each Benefit listed. A complete description of each Benefit begins in Section Four.**

| BENEFIT | AMOUNT |
|---|---|
| **Accidental Death and Dismemberment Benefit** | $9,000 |
| *Insured by Amalgamated Life Insurance Co.* | |
| **Death Benefit** | $30,000 |
| *Insured by Amalgamated Life Insurance Co.* | |
| **Dependent Survivor Monthly Income Benefit** | |
| *Survivor of Active Eligible Employee Only* | |
| Benefit Amount | $100 |
| Maximum Period | 60 months |
| **Employee Disability Income Benefit** | |
| Basic Disability | |
|     Weekly Benefit Rate | $125 |
|     Maximum Period | 26 weeks |
| Supplemental Disability | |
|     Weekly Benefit Rate | $125 |
|     Maximum Period | 3 weeks |

**Alcohol and Substance Abuse Benefit**
*The Co-Insurance percentages apply only after the Deductible has been met.*

In-Patient Care
*Fund pays*
    In-Network ............................................................................................... 90%
    Out-of-Network.......................................................................................... 70%
*Co-Insurance (Employee pays)*
    In-Network................................................................................................. 10%
    Out-of-Network.......................................................................................... 30%

Out-Patient Care
*Fund pays*
    In-Network ............................................................................................... 90%
    Out-of-Network.......................................................................................... 70%
*Co-Insurance (Employee pays)*
    In-Network................................................................................................. 10%
    Out-of-Network.......................................................................................... 30%

**Ambulance Benefit**
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network ............................................................................................... 90%
    Out-of-Network.......................................................................................... 70%
*Employee pays*
    In-Network................................................................................................. 10%
    Out-of-Network.......................................................................................... 30%

**Chiropractic Expense Benefit**
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
Maximum Benefit per manipulation.............................................................$15
Maximum number of manipulations (per Calendar Year)...............................26 per person

**Dental Benefit**
*Delta Dental Network*

*Fund pays*
    Diagnostic and Preventative Services.................................................... 100%
    All other covered dental benefits ............................................................ 50%

*Employee pays*
    Diagnostic and Preventative Services........................................................ 0%
    All other covered dental benefits ............................................................ 50%

Maximum – calendar year per person.................................................................... Unlimited
Orthodontics – Dependent Maximum – lifetime per person ......................................$1,500
Orthodontics – Adult Maximum – lifetime per person.............................................$1,500
Deductible – calendar year per person..........................................................................$0

## Diagnostic X-Ray and Laboratory Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network ....................................................................................... 90%
    Out-of-Network................................................................................... 70%
*Employee pays*
    In-Network ........................................................................................ 10%
    Out-of-Network................................................................................... 30%

## Durable Medical Equipment Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network ....................................................................................... 90%
    Out-of-Network................................................................................... 70%
*Employee pays*
    In-Network ........................................................................................ 10%
    Out-of-Network................................................................................... 30%

## Free Standing Surgical Facility Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network....................................................................................... 90%
    Out-of-Network................................................................................... 70%
*Employee pays*
    In-Network ........................................................................................ 10%
    Out-of-Network................................................................................... 30%

## Hearing Aid Benefit
Maximum Benefit (per 60 consecutive months)..................................................... $300/unit

## Home Health Care Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network....................................................................................... 90%
    Out-of-Network................................................................................... 70%
*Employee pays*
    In-Network ........................................................................................ 10%

Out-of-Network................................................................................................ 30%
Maximum Annual Visits....................................................................................40

**Hospice Benefit**
*Fund pays*
In-Network or Out-of-Network ............................................................ 100%
Maximum Confinement Period............................................................. 210 days

Bereavement Counseling for a patient's immediate family
*The Co-Insurance percentages apply only after the Deductible has been met.*
*Fund pays*
In-Network ........................................................................................... 90%
Out-of-Network.................................................................................... 70%
Co-Insurance *(Employee pays)*
In-Network........................................................................................... 10%
Out-of-Network.................................................................................... 30%

**Hospital Benefit**
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
In-Network........................................................................................... 90%
Out-of-Network.................................................................................... 70%
*Employee pays*
In-Network........................................................................................... 10%
Out-of-Network.................................................................................... 30%

**Hospital Emergency Care Benefit**
*In-Network Out-Patient Co-Insurance percentage applies after the required Employee*
*Co-Payment and is not subject to Deductible.*
*Employee Co-Payment does not apply to Deductible or Out-of-Pocket Limits.*
*All other Co-Insurance percentages apply only after the Deductible has been met.*

Out-Patient
*Fund pays*
In-Network (after Co-Payment)........................................................... 100%
Out-of-Network.................................................................................... 70%
*Employee pays*
In-Network Co-Payment......................................................................$40
Out-of-Network.................................................................................... 30%

Emergency Admission
*Fund pays*
In-Network........................................................................................... 90%
Out-of-Network.................................................................................... 70%

*Employee pays*
    In-Network .................................................................................. 10%
    Out-of-Network ........................................................................... 30%

## Hospital Out-Patient Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network .................................................................................. 90%
    Out-of-Network ........................................................................... 70%
*Employee pays*
    In-Network .................................................................................. 10%
    Out-of-Network ........................................................................... 30%

## Hospital Out-Patient Non-Emergency Care Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network .................................................................................. 90%
    Out-of-Network ........................................................................... 70%
*Employee pays*
    In-Network .................................................................................. 10%
    Out-of-Network ........................................................................... 30%

## Major Medical Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network .................................................................................. 90%
    Out-of-Network ........................................................................... 70%
*Employee pays*
    In-Network .................................................................................. 10%
    Out-of-Network ........................................................................... 30%

## Maternity Benefit – Hospital & Nursery Care
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network .................................................................................. 90%
    Out-of-Network ........................................................................... 70%
*Employee pays*
    In-Network .................................................................................. 10%
    Out-of-Network ........................................................................... 30%

## Maternity Benefit – Physician Services
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
- In-Network.................................................................................................. 90%
- Out-of-Network........................................................................................... 70%

*Employee pays*
- In-Network.................................................................................................. 10%
- Out-of-Network........................................................................................... 30%

## Mental Health Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

In-Patient Care
*Fund pays*
- In-Network.................................................................................................. 90%
- Out-of-Network........................................................................................... 70%

*Co-Insurance (Employee pays)*
- In-Network.................................................................................................. 10%
- Out-of-Network........................................................................................... 30%

Out-Patient Care
*Fund pays*
- In-Network.................................................................................................. 90%
- Out-of-Network........................................................................................... 70%

*Co-Insurance (Employee pays)*
- In-Network.................................................................................................. 10%
- Out-of-Network........................................................................................... 30%

## Physical Therapy Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
- In-Network.................................................................................................. 90%
- Out-of-Network........................................................................................... 70%

*Employee pays*
- In-Network.................................................................................................. 10%
- Out-of-Network........................................................................................... 30%

## Physician Office Visit
*In-Network Co-Insurance percentage applies after the required Employee Co-Payment and is not subject to Deductible.*
*Employee Co-Payment does not apply to Deductible or Out-of-Pocket Limits.*
*The Out-of-Network Co-Insurance percentage applies only after the Deductible has been met.*

*Fund pays*
- In-Network (after Co-Payment) ............................................................ 100%
- Out-of-Network ....................................................................................... 70%

*Employee pays*
- In-Network Co-Payment .......................................................................... $20
- Out-of-Network ....................................................................................... 30%

## Physician Hospital Visit Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
- In-Network ............................................................................................... 90%
- Out-of-Network ....................................................................................... 70%

*Employee pays*
- In-Network ............................................................................................... 10%
- Out-of-Network ....................................................................................... 30%

## Prescription Drug Benefit
*Employee Co-Payment does not apply to Deductible.*
*Maximum Co-Payment for any one prescription or refill will be $300.*
*Maximum monthly Out-of-Pocket for all prescriptions will be $800 per person.*

Retail Co-Payment *(Employee pays)*
- Level 1 – Generic ................................................... Greater of $5 or 25% of cost of drug
- Level 2 – Preferred Brand Name ......................... Greater of $25 or 25% of cost of drug
- Level 3 – Non-Preferred Brand Name ................ Greater of $40 or 25% of cost of drug
- Maximum days of medication allowed .................. 34 days per person per Co-Payment

Mail Order Co-Payment *(Employee pays)*
- Level 1 – Generic ................................................................................................... $12
- Level 2 – Preferred Brand Name ......................... Greater of $60 or 15% of cost of drug
- Level 3 – Non-Preferred Brand Name .............. Greater of $100 or 15% of cost of drug
- Maximum days of medication allowed .................. 90 days per person per Co-Payment

---

**THE ANNUAL INDIVIDUAL AND FAMILY DEDUCTIBLES DO NOT APPLY TO THE PRESCRIPTION DRUG BENEFIT.**

---

## Surgery – Out-Patient Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
- In-Network ............................................................................................... 90%
- Out-of-Network ....................................................................................... 70%

*Employee pays*
- In-Network ............................................................................................... 10%
- Out-of-Network ....................................................................................... 30%

**<u>Surgery – Second Surgical Opinion Benefit</u>**
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network.................................................................................. 90%
    Out-of-Network........................................................................... 70%
*Employee pays*
    In-Network.................................................................................. 10%
    Out-of-Network........................................................................... 30%

**<u>Vision Benefit</u>**
Maximum Benefit (Normal) ................................................$100 every two calendar years
Maximum Benefit (Sub-Normal).........................................$300 every two calendar years

**<u>Wellness Benefit (Adult & Child)</u>**
*In-Network Co-Insurance percentage applies after the required Employee Co-Payment and is not subject to Deductible.*
*Employee Co-Payment does not apply to Deductible or Out-of-Pocket Limits.*
*All Wellness Benefits are payable for In-Network services only. Benefits are payable only after the required Employee Co-Payment.*

*Fund pays*
    In-Network (after Co-Payment)............................................................. 100%
    Out-of-Network............................................................................... 0%
Co-Payment *(Employee pays)*
    In-Network Physician Office Visit Co-Payment ......................................$20
    Out-of-Network............................................................................... 100%

Maximum Benefit (Calendar Year) *Routine Physical Exam*.......................$300 per person

Maximum Benefit (Calendar Year) *Other Covered Exams*.........................$200 per person
(for services other than annual routine mammographic screening)

Maximum Benefit (Calendar Year) *Annual Routine Mammographic Screening* ....... 100%

Maximum Well Child Benefit
    Eligible Dependent children from birth to 1 year ................................. 6 visits per year
    Eligible Dependent children ages 1 to 2 years....................................... 3 visits per year
    Eligible Dependent children ages 3 to 18 years......................................1 visit per year
    Eligible Dependent children over age 18.............................................. 0 visits per year

# Schedule of Benefits
## <u>Retired Participants not eligible for Medicare and their Eligible Dependents</u>

**All Co-Payment percentages apply to the Usual, Customary and Reasonable Charges allowed by Plan. This Schedule is only a summary of each Benefit listed. A complete description of each Benefit begins in Section Four.**

<u>**BENEFIT**</u>                                                                                      <u>**AMOUNT**</u>

### <u>Alcohol and Substance Abuse Benefit</u>
*The Co-Insurance percentages apply only after the Deductible has been met.*

<u>In-Patient Care</u>
*Fund pays*
    In-Network ........................................................................ 90%
    Out-of-Network.................................................................. 70%
*Co-Insurance (Employee pays)*
    In-Network ........................................................................ 10%
    Out-of-Network.................................................................. 30%

<u>Out-Patient Care</u>
*Fund pays*
    In-Network ........................................................................ 90%
    Out-of-Network.................................................................. 70%
*Co-Insurance (Employee pays)*
    In-Network ........................................................................ 10%
    Out-of-Network.................................................................. 30%

### <u>Ambulance Benefit</u>
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network ........................................................................ 90%
    Out-of-Network.................................................................. 70%
*Employee pays*
    In-Network.......................................................................... 10%
    Out-of-Network.................................................................. 30%

### <u>Chiropractic Expense Benefit</u>
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
Maximum Benefit per manipulation...............................................$15
Maximum number of manipulations (per Calendar Year)..............................26 per person

31

## Diagnostic X-Ray and Laboratory Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network ................................................................................................ 90%
    Out-of-Network............................................................................................ 70%
*Employee pays*
    In-Network ................................................................................................. 10%
    Out-of-Network............................................................................................ 30%

## Durable Medical Equipment Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network ................................................................................................ 90%
    Out-of-Network............................................................................................ 70%
*Employee pays*
    In-Network.................................................................................................. 10%
    Out-of-Network............................................................................................ 30%

## Free Standing Surgical Facility Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network.................................................................................................. 90%
    Out-of-Network............................................................................................ 70%
*Employee pays*
    In-Network.................................................................................................. 10%
    Out-of-Network............................................................................................ 30%

## Home Health Care Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network.................................................................................................. 90%
    Out-of-Network............................................................................................ 70%
*Employee pays*
    In-Network.................................................................................................. 10%
    Out-of-Network............................................................................................ 30%
Maximum Annual Visits..........................................................................................40

**Hospice Benefit**
*Fund pays*

In-Network or Out-of-Network............................................................. 100%

Maximum Confinement Period........................................................ 210 days

Bereavement Counseling for a patient's immediate family
*The Co-Payment percentages apply only after the Deductible has been met.*

*Fund pays*

In-Network........................................................................................ 90%

Out-of-Network................................................................................. 70%

Co-Payment *(Employee pays)*

In-Network........................................................................................ 10%

Out-of-Network................................................................................. 30%

**Hospital Benefit**
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*

In-Network........................................................................................ 90%

Out-of-Network................................................................................. 70%

*Employee pays*

In-Network........................................................................................ 10%

Out-of-Network................................................................................. 30%

**Hospital Emergency Care Benefit**
*In-Network Out-Patient Co-Insurance percentage applies after the required Employee Co-Payment and is not subject to Deductible.*
*Employee Co-Payment does not apply to Deductible or Out-of-Pocket Limits.*
*All other Co-Insurance percentages apply only after the Deductible has been met.*

Out-Patient
*Fund pays*

In-Network (after Co-Payment)......................................................... 100%

Out-of-Network................................................................................. 70%

*(Employee pays)*

In-Network Co-Payment.....................................................................$40

Out-of-Network................................................................................. 30%

Emergency Admission
*Fund pays*

In-Network........................................................................................ 90%

Out-of-Network................................................................................. 70%

*Employee pays*
    In-Network.................................................................................................... 10%
    Out-of-Network............................................................................................. 30%

## Hospital Out-Patient Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network.................................................................................................... 90%
    Out-of-Network............................................................................................. 70%
*Employee pays*
    In-Network.................................................................................................... 10%
    Out-of-Network............................................................................................. 30%

## Hospital Out-Patient Non-Emergency Care Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network .................................................................................................. 90%
    Out-of-Network............................................................................................. 70%
*Employee pays*
    In-Network.................................................................................................... 10%
    Out-of-Network............................................................................................. 30%

## Major Medical Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network.................................................................................................... 90%
    Out-of-Network............................................................................................. 70%
*Employee pays*
    In-Network.................................................................................................... 10%
    Out-of-Network............................................................................................. 30%

## Maternity Benefit – Hospital & Nursery Care
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network.................................................................................................... 90%
    Out-of-Network............................................................................................. 70%
*Employee pays*
    In-Network.................................................................................................... 10%
    Out-of-Network............................................................................................. 30%

## Maternity Benefit – Physician Services
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network .......................................................................................... 90%
    Out-of-Network ................................................................................... 70%

*Employee pays*
    In-Network .......................................................................................... 10%
    Out-of-Network ................................................................................... 30%

## Mental Health Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

In-Patient Care
*Fund pays*
    In-Network .......................................................................................... 90%
    Out-of-Network ................................................................................... 70%
*Co-Insurance (Employee pays)*
    In-Network .......................................................................................... 10%
    Out-of-Network ................................................................................... 30%

Out-Patient Care
*Fund pays*
    In-Network .......................................................................................... 90%
    Out-of-Network ................................................................................... 70%
*Co-Insurance (Employee pays)*
    In-Network .......................................................................................... 10%
    Out-of-Network ................................................................................... 30%

## Physical Therapy Benefit
*The Co-Insurance apply only after the Deductible has been met.*

*Fund pays*
    In-Network .......................................................................................... 90%
    Out-of-Network ................................................................................... 70%
*Employee pays*
    In-Network .......................................................................................... 10%
    Out-of-Network ................................................................................... 30%

## Physician Office Visit

*In-Network Co-Insurance percentage applies after the required Employee Co-Payment and is not subject to Deductible.*
*Employee Co-Payment does not apply to Deductible or Out-of-Pocket Limits.*
*The Out-of-Network Co-Insurance percentage applies only after the Deductible has been met.*

*Fund pays*
    In-Network (after Co-Payment) .......................................................... 100%
    Out-of-Network ................................................................................... 70%
*Employee pays*
    In-Network Co-Payment ..................................................................... $20
    Out-of-Network ................................................................................... 30%

## Physician Hospital Visit Benefit

*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network .......................................................................................... 90%
    Out-of-Network ................................................................................... 70%
*Employee pays*
    In-Network .......................................................................................... 10%
    Out-of-Network ................................................................................... 30%

## Prescription Drug Benefit

*Employee Co-Payment does not apply to Deductible.*
*Maximum Co-Payment for any one prescription or refill will be $300.*
*Maximum monthly Out-of-Pocket for all prescriptions will be $800 per person.*
Retail Co-Payment *(Employee pays)*
    Level 1 – Generic .................................................... Greater of $5 or 25% of cost of drug
    Level 2 – Preferred Brand Name ........................ Greater of $25 or 25% of cost of drug
    Level 3 – Non-Preferred Brand Name ................ Greater of $40 or 25% of cost of drug
    Maximum days of medication allowed .................. 34 days per person per Co-Payment
Mail Order Co-Payment *(Employee pays)*
    Level 1 – Generic ................................................................................................ $12
    Level 2 – Preferred Brand Name ........................ Greater of $60 or 15% of cost of drug
    Level 3 – Non-Preferred Brand Name .............. Greater of $100 or 15% of cost of drug
    Maximum days of medication allowed .................. 90 days per person per Co-Payment

> **THE ANNUAL INDIVIDUAL AND FAMILY DEDUCTIBLES DO NOT APPLY TO THE PRESCRIPTION DRUG BENEFIT.**

## Surgery – Out-Patient Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
 In-Network................................................................................................. 90%
 Out-of-Network.......................................................................................... 70%
*Employee pays*
 In-Network................................................................................................. 10%
 Out-of-Network.......................................................................................... 30%

## Surgery – Second Surgical Opinion Benefit
*The Co-Insurance percentages apply only after the Deductible has been met.*

*Fund pays*
 In-Network................................................................................................. 90%
 Out-of-Network.......................................................................................... 70%

*Employee pays*
 In-Network................................................................................................. 10%
 Out-of-Network.......................................................................................... 30%

## Wellness Benefit (Adult & Child)
*In-Network Co-Insurance percentage applies after the required Employee Co-Payment and is not subject to Deductible.*
*Employee Co-Payment does not apply to Deductible or Out-of-Pocket Limits.*
*All Wellness Benefits are payable for In-Network services only. Benefits are payable only after the required Employee Co-Payment.*

*Fund pays*
 In-Network............................................................................................... 100%
 Out-of-Network............................................................................................ 0%
Co-Payment *(Employee pays)*
 In-Network Physician Office Visit Co-Payment ........................................$20
 Out-of-Network.......................................................................................... 100%

Maximum Benefit (Calendar Year) *Routine Physical Exam*.......................$300 per person

Maximum Benefit (Calendar Year) *Other Covered Exams*..........................$200 per person
(for services other than annual routine mammographic screening)

Maximum Benefit (Calendar Year) *Annual Routine Mammographic Screening* ....... 100%

Maximum Well Child Benefit

Eligible Dependent children age birth to 1 year .................................... 6 visits per year

Eligible Dependent children ages 1 to 2 years....................................... 3 visits per year

Eligible Dependent children ages 3 to 18 years...................................... 1 visit per year

Eligible Dependent children over age 18............................................... 0 visits per year

## Section Four – Medical Benefits

Please read this Section to fully understand your medical Benefits. There are separate Sections that describe the Plan's Prescription Drug Benefit, Dental Benefit, Vision Benefit, Hearing Aid Benefit and Accidental Death and Dismemberment, Death, Dependent Survivor Monthly Income or Employee Disability Income Benefit.

> **NOT ALL BENEFITS ARE AVAILABLE TO ALL COVERED PERSONS. PLEASE CONSULT THE APPLICABLE SCHEDULE OF BENEFITS TO DETERMINE IF YOU OR YOUR DEPENDENTS ARE ELIGIBLE FOR ANY PARTICULAR BENEFIT.**

A. Alcohol and Substance Abuse Benefit – In-Patient

Benefits for In-Patient treatment of alcoholism, chemical dependency or substance abuse are payable according to the Schedule of Benefits for the Usual, Customary and Reasonable Charges for medical expenses for treatment, if such care and services are rendered by:

1. An institution accredited by the Joint Commission of Accreditation of Hospitals as alcoholism treatment programs or facility, or

2. Facilities in New York State which are certified by the Office of Alcoholism and Substance Abuse Services as an alcoholism treatment program.

Covered Charges are:

1. Charges by a Hospital for room and board (semi-private room only),

2. Charges for Effective Treatments which means a program of therapy that is prescribed and supervised by a Physician, has a follow-up therapy program directed by a Physician on at least a monthly basis, or includes meetings at least twice a month with an organization devoted to the treatment of alcoholism.

Benefits for In-Patient treatment of alcohol or drug abuse are **NOT** payable for:

1. Service or treatment rendered by anyone other than an approved facility, or

2. Treatment plans not meeting the requirements of Effective Treatment, or

3. Any charges related to a period of confinement or frequency of treatment which is considered custodial or not reasonable for the diagnosed condition(s).

B.   Alcohol and Substance Abuse Benefit – Out-Patient
     Benefits for Out-Patient treatment of alcoholism, chemical dependency or substance abuse are payable according to the Schedule of Benefits for the Usual, Customary and Reasonable Charges for medical expenses for treatment, if such care and services are rendered by:

     1.  An institution accredited by the Joint Commission of Accreditation of Hospitals as alcoholism treatment programs or facility, or

     2.  Facilities in New York State which are certified by the Office of Alcoholism and Substance Abuse Services as an alcoholism treatment program.

     For assistance with facility or program selection you may contact the New York State AFL-CIO Labor Community Services Agency EAP Program at (518) 436-8516.

     Covered Charges are:

     1.  Charges for Effective Treatments which means a program of therapy that is prescribed and supervised by a Physician, has a follow-up therapy program directed by a Physician on at least a monthly basis, or includes meetings at least twice a month with an organization devoted to the treatment of alcoholism, and

     2.  Out-Patient charges for both Hospital and office visits.

     Benefits for Out-Patient treatment of alcohol or drug abuse are **NOT** payable for:

     1.  Service or treatment rendered by anyone other than an approved facility, or

     2.  Treatment plans not meeting the requirements of Effective Treatment, or

     3.  Any charges related to a period of confinement or frequency of treatment which is considered custodial or not reasonable for the diagnosed conditions(s).

C.   Ambulance Benefit
     Benefits for emergency transportation service by an ambulance service to the nearest Hospital or to the nearest Hospital qualified to provide necessary treatment, and other Medically Necessary professional ambulance (ground or air) transportation to and from a medical facility, will be paid according to the Schedule of Benefits.

D.   Chiropractic Expense Benefit
     Benefits for Chiropractic Expense Benefit will be paid for manual manipulations according to the Schedule of Benefits if the treatment is performed by a licensed chiropractor.

Chiropractic Expense Benefits are **NOT** payable for:

1. Other treatments by a chiropractor including (but not limited to) allergy therapy, diet or hair analysis,

2. Any diagnostic x-ray or laboratory procedure  including (but not limited to) urinalysis or blood chemistry,

3. Nutritional or food supplements and/or vitamins which may be legally obtained without a Physician's prescription,

4. Pillows, supports or similar devices,

5. More than one treatment per day, or

6. Booklets.

Benefit Limitations

Maximum Annual Visits Allowed ...........................................................................26
Maximum Benefit per Visit ................................................................................$15

E.   Diagnostic X-Ray and Laboratory Benefit
Benefits are payable for x-ray and laboratory examinations for the diagnosis of an injury or Illness up to the maximum stated in the Schedule of Benefits for all such examinations made in a calendar year.

Benefit Limitations
Diagnostic X-Ray and Laboratory Benefits are **NOT** payable for dental x-ray, eye examinations, the fitting of eyeglasses or hearing aids.

F.   Durable Medical Equipment Benefit
Benefits for Durable Medical Equipment will be paid according to the Schedule of Benefits.  Durable Medical Equipment must meet each of the following criteria:

1. Is certified, in writing, by the prescribing Physician as necessary in the treatment, habilitation or rehabilitation of a handicapped person,

2. Is primarily and customarily used to serve a medical or rehabilitative purpose rather than primarily for transportation, comfort or convenience.  The fact that the equipment or device is also useful for transportation, comfort or convenience will NOT serve as a disqualifying factor,

3. Is not beyond the appropriate level of performance and quality required under the circumstances (i.e., non-luxury, non-deluxe),

4. Would NOT be necessary in the absence of an Illness or physical or mental disability, and

5. Is appropriate for and intended for use in the home.

Examples of Durable Medical Equipment include equipment to assist mobility, such as a standard wheelchair, a standard Hospital type bed, oxygen concentrator units and the rental of equipment to administer oxygen, delivery pumps for tube feedings, braces that stabilize an injured body part, or mechanical equipment necessary for the treatment of chronic or acute respiratory failure or conditions. Nondurable supplies (i.e. tubing, connectors and masks), repair and maintenance are a Covered Expense when used with Covered Durable Medical Equipment. Requests for Durable Medical Equipment must be accompanied by a Physician's statement describing the Medical Necessity and length of use. Rental of Durable Medical Equipment is covered up to the purchase price. **You should contact Blue Shield of Northeastern New York before purchasing or renting any of these items if you wish to know the cost that will be covered.**

G.  Free Standing Surgical Facility Benefit
Benefits for Free Standing Surgical Facility Benefit will be paid according to the Schedule of Benefits.

H.  Home Health Care Benefit
Benefits for Medically Necessary Home Health Care will be payable according to the Schedule of Benefits. Home Health Care services must be arranged or authorized by a Physician. Benefits are payable for the following as long as it is Medically Necessary, and not Custodial Care:

1. Home nursing care by or under the supervision of a registered nurse, when determined to be Medically Necessary,

2. Part-time intermittent health aide services. Such services must consist primarily of caring for the patient and do not include Custodial Care,

3. Short-term physical and/or speech therapy for acute conditions if provided by home health agency personnel or other qualified providers, if not available through home health agency personnel, and

4. Medical supplies, drugs and medications prescribed by a Physician and laboratory services, to the same extent as would be covered if the person were hospitalized.

Benefit Limitations
Maximum Annual Visits...........................................................................................40

I.  Hospice Benefit
    Benefits, on behalf of a Covered Person, for Covered Services for Hospice Care
    will be paid according to the Schedule of Benefits.

    Hospice Benefits will only be paid if the patient's attending Physician certifies, in
    writing, that the patient is terminally ill and that the patient is expected to die within
    six months or less.

    Covered Charges are:

    1.  Room and board for confinement in a Hospice,

    2.  Services and supplies furnished by the Hospice while the patient is confined
        therein,

    3.  Part-time nursing care by or under the supervision of a Registered Nurse (RN),

    4.  Home Health Aide services,

    5.  Nutrition services,

    6.  Special meals,

    7.  Counseling services by a licensed social worker or a Licensed Mental Health
        Counselor, and

    8.  Bereavement counseling by a licensed social worker or a Licensed Mental
        Health Counselor for a patient's immediate family.

    Hospice Benefits are **NOT** payable for:

    1.  Custodial Care or Services (i.e. room and board or other institutional or nursing
        services which are provided to or for a Covered Person due to the Covered
        Person's age, mental or physical condition) mainly to aid the person in daily
        living, or

    2.  Medical services to maintain the person's present state of health and which
        cannot reasonably be expected to improve the Covered Person's medical
        condition.

    Benefit Limitations
    Hospice Benefits are available only once during a Participant's lifetime.

    Maximum Lifetime Benefit ........................................................................... 210 days

**Bereavement Counseling for a patient's immediate family**
*The Co-Payment percentages apply only after the Deductible has been met.*

*Fund pays*
    In-Network ................................................................................................... 90%
    Out-of-Network ............................................................................................. 70%

Co-Payment *(Employee pays)*
    In-Network ................................................................................................... 10%
    Out-of-Network ............................................................................................. 30%

J.    Hospital Benefit
    In-Patient Hospital Benefits covered by this Plan apply to the reasonable expenses incurred for acute care of Illness, disease, or Accident, after which the Covered Person returns to his or her normal or previous state and level of activity. In-Patient Hospital Benefits will be paid according to the Schedule of Benefits. Covered Expenses include, but are not limited to:

    1.  Semi-Private room and board expenses, and

    2.  Medically Necessary charges made by the Hospital for other services during necessary confinement such as:  special diets, general nursing service (does not include special or private nursing), use of operating, recovery, intensive care, and cystoscopic rooms and equipment, laboratory, x-ray and pathology examinations, therapy and radioactive isotopes, basal metabolism test, use of cardiographic equipment, oxygen and use of equipment for administration, prescribed evidence that local conditions make it necessary to incur expenses for blood and blood plasma, use of transfusion equipment, physiotherapy and hydrotherapy by a Hospital staff employee and use of therapeutic equipment.

    Period of Hospitalization
    All Hospital confinements will be considered as continuous during one period of disability unless acceptable evidence is furnished that:

    1.  The causes of the latest confinement cannot be connected with the causes of any of the prior confinements, or

    2.  The Employee or Eligible Dependent has recovered completely from all of the causes of such prior Hospital confinements, or

    3.  The Employee has returned to active work for at least one full day, or the Eligible Dependent has not been confined at least 90 days.

Extended Hospital Benefits

Hospital Benefits are available after termination of eligibility if the Employee or Eligible Dependent remains hospitalized from the date eligibility terminates and applies only to the specific Accident or Illness which was incurred prior to termination of eligibility. Benefits are payable for a period not to exceed three months from the eligibility termination date.

K. Hospital Emergency Care Benefit

Benefits will be covered according to the Schedule of Benefits for Hospital Emergency Care Benefits.

L. Hospital Out-Patient Benefit

Benefits will be covered according to the Schedule of Benefits for all Medically Necessary services in the Out-Patient department of a Hospital. Covered Charges include, but are not limited to:

1. Charges made for diagnostic tests and examinations including routine annual mammographic screening,

2. Charges made for radiation therapy, chemotherapy treatment and cancer hormone therapy.

M. Hospital Out-Patient Non-Emergency Care Benefit

Benefits will be covered according to the Schedule of Benefits for Hospital Out-Patient Non-Emergency Care Benefits.

N. Major Medical Benefit

Benefits are payable for Medically Necessary treatment or services provided by a Physician. Covered Expenses include, but are not limited to:

1. Charges made for the professional services of a Physician for home, office and Hospital medical services

2. Charges made for Registered Graduate Nurse, Licensed Practical Nurse, Licensed Vocational Nurse and Certified Nurse Aide services,

3. Charges for artificial limbs, eyes and other prosthetic devices,

4. Charges for casts, splints, trusses, crutches and braces (except dental braces),

5. Charges for oxygen and rental of its equipment for its administrations. The Benefit for renting will not exceed the purchase cost,

6. Charges for blood, blood plasma and blood storage,

7. Charges for hemodialysis,

45

8. Charges for treatment of facial pain including any condition that is diagnosed as orificial pain, tempromandibular joint syndrome (TMJ), myofacial pain dysfunction syndrome (MPD), facial and mandibular dysfunction, Casten's syndrome, cranioservicalmandibular syndrome and craniofacial pain and dysfunction,

9. Charges for othoptic therapy to a maximum of $45 each session for a lifetime maximum of 25 sessions,

10. Charges for orthotic devices, except for charges for devices sold over-the-counter,

11. Charges for Medically Necessary services provided by a licensed podiatrist,

12. Diabetic supplies,

13. Routine foot care procedures provided by a licensed podiatrist for diabetic treatment and impressions casts for prosthetics and appliances, including prescriptions for orthotics, and

14. Dietary supplements for infants up to age 1, if they are Medically Necessary and prescribed by a Physician.   The In-Network Physician's Office Visit Co-Payment is required for In-Network services,

15. Mammograms for Eligible Females under Age 40 with a Physician's written request.

O.   <u>Maternity Benefit – Hospital & Nursery</u>
Hospital and Nursery Maternity Benefits include all maternity-related medical services for In-Patient Hospital and nursery charges.

Covered Charges are:

1.   In-Patient stay of at least 48 hours for the mother and newborn child following a vaginal delivery.

2.   In-Patient stay of at least 96 hours for the mother and newborn child following a cesarean section delivery.

**If the mother agrees, the attending Physician may discharge the mother and/or the newborn child earlier than these minimum time frames.**

P.   Maternity Benefit – Physician Services
     Physician Service Maternity Benefits include all maternity-related Physician services for prenatal care, postnatal care, delivery and any related complications.

Q.   Mental Health Benefit – In-Patient
     Benefits for expenses incurred by a Covered Person for In-Patient treatment prescribed by a legally qualified professional for mental or nervous Illness will be paid according to the Schedule of Benefits for Medically Necessary care and services.

     Covered Charges are:

     1.  Mental health evaluations and assessment,

     2.  Diagnosis,

     3.  Treatment planning,

     4.  Referral services,

     5.  Medication management,

     6.  Short-term individual, family and group therapeutic services (including intensive Out-Patient therapy),

     7.  Crisis intervention,

     8.  Psychological testing,

     9.  Behavioral, conduct or impulse control disorders.

     Mental Health Benefits are **NOT** payable for:

     1.  Service or treatment rendered by anyone other than a Physician, or

     2.  Any charges related to a period of confinement or frequency of treatment which is considered custodial or not reasonable for the diagnosed condition(s).

R.   Mental Health Benefit – Out-Patient
     Benefits for expenses incurred by a Covered Person for Out-Patient treatment prescribed by a legally qualified professional for mental or nervous Illness will be paid according to the Schedule of Benefits for Medically Necessary care and services.

Covered Charges are:

1. Mental health evaluations and assessment,

2. Diagnosis,

3. Treatment planning,

4. Referral services,

5. Medication management,

6. Short-term individual, family and group therapeutic services (including intensive Out-Patient therapy),

7. Crisis intervention,

8. Psychological testing,

9. Behavioral, conduct or impulse control disorders.

Mental Health Benefits are **NOT** payable for:

1. Service or treatment rendered by anyone other than a Physician, or

2. Any charges related to a period of confinement or frequency of treatment which is considered custodial or not reasonable for the diagnosed condition(s).

S.  <u>Physical Therapy Benefit</u>
Physical Therapy for an injury or Illness shall be **considered** under the Plan according to the Schedule of Benefits, provided Blue Shield of Northeastern New York (the TPA) receives a complete plan of treatment from a referring Physician. The plan of treatment submitted to the TPA must include:

1. Diagnosis,

2. Type of treatment, and

3. Anticipated length of treatment.

<u>Benefit Limitations</u>
Your Physician should submit the plan of treatment to the TPA **before** beginning any physical therapy.

T.   Physician Hospital Visit Benefit
Benefits are payable for Physician office visits or Hospital visits according to the Schedule of Benefits.  Covered Expenses include, but are not limited to:

1.  Charges made for the professional services of a surgeon performing a surgical procedure,

2.  Charges made for the professional services of a Physician in rendering technical assistance to the operating surgeon in connection with a surgical procedure with the eligible covered expense limited to 25% of the applicable surgical allowance for the operation performed,

3.  Charges made for the professional services of a legally qualified anesthetist.

U.   Surgery – Out-Patient Benefit
If surgery is recommended by a Physician and can be performed on an Out-Patient basis, charges will be covered according to the Schedule of Benefits.

V.   Surgery – Second Surgical Opinion Benefit
When a Covered Person wishes to secure a second opinion regarding the Medical Necessity for an In-Patient Surgical Procedure of a non-emergency nature, the Plan will pay the Physician's fee according to the Schedule of Benefits provided:

1.  The Covered Person is examined in person by a board certified specialist, and the specialist Physician submits a written report of findings and recommendation, and

2.  The specialist Physician has no relationship with the Physician(s) who rendered prior opinions or who performs or assists in the Surgical Procedure.

If surgery is performed after the second surgical opinion, the Fund will pay the surgical fees under the Hospital Benefit.

W.   Wellness Benefit

*Adult Wellness Benefit*
For an Eligible Employee, an eligible spouse of an Eligible Employee, a retired Employee or an eligible spouse of a retired Employee, the Plan will pay 100% of Usual, Customary and Reasonable Charges, after the office visit copay, up to the maximum benefit limit for a Routine Physical Exam from a Physician or gynecologist participating in the PPO network.  Lab work must also be provided by an organization participating in the PPO network.  Additional Covered Exams will also be covered at 100% of Usual, Customary and Reasonable Charges and subject to a separate annual calendar maximum benefit, provided that the Additional Covered Exams are performed in conjunction with the Routine Physical Exam.  The following schedule applies to this benefit:

Routine Physical Exam ..............................................................................1 per year
(including lipid profile, glucose, colorectal hemoccult test for persons over age 40,
anthropometrics, strength/flexibility tests, electrocardiogram)

Covered Charges incurred for lab work related to the Routine Physical Exam must
be performed within ten  days prior to or 30 days after services incurred for the
Routine Physical Exam.

Maximum Benefit (Calendar Year) .....................................................$300 per person

Additional Covered Exams
Thyroid Stimulating Hormone (TSH) Test
    Eligible Female Age 39 and under.................................................... 1 every 3 years
    Eligible Female Age 40 and over...........................................................1 every year
    Eligible Male (any age)..................................................................... 1 every 5 years
Pap Smear
    Eligible Female ......................................................................................1 every year
Mammogram
*Mammograms for Eligible Females under age 40 will be covered under Major
Medical Benefit with a Physician's written request.*
    Eligible Female Age 40-49 ................................................................ 1 every 2 years
    Eligible Female Age 50 and over...........................................................1 every year
Prostate Specific Antigen (PSA) Test
    Eligible Male Age 50 and Over .............................................................1 every year
Colonoscopy ...................................................Covered under Major Medical Benefit
Chest X-ray
    Eligible Male/Female Age 35 and under .......................................... 1 every 5 years
    Eligible Male/Female Age 36-44..................................................... 1 every 2 years
    Eligible Male/Female Age 45 and over ..................................................1 every year

Benefit Limitations
Maximum Benefit (Calendar Year) .....................................................$200 per person
(for services other than annual routine mammographic screening)

Maximum Benefit (Calendar Year) for Annual Routine
Mammographic Screening ......................................... 100% of Usual, Customary and
(after office visit co-pay)                                                    Reasonable Charges

*Child Wellness Benefit*
This benefit is limited to Eligible Dependents of Eligible Employees.  After the
office visit copay, the Plan will pay 100% of the Covered Charge for services
provided or supervised by a Physician for routine well baby care, pediatric
preventative services, developmental assessment, appropriate immunizations and
lab tests.  Provided that immunization is provided in conjunction with an office visit
covered under this Child Wellness Benefit, the Plan will also provide full coverage

for the following immunizations required to place an Eligible Dependent child in a child care facility, school or similar program: (1) Hepatitis B, (2) Diphtheria, Tetanus, Pertussis, (3) Haemophilus influenzae type b, (4) Inactivated Poliovirus, (5) Measles, Mumps, Rubella, (6) Varicella (chickenpox), and (7) Pneumococcal. For children ages 7 and older, the Plan will cover the Covered Charges for required immunizations, but not the office visit to get the immunization.

The Plan will also pay 100% of the Covered Charge for the meningococcal disease vaccine (meningitis) for college-age Dependents if such vaccination is required for the Eligible Dependent's admission to an accredited junior college, college, university, vocational or trade school approved by the Department of Education of New York State.

Maximum Well Child Benefit
Eligible Dependent children age from birth to 1 year..........................6 visits per year
Eligible Dependent children ages 1 to 2 years....................................3 visits per year
Eligible Dependent children ages 3 to 18 years...................................1 visit per year
Eligible Dependent children over age 18............................................0 visits per year

## Section Five – Prescription Drug Benefit

With the Prescription Drug Benefit, eligible Employees and retirees will receive two prescription drug cards. A card should be presented at a participating pharmacy with each prescription drug purchase. The cards will permit eligible Employees and Retirees and their dependents to purchase prescription drugs at a discounted price. You will only pay the required Co-Payment when you make a purchase with the card. The Fund will pay the remaining cost.

A. Retail
This Benefit includes both retail pharmacies and a mail order service. A prescription filled at a retail pharmacy can provide medication for no more than 34 days per Co-Payment. A prescription filled through the mail order service can provide your medication for 90 days per Co-Payment.

B. First Dollar Coverage
You do not have to satisfy the annual Deductible in order to have a prescription covered by the Fund. As long as you are eligible, the prescription drug that you are purchasing is covered by the Fund and you are making your purchase at a participating pharmacy, then your purchase will be covered.

C. Co-Payments
There will be three levels of Co-Payments. What you pay will depend upon the type of prescription drug you are purchasing and how it is being purchased (retail or home delivery). The Co-Payment levels are:

| Formulary Level - Drug Type | Retail (up to 34-day supply) | Home Delivery (up to 90-day supply) |
|---|---|---|
| Level 1 – Generic | Greater of $5 or 25% of cost of drug | $12 |
| Level 2 – Preferred Brand Name | Greater of $25 or 25% of cost of drug | Greater of $60 or 15% of cost of drug |
| Level 3 – Non-Preferred Brand Name | Greater of $40 or 25% of cost of drug | Greater of $100 or 15% of cost of drug |

D. Formulary Choice Guide
Some brand name drugs are very expensive and are no more effective than other medications that have a lower price. Generic drugs are often available that are chemically equal to a brand name drug. In other situations, two brand name drugs are available that treat the same condition. One may be significantly more expensive than the other. The Prescription Drug Benefit will not tell you which medication you should purchase. That is left to you and your Physician. The Benefit will hopefully encourage you to make the most cost effective purchase that is consistent with your medical needs.

You will receive a listing of the Preferred brand name drugs called a Formulary Choice Guide. You will find that most drugs require the Level 2 Co-Payment. If a brand name drug is not part of the formulary it will be considered a non-preferred brand name drug and will require a Level 3 Co-Payment.

If you have any questions regarding the Prescription Drug Benefit or have any problems with a purchase at a participating pharmacy, please contact SAV-RX toll-free at (800) 228-3108.

E.   Covered Services
In order for a prescription medication to be covered under the program, the medication must:

1. Be purchased at a participating pharmacy,

2. Be prescribed by a Physician practicing within the scope of his or her license,

3. Not be more than a 34 day supply for a retail pharmacy or more than a 90 day supply for home delivery, and

4. Be a drug or device approved by the Food and Drug Administration (FDA), a legend medication.

Additional covered medications include:

1. Insulin, and

2. Self-administered injectables.

F.   Medications Requiring Prior Authorization
The following medications are covered, pending prior authorization, if Medically Necessary:

1. Retin-A for acne treatment,

2. Dexedrine, desoxyn and adderall for ADD and narcolepsy,

3. Viagra, Cialis, Levitra and other medications for treating erectile dysfunction – 8 pills per month, and

4. Oral contraceptives.

G.   Medications Not Covered

1. Contraceptives (oral contraceptives may be covered if Medically Necessary, as stated in Subsection F.),

2. Infertility drugs,

3. Appetite suppressants,

4. General and fluoride vitamins,

5. Smoking cessation products,

6. Immunizations (except where stated under Section Four Subsection W.),

7. Diabetic supplies,

8. Prenatal and single entity vitamins,

9. Medications for cosmetic purposes,

10. Durable or disposable medical supplies,

11. Medications used for experimental indications and/or dosage regimens determined to be experimental,

12. Over-the-counter (OTC) medications that do not require a Physician's authorization by state or federal law and any prescription medicine that is available as an OTC medication,

13. Prescription refills dispensed after one year from original date of dispensing, and

14. Dietary supplements (dietary supplements for infants may be covered under the Plan)

H.   Payments for Which You are Responsible

1. The cost of all medications not covered under this Prescription Drug Benefit,

2. The appropriate Co-Payment amount as described in Subsection C.,

3. The cost of any quantity of drugs dispensed in excess of the allowed days supply,

4. The full cost of medications purchased out-of-network, and

5. The difference between the brand and generic cost, if you choose to receive a brand name drug not requested by your Physician when a generic one is available.

## Section Six – Vision Benefit

Plan payments will be made, up to the maximum amounts shown in the Schedule of Benefits, for each person once during any two calendar-year period, for the expenses incurred for the services rendered or supplies furnished, by an Optician, Optometrist or Ophthalmologist.

Definitions
The following definitions apply to the Vision Benefit:

**"Covered Charges"** are:

1. Vision Screening (eye examination),

2. Visual Analysis,

3. Lenses when provided by an optometrist, Physician, or optician,

4. Frames when provided by an optometrist, Physician, or optician,

5. Contact Lenses when provided by an optometrist, Physician, or optician.

**"Vision Screening"** (eye examination) means a survey of the principal visual functions in order to determine the condition of the vision. If the Vision Screening indicates a need for further work, a Visual Analysis may be necessary.

**"Visual Analysis"** means and includes, but is not limited to, the following:

1. Case history,

2. Examination for pathology or anomalies,

3. Refraction,

4. Visual field charting, and

5. Prescription for proper lenses.

Covered Charges

Normal Vision Care
If any Covered Person desires to know the condition of their eyes and whether or not further vision care is required, Benefits will be provided for the cost of normal vision aids and services in connection with:

1. Vision Screening,

2. Vision Analysis,

3. Lenses, including contact lenses, and

4. Frames.

<u>Sub-Normal Vision Care</u>
When the visual acuity of a Covered Person is not correctable to 20/40 in the better eye by use of conventional lenses, the Plan will pay the expenses actually incurred for such contact lenses, telescopic lenses or other subnormal vision aids, as well as professional services required to fit, administer or otherwise prepare such sub-normal vision aids to improve such person's visual acuity in the better eye up to 20/40.

<u>Benefit Limitations</u>

Normal Vision Care ................................................................$100 every two calendar years
Sub-Normal Vision Care.......................................................$300 every two calendar years

Benefit payment under the Vision Care Plan for any Expense Incurred for the following **will not be a Covered Expense**:

1. Any medical or surgical treatment or supplies furnished for treatment of any eye injury or eye disease,

2. Sunglasses, plain or prescription, or safety lenses or goggles,

3. Vision training or aniseikonia, and

4. Services performed or supplies furnished by other than a licensed Optician, Optometrist or Ophthalmologist.

<u>Extended Benefits</u>
There is no coverage after termination of eligibility except for charges for optical devices and the fitting thereof which were ordered while the Covered Person was eligible under the Plan, but are finally installed or delivered to such Covered Person within 30 days after the eligibility termination date.

## Section Seven – Dental Benefit

Dental Benefits are provided by the Plan through a contract with Delta Dental. You are not required to use a Delta Dental Provider. However, choosing a Dentist that is within the Delta Dental PPO network () saves money for both you and the Plan because Delta Dental Providers have agreed to a fixed fee schedule. By choosing a Dentist who participates in DeltaPreferred Network your savings may be greater than it would be if the dentist only participates in the DeltaPremier Network. To find a Dentist within either Delta Dental network, you may call the Delta Dental Customer Service Line toll-free at (800) 932-0783 or visit their website at www.MidAtlanticDeltaDental.com.

Covered Dental Expenses incurred by active Employees and their Eligible Dependents will be paid according to the Schedule of Benefits.

Definitions
The following definitions apply to the Dental Expense Benefit:

**"Calendar Year"** means January 1 through December 31 of each year.

**"Dental Expense"** means the part of a charge for dental services which meets **all** of the following conditions:

1. Is covered under the Dental Expense Benefit, and

2. Does not exceed the Prevailing Fee for the service, and

3. Is incurred while the patient is eligible for the Dental Expense Benefit.

**"Dental Hygienist"** means a duly licensed dental hygienist who works under the supervision of a Dentist.

**"Dentist"** means a duly licensed dentist or Physician who is operating within the scope of a dentist's or Physician's license.

**"Prevailing Fee"** means a charge for Dental Expense which does not exceed the 90th percentile of the Plan's prevailing health care data.

Covered Charges
Covered Dental Expenses include the charges of a Dentist which the patient is required to pay. However, Benefit payment will not be more than the amount shown in the Schedule of Benefits. When you visit a Delta Dental Provider, the Covered Person is responsible for the difference between the Delta Dental Maximum Plan Allowance (the contracted maximum amount payable for each service) and the Maximum Allowance listed in the Schedule of Benefits. When you visit a Non-Participating Provider the Covered Person is responsible for the difference between the amount billed and the Maximum Allowance listed in the Schedule of Allowances. Please refer to the examples on page 113 for further explanation.

Diagnostic and Preventive Services

Covered Dental Expenses for Diagnostic and Preventive Services provided by a Delta Dental PPO Provider will be covered at 100% of the Delta Dental Maximum Plan Allowance. Covered Dental Expenses for Diagnostic and Preventive Services provided by a non-participating Dentist will be covered at 80% of the Prevailing Fee. Choosing a Delta Dental Provider will offer a smaller co-payment for the patient.

Non-Diagnostic and Preventive Services

Covered Dental Expenses for Services other than Diagnostic and Preventive Services will be paid according to the Maximum Allowance shown in the Schedule of Benefits. Remember, choosing a Delta Dental Provider will offer a smaller co-payment for the patient.

If two or more dental services are rendered, payment will be made for each dental service unless the Schedule of Benefits specifies a maximum amount for a particular combination of dental services.

Extended Benefits

There is no Dental coverage after the termination of eligibility. However, Benefits will be payable for charges for prosthetic devices (including bridges and crowns), and the fitting thereof, which were ordered while the Covered Person was eligible under the Plan, but are installed or delivered to such Covered Person within 30 days after the eligibility termination date.

Benefit Limitations

Benefit payment will not be made for any expenses incurred for the following:

1. Charges for any dental procedures included as a covered medical expense,

2. Charges for treatment by other than a Dentist, excluding cleaning or scaling of teeth which may be performed by a Dental Hygienist,

3. Charges for any replacement of an existing partial or full removable denture or fixed bridgework, or the addition of teeth to an existing partial removable denture or to bridgework to replace extracted natural teeth, unless satisfactory evidence is presented that:

   a. The replacement or addition of teeth is required to replace one or more natural teeth extracted while eligible under the Plan, or

   b. The existing denture or bridgework was installed at least 48 months prior to its replacement, or

   c. The placing of an initial denture necessitates the replacing of an existing opposing denture.

4.  Charges for services and supplies that are partially or wholly cosmetic in nature including charges for personalization or characterization of dentures,

5.  Charges for the replacement of a lost or stolen prosthetic device,

6.  Charges for any services or supplies which are for orthodontic treatment (including correction of malocclusion), except as provided for in the Schedule of Benefits.

## Section Eight – Hearing Aid Benefit

The Plan provides a Hearing Aid Benefit for eligible active Employees and their Eligible Dependents, who are certified by a Physician or hearing specialist as being required to use a hearing aid to maintain normal hearing. Plan payment will be made according to the Schedule of Benefits, up to the Usual, Customary and Reasonable Charge for the purchase price of the hearing unit, plus all repairs.

Benefit Limitations
Maximum Benefit Allowed (per 60 consecutive months).....................................$300/unit

Extended Benefits
There is no coverage after termination of eligibility except for charges for hearing units, and the fitting thereof, which were ordered while the Covered Person was eligible under the Plan, but are finally installed or delivered to such Covered Person within 30 days after the eligibility termination date.

## Section Nine – Employee Life Insurance Benefit
*Underwritten by Amalgamated Life Insurance Co.*
Active Eligible Employees Only

In the event of the death of an active eligible Employee, Life Insurance, determined from the Schedule of Benefits, will be paid to your Beneficiary.

### Beneficiary
On or before the date you become eligible to participate in the Plan, the Fund Office will furnish you with an Appointment of Beneficiary Statement. You are to complete this Statement, including the name of the person you want listed as your Beneficiary. After completing the Statement, you are to sign, date and return the Statement to the Fund Office.

You may name anyone you wish as your Beneficiary and you may change your Beneficiary designation at anytime by completing a new Appointment of Beneficiary Statement. If the Beneficiary you name is not living when your Life Insurance becomes payable, payment will be made according to the terms of the group insurance policy.

### Total and Permanent Disability Feature
If, while an eligible Participant in the Plan and before your 60th birthday, you become totally and permanently disabled by bodily injury or Illness, which completely prevents you from engaging in any occupation or employment for wage or profit, and you show evidence of an approved Social Security Disability Award, your Life Insurance coverage will be continued until you attain age 65.

> **IT IS YOUR PERSONAL RESPONSIBILITY TO SUBMIT EVIDENCE OF YOUR TOTAL DISABILITY TO THE FUND OFFICE ANNUALLY.**

### Conversion Privilege Feature
When your group Life Insurance terminates because your eligibility under the Insurance Fund is terminated, you may convert it to an individual policy of Life Insurance without medical examination provided you apply in writing for conversion within 31 days from the date your eligibility under the Insurance Fund is terminated. Contact the Fund Office for the necessary forms.

## Section Ten – Accidental Death and Dismemberment Benefits
### Active Eligible Employees Only

Accidental Death and Dismemberment Benefit

When bodily injury to an active Employee caused solely by an Accident shall result in any of the following losses within 90 days after the date of the Accident, the Plan will pay the Benefit stated in the Schedule of Benefits and in the table below:

| Loss | Amount |
|---|---|
| Life | $9,000 |
| Both Hands or Both Feet | $9,000 |
| Entire Sight of Both Eyes | $9,000 |
| One Hand **and** One Foot | $9,000 |
| One Hand **or** One Foot **and** Entire Sight of One Eye | $9,000 |
| One Hand **or** One Foot | $4,500 |
| Entire Sight of One Eye | $4,500 |

Definition

The following definition applies to the Accidental Death and Dismemberment Benefit:

**"Loss"** with reference to the hand or foot means complete severance through or above wrist or ankle joint, and with reference to the eye means the irrevocable loss of the entire sight thereof. In the event of multiple losses, Benefits will be paid for the greatest loss sustained as a result of any one Accident.

Benefit Limitations

Benefits will **NOT** be paid for any loss caused directly or indirectly, wholly or partially, by:

1. War or any act of war, whether declared or undeclared,

2. Service in the Armed forces or units auxiliary thereto,

3. Being intoxicated or under the influence of any narcotic unless administered on the advice of a physician,

4. Intentionally self inflicted injury,

5. Suicide or attempted suicide,

6.  Injury sustained while engaged in or taking part in aeronautics and/or aviation of any description or resulting from being in an aircraft, other than as a fare-paying passenger on a scheduled or charter flight operated by a scheduled airline,

7.  Commission of or participation in a felony, a riot or an insurrection.

## Section Eleven – Dependent Survivor Income Benefit
Surviving Spouse or Dependent Children of Active Eligible Employee Only

The Plan provides this Benefit coverage to a surviving spouse of an eligible active Employee in the event of his or her death from any cause.

A monthly Benefit, as stated in the Schedule of Benefits, will be paid to the lawful surviving spouse, or equally to the guardians of any surviving dependent children if there is no surviving spouse. The part of any Benefits payable for a dependent child who is no longer under guardianship may be paid to the child.

Benefits will commence on the first day of the month following the death of the eligible Employee and continues to be paid on the first day of each month until the earlier of:

1.  A total of 60 monthly payments have been made, or

2.  The Surviving spouse's remarriage, or

3.  The Surviving spouse's death, or

4.  The Surviving spouse's attainment of age 60.

The monthly income Benefit will continue for the unpaid balance of 60 payments in the occurrence of 3. or 4. if there is an eligible surviving dependent child.

Subject to the conditions outlined above, the Survivor Income Benefit will be paid to:

1.  Your lawful spouse under age 60, however,

    a.  If you become married after attaining eligibility, your spouse will be considered a dependent for purposes of this Benefit only after you have been married for one year, or

    b.  If you are separated from your spouse for one year or more, or if you are legally separated by judicial order of legal separation from your spouse, then your spouse will not be considered an Eligible Dependent for purposes of this Benefit.

2.  Your Eligible Dependent children, as defined in Section Nineteen, Subsection J.

This coverage terminates at the date the active Employee's eligibility terminates. There is no extension of coverage after termination of eligibility.

## Section Twelve – Employee Disability Income Benefits
Active Eligible Employees Only

If you become disabled as a result of an injury or Illness which prevents you from working at your regular occupation and which requires regular care and treatment by a Physician, Disability Income Benefits are payable at the Weekly Rate shown in the Schedule of Benefits.

No Benefits will be made for any period of disability in which you are not under treatment of a Physician.

Basic Disability Benefits
Basic Disability Benefits are temporary cash Benefits payable to an eligible active Employee who is disabled by an off-the-job injury or Illness.

You are eligible to receive Basic Disability Benefits if at the date your disability begins, you are an active Employee for Benefit coverage and you furnish proof that you are receiving:

1. A weekly Benefit under New York State Disability Benefits, or

2. A weekly Benefit from an automobile accident covered by No-Fault Insurance, or

3. A partial Workers' Compensation weekly Benefit for a disability arising from work in Covered Employment (subject to a maximum Benefit not to exceed the current New York State Disability maximum weekly amount).

Payment of Basic Disability Benefits begins with the eighth day of disability. The first seven days of disability are a waiting period for which no Benefits are paid. Basic Disability Benefits are paid at the Weekly Rate shown in the Schedule of Benefits.

For eligible active Employees who are receiving New York State Unemployment Insurance Benefits, and registered with Iron Workers Local 12 as being ready, willing, able and available for work in Covered Employment, Basic Disability Benefits are payable from the first day of disability that disqualifies them from receiving Unemployment Insurance Benefits.

If you receive Basic Disability Benefits for a maximum of 26 weeks of disability during any period of 52 consecutive weeks, you will not be entitled to further Basic Disability Benefits until you have been re-employed in Covered Employment for four consecutive weeks. The maximum Basic Disability Benefit is payable only once in any 52 consecutive week period.

Basic Disability Benefits are paid in addition to any weekly Benefits you may be entitled to under New York State Disability Benefits, No-Fault Insurance, or Workers' Compensation (partial benefit).

If you are totally and continuously disabled at your eligibility termination date, Basic Disability Benefits are payable for the specific injury or Illness that caused your disability prior to your eligibility termination date. Basic Disability Benefits are payable up to 90 days from your eligibility termination date.

Supplemental Disability Benefits
Supplemental Disability Benefits are temporary cash Benefits payable to an eligible active Employee who is disabled by an off-the-job injury, or an on-the-job (in Covered Employment) injury.

You are eligible to receive Supplemental Disability Benefits, if, at the date your disability begins, you are an active Employee eligible for Benefit coverage and you furnish proof that you are receiving:

1. A weekly benefit under the New York State Disability Benefits, or

2. A weekly benefit from an automobile accident covered by No-Fault Insurance, or

3. A Workers' Compensation benefit for a disability arising from work in Covered Employment.

Payment of Supplemental Disability Benefits begins with the first day of disability. Supplemental Disability Benefits are paid at the Weekly Rate shown in the Schedule of Benefits.

If you receive Supplemental Disability Benefit for a maximum of three weeks of disability during a period of 52 consecutive weeks, you will not be entitled to further Supplemental Disability until you have been re-employed in Covered Employment for four consecutive weeks. The maximum Supplemental Disability Benefit is payable only once in any 52 consecutive week period.

Supplemental Disability Benefits are paid in addition to any weekly benefits you may be entitled to under Insurance Fund Disability Benefits, New York State Disability Benefits, No-Fault Insurance, or Workers' Compensation.

Disability Income Claim Filing Instructions
If you become disabled you should file the proper claim form.

Claim forms are available at the Fund Office. Before mailing your claim be sure that you:

1. Complete in full and sign the Employee's Statement, and

2. Furnish proof that you are receiving New York State Disability Benefit, or No-Fault Insurance Benefits, or a Workers' Compensation Benefit.

Payments may be delayed if you do not completely answer all questions on the claim form, and if you do not provide proper proof of disability.

*Is there a time limit for filing a claim?*
Yes. You must file your claim, using the proper form with proof of disability within 20 days from the date you become disabled. Claims filed more than 20 days from the date of disability are not necessarily rejected but will not be paid for any disability period more than two weeks before the claim is filed unless you can show that it was not reasonably possible to file earlier, and that the claim was filed as soon as possible and approved by New York State Disability Benefits, No-Fault Insurance or Workers' Compensation.

*Can you collect Unemployment Insurance and Disability Income Benefits for the same period of time?*
No. You cannot receive Unemployment Insurance Benefits and Disability Benefits for the same period of time.

*Can you collect No-Fault Insurance Benefits and Disability Income Benefits for the same period of time?*
Yes. Disability Income Benefits are in excess to the amount you are eligible to receive under No-Fault Insurance.

*Can you receive Retirement Benefits and Disability Income Benefits for the same period of time?*
No. If you are entitled to a Retirement Benefit from Iron Workers Local 12 Pension Fund, the fact that you are retired and no longer an active Employee makes you ineligible for Disability Income Benefits.

## Section Thirteen – Benefit Exclusions and Limitations

The Plan provides Benefits only for those Medically Necessary covered services and charges expressly described in the Plan. **Any omission of service or charge shall be presumed to be an <u>exclusion</u> even though not expressly stated as such.**

---

**IF YOU ARE UNSURE WHETHER A MEDICAL SERVICE OR PROCEDURE IS EXCLUDED, PLEASE CONTACT THE FUND OFFICE FOR CLARIFICATION. FAILURE TO DO SO COULD RESULT IN <u>YOU</u> BEING RESPONSIBLE FOR ANY NON-COVERED OR EXCLUDED CHARGES YOU INCUR.**

---

Benefits **WILL NOT** be paid for or shall be limited as follows:

1. Loss caused by accidental bodily injury or Illness which arises out of or occurs in the course of any occupation or employment for wage or profit, or any accidental bodily injury or Illness for which the Covered Employee is entitled to any benefits under any Workers' Compensation or Occupational Disease Law. The Fund retains the option to withhold Benefits for any injury which may be questionable or compensable under a Workers' Compensation or Occupational Disease Law, until such time as the Covered Employee shows that such Employee has made reasonable efforts to exhaust a claim for benefits under a Workers' Compensation or Occupational Disease Law.

2. Hospital, medical or surgical treatment provided because of loss suffered in war or while in Military Service.

3. Expenses Incurred for room and board, education and training in an institution which is primarily a school or other institution of training, a place of rest, a place for the aged, a nursing home, a convalescent home or any institution of like character or for convalescent or custodial services.

4. Routine foot care procedures except for as provided under the Major Medical Benefit on page 46.

5. Services or procedures which are not customary and generally accepted by the medical profession and services or procedures which are experimental or for the purpose of research.

6. Services or supplies related to sex transformations or sexual dysfunction, unrelated to organic disease.

7. Visual analysis, eye examination or the correction of vision, eyeglasses, therapy or training for muscular imbalance of the eye, or fitting of glasses or orthotics, except as stipulated under the Vision Benefit in the Plan.

8. Services provided by an audiologist when not performed in connection with an Illness, hearing aids and other devices to improve hearing and their related fittings.

9. Expenses related to treatment or services for Accident or Illness rendered after losing eligibility for Benefits, except as stated under specific provisions.

10. Physical therapy for an Accident, unless performed by a licensed physiotherapist according to a complete plan of treatment provided to Blue Shield of Northeastern New York by the referring Physician.

11. Loss suffered for which a contributing cause was the Covered Person's commission of or attempt to commit a felony or the Covered Person's engaging in an illegal occupation because the loss would not meet the Plan's definition of Accident, as listed on page 104 of this booklet.

12. Any Expense Incurred for obesity such as weight reduction programs, including drugs, surgical procedures, gastric bypass procedures, lipotomy, or any other such procedure, even if they are Physician supervised.  Complications from any excluded expenses are also excluded.

13. Treatment or services in connection with an elective abortion.

14. Tooth extractions or other dental work or surgery that involves any tooth or tooth structure, alvaeolar process, abscess, periodontal disease or disease of the gingival tissue except as otherwise provided under the Dental Expense Benefit, or when treatment is provided within 120 days following an accidental injury to the jaw, sound natural teeth, mouth or face.

15. Alternative Treatments as defined by the Office of Alternative Medicine of the National Institutes of Health.  Examples of some treatments not covered are acupuncture, aromatherapy, hypnotism, massage therapy and rolfing.

16. Charges for personal care items that are primarily for personal comfort or convenience, including, but not limited to, diapers, bathtub grabbers, handrails, lift chairs, over-bed tables, incontinence pads, ramps, snug seats, recreational items, home improvements and home appliances, spas, wigs and braces for sports.

17. Charges for motor driven wheelchairs or scooters, implantable spinal column stimulator, ThAIRapy vests or non-standard equipment of any type.  Any equipment that does not meet the covered Durable Medical Equipment criteria on

page 41 is NOT a covered Benefit. Any nondurable supplies related to equipment that is not covered will also not be a covered Benefit.

18. Services for cosmetic and reconstructive surgery or treatment except: (a) to repair damage caused by or a result of an Accident that occurred while the Covered Person was eligible for Benefits, (b) as a result of a surgical procedure for which Benefits were paid under the Plan, (c) to repair a Medically Necessary congenital defect, (d) a disfiguring disease, or (e) for reconstruction of the non-diseased breast to produce a symmetrical appearance, or for coverage for prostheses and physical complications of all states of mastectomy (including lymphedemas) in a manner determined in consultation with the attending Physician and the patient. For this purpose cosmetic surgery or treatment includes any procedure that is directed at improving the patient's appearance and which does not meaningfully promote the proper function of the body or treatment of an Illness.

19. Fertility treatments, artificial insemination, in vitro and vivo fertilization, gamete intrafallopian transfer (GIFT) procedures, zygote intrafallopian transfer (ZIFT) procedures, laparoscopy for ovum retrieval, penile prosthesis and any related prescription medication treatment.

20. Genetic or chromosomal testing, counseling or therapy.

21. Treatment of hair loss including wigs, toupees, hairpieces, hair implants or transplants and drugs to treat hair loss.

22. Expenses Incurred for contraceptives and related supplies which are not deemed to be Medically Necessary.

23. Enteral feedings and other nutritional and electrolyte supplements, including infant formula, donor breast milk, nutritional supplements, dietary supplements, electrolyte supplements, diets for weight control or treatment of obesity (including liquid diets or food), food of any kind (diabetic, low fat, cholesterol), oral vitamins, and oral minerals except when sole source of nutrition or except when a certain nutritional formula treats a specific inborn error of metabolism.

24. Expense Incurred for recreational or leisure therapy (i.e. membership dues, costs, or any other expenses directly or indirectly related to a Physician's recommendation of activity or participation in a recreational or leisure activity). This also includes health and fitness clubs and physical conditioning programs such as athletic training, bodybuilding, exercise fitness, flexibility, and diversion or general motivation.

25. Growth hormone medications and similar biopharmaceuticals.

26. Services and supplies for which the individual is not legally required to pay or for which no charge would be made if this coverage did not exist.

27. Treatment pertaining to the periodontium, except as covered under the Dental Expense Benefit.

28. Any dental treatment, except as covered under the Dental Expense Benefit.

29. Any treatment, services or supplies not considered Medically Necessary or that is not ordered, recommended or approved by a Physician practicing within the scope of his or her license.

30. Any Expense Incurred that results from accidental bodily injury caused by war or act of war, declared or undeclared, or act of terrorism or by participation in a riot or intentional self-inflicted act, unless such self-inflicted injury results from a medical condition.

31. Expenses Incurred for routine physicals and checkup exams for adults which are not specifically provided for by the Plan.

32. For any service that is payable by Medicare or would be payable if the Covered Person were properly enrolled for both the Part A and Part B programs.

33. Expenses Incurred for services not specifically listed as covered medical services under the Plan.

34. Expenses Incurred that exceed the Usual, Customary and Reasonable Charges as determined by the Fund Office.

35. Expenses Incurred for radial keratomy or any other surgical procedure to correct myopia (nearsightedness) or hyperpia (far sidedness).

36. Charges for confinement or services in a Hospital or institution owned or operated by the federal government, except for Usual, Customary and Reasonable Charges to the Plan for services and supplies provided by a Veteran's Administration facility that are unrelated to Military Service.

37. Charges for confinement or service in a Hospital or institution owned or operated by a state or municipal government unless a charge is made with an unconditional requirement to pay being made to an Employee.

38. For well child services for a dependent child over the age of eighteen, such as preventative shots and medication, routine physicals and check-up visits unless specifically provided for by the Plan.

39. Charges for which some other third party is responsible unless and until the Plan's proper subrogation documents are signed.

40. Charges for the donor, and organ procurement for organ and tissue transplants (unless the transplant is performed at a Center of Excellence), and patient and family transportation costs.

41. Charges for telephone consultations or for completion of claim forms or other medical reports.

42. Charges billed for services provided by an immediate family member of an Employee or Eligible Dependent.

43. Expenses Incurred for Custodial Care as defined on page 105 of this booklet.

44. Benefits that are payable or services provided by: any group insurance plan (whether insured or non-insured), any employer sponsored Blue Cross, Blue Shield or other prepayment coverage, any governmental plan or any mandatory automobile "no-fault" motor vehicle plan (See Coordination of Benefits beginning on page 85 of this booklet).

45. Expenses Incurred for non-health related items such as use of a telephone and television while an In-Patient at a Hospital.

46. For expenses or treatment in connection with orthomolecular therapy.

47. Expenses Incurred for treatment of an Injury that results from a Covered Person consciously placing his or herself at risk by participation in a hazardous recreational activity such as parachuting, skydiving, hang gliding, drag racing, motorcycle racing, automobile racing, operation of an all terrain vehicle, scuba diving, bungee jumping, mountain climbing, rock climbing, etc.

48. Charges made by a Hospital for non-emergency elective admission on a Friday, Saturday or Sunday except if surgery is scheduled for Monday, charges made for admission on the preceding Sunday will be covered.

49. Expenses Incurred for treatment of an injury to a Covered Person resulting from or related to any Accident if the Covered Person is lawfully determined by either the police or qualified medical personnel to be legally intoxicated at the time of the Accident.

For the purpose of this exclusion, legal intoxication is deemed to mean a level of blood alcohol content equaling or exceeding the level indicating legal intoxication established by the state in which the Accident occurs.

This exclusion will also apply to Accidents in which the Covered Person is determined by qualified medical personnel to be under the influence of narcotics, hallucinogens or other illegal drugs which results in an impairment of the Covered Person's ability equivalent to the impairment attributable to legal intoxication.

The application of this exclusion will not be affected by the "No Fault" automobile insurance law of any state. In the event that a Covered Person who is denied Benefits due to this exclusion is subsequently exonerated due to legal process, Benefits will then be payable, upon furnishing of acceptable proof of legal exoneration.

50. Expenses Incurred (including all Physician and Hospital charges) for voluntary sterilization.

51. Expenses Incurred from a Hospital for confinement (per each 24 hour period) prior to surgery during which the Covered Person is simply waiting for the Physician or the operating room to be available.

52. Expenses Incurred from a Hospital solely for admissions for diagnosis, physical therapy or Physician's services.

53. Expenses Incurred for any nutritional or dietary counseling.

## Section Fourteen – Claims and Appeal of Denied Claims Procedures

Receiving a claim form or submitting a claim is no guarantee that you are eligible for Benefits or that you will receive Benefit payment.

The Board of Trustees has exclusive authority and discretion to make all determinations concerning eligibility and the amount of any Benefits payable by this Plan.

The Trustees' determinations will be based solely on clearly defined and ascertainable criteria contained in the Plan at the time a claim occurs.   Their decision is final and binding.

Claim Forms

The Fund's Third Party Administrator (TPA), Blue Shield of Northeastern New York, and the Fund Office provide claim forms for you to use when submitting a claim for payment of vision and out-of-network medical benefits.  All of these claims must be filed by using the proper claim envelope.

You can obtain claim forms by calling the TPA or the Fund Office.

All out-of-network medical claims as well as vision claims must be sent to the TPA.  The TPA's business hours are 8:00 a.m. through 7:00 p.m. Eastern Standard Time (EST), Monday through Friday and 9:00 a.m. through 1:00 p.m. EST, Saturday.  The TPA can be reached at the following address and telephone number:

Blue Shield of Northeastern New York
P.O. Box 80
Buffalo, NY 14240
Telephone: (888) 840-6322

A properly completed claim form, itemized bills and any other information required is necessary to process your claim.   No benefit payment will be made until the TPA receives all required information.

Claim Filing Instructions

Vision and Out-of-Network Medical Benefits

A claim form is required for vision and out-of-network medical claims.  No claim forms are required for in-network benefits.  Follow these steps to receive all the benefits to which you are entitled:

Step 1.     Obtain a claim form from the TPA or Fund Office.

Step 2.     Complete your member portion of the claim form in full.  (If all questions are not answered, it will be necessary to return the form, which will delay settlement of your claim).

Step 3.     Enclose all related bills in the claim envelope.  It is important that they contain the right information.  Related bills received late may be sent separately.

Step 4.     Review all forms for completeness.  Make sure you sign the claim envelope.

Step 5.     Mail the completed and signed claim form promptly to:

Blue Shield of Northeastern New York
P.O. Box 80
Buffalo, NY 14240

## Claim Reminders

- The instructions on the claim form should be read and followed carefully.

- Claims should be filed as soon as you have incurred covered expenses and not more than 90 days after the date of service.

- If you sign the section of the claim form assigning and authorizing benefit payment directly to the Physician, be sure the Physician's tax identification number is included on the claim form or in a separate medical invoice.

- Be sure to sign the section of the claim form authorizing the release of information needed to process the claim.

## Assignment of Benefits

The claim form contains an "Assignment of Benefits" whereby you (the Covered Employee, not an Eligible Dependent) authorize the TPA or Fund Office to make payment directly to the named Physician of the Benefits otherwise payable to you, but not to exceed the charges made.  Should you sign and authorize assignment of Benefits, you are still financially responsible for the balance of the charges not paid by the TPA or Fund Office.

## Payment of Benefits

All Plan Benefits are payable to you, the Employee.  However, at the option of the Plan and with your consent, all or any part of them may be paid directly to the person or institution on whose charge the claims are based.

If any person to whom Benefits are payable is a minor or, in the opinion of the Plan, is not able to give a valid receipt for any payment due to him or her, such payment will be made to his or her legal guardian.  The Plan, at its option, may make payment to the eligible member or institution.

## Common Claim Delay Problems and Causes

*Incomplete Employee and Dependent Information*

- Regarding whether you or your spouse has other insurance coverage, and if so, name of group, name of insurance company, address, policy number, etc.

- Regarding accidental injuries: how occurred, where, when, etc.

- Regarding dates of birth or age to determine whether you or your spouse has Medicare coverage.

- Regarding date of birth of Eligible Dependents.

*What is Needed if You Have Other Insurance Coverage?*

- Information on your claim form with name of other policyholder, name and address of insurance company, policy number and whether group or individual coverage.

- Copies of all bills (must be submitted to both plans).

- If lump sum receipts are submitted, these must be itemized.

How to File a Claim for Life Insurance Benefits

If an active, eligible Employee dies, send a certified copy of the death certificate to the Fund Office with the Beneficiary's full name, Social Security number and correct address.

Life Insurance Benefits will be paid only to the person's designated Beneficiary or Beneficiaries according to the Beneficiary Statement filed with the Fund Office.

If you have no designated Beneficiary, make sure you complete a Beneficiary Statement provided by the Fund Office. If you want to change your Beneficiary, request a Change-of-Beneficiary Statement from the Fund Office.

**Procedure for Initial Benefit Determinations, Notices of Denial of a Claim and How to Appeal a Denial of a Claim for Benefits**

> **ALL PROCEDURES DESCRIBED IN THIS SECTION MUST BE FOLLOWED AND EXHAUSTED BEFORE A CLAIMANT MAY INITIATE ANY LEGAL ACTION. FAILURE TO FOLLOW AND EXHAUST ALL PROCEDURES MAY RESULT IN A NEGATIVE RULING AND MAY IMPAIR OR CAUSE THE LOSS OF THE RIGHT TO BRING ANY FURTHER LEGAL ACTION.**

a. Time Frames

i.  <u>Medical Benefits (including Vision and Dental Benefits)</u>
    You will be notified of any adverse benefit determination within a
    reasonable period, but not later than 30 days after receipt of the claim.
    The 30-day period may be extended for up to 15 days for matters beyond
    the Plan's control if, before the end of the initial 30-day period, the Plan
    notifies you of the reasons for the extension and of the date by which the
    Plan expects to render a decision.  If the extension is needed because
    you did not submit the information necessary to decide the claim, the
    notice of extension will describe the required information and give you
    at least 45 days from receipt of the notice to provide it.

ii. <u>Employee Disability Income Benefit</u>
    If your claim for Employee Disability Income Benefits is denied in
    whole or in part for any reason, then within 45 days after the Plan
    receives your claim, the Plan will send you a written notice of its
    decision. This period may be extended for up to two 30-day periods due
    to matters beyond the control of the Plan.

    For any extensions, the Plan will provide advance written notice
    indicating the circumstances requiring the extension and the date by
    which the Plan expects to render a decision.  Any notice of extension
    shall specifically explain the standards on which entitlement to a benefit
    is based, the unresolved issues that prevent a decision on the claim, and
    the additional information needed to resolve those issues (if any), and
    you shall be afforded at least 45 days within which to provide specified
    information (if applicable).

iii. <u>Employee Life Insurance and Employee Accidental Death and
     Dismemberment Benefit</u>
     If your claim for Employee Life Insurance or Employee Accidental
     Death and Dismemberment Benefit is denied in whole or in part for any
     reason, then within 90 days after the Carrier receives your claim, the
     Carrier will send you written notice of its decision, unless special
     circumstances require an extension, in which case the Carrier will send
     you written notice of the decision no later than 180 days after the Carrier
     receives your claim.  If an extension is necessary, you will be given
     written notice of the extension circumstances requiring the extension of
     time and the date by which the Carrier expects to render the benefit
     determination.

b. Content of Notification of Initial Adverse Benefit Determination
If an initial notification of adverse benefit determination is needed, the notification shall set forth:

   i. The specific reasons for the adverse determination,

   ii. Reference to the specific Plan provisions (including any internal rules, guidelines, protocols, criteria, etc.) on which the determination is based,

   iii. A description of any additional material or information necessary for you to complete the claim and an explanation of why such material or information is necessary,

   iv. A description of the Plan's review procedures and the time limits applicable to such procedures, including a statement of your right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review,

   v. In the case of an adverse determination involving the claim for urgent care, a description of the expedited review process applicable to such claims,

   vi. If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse benefit determination, the notice will provide either the specific rule, protocol, or other similar criterion that was relied upon in making the adverse benefit determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge upon request, and

   vii. If the adverse benefit determination is based on medical necessity or experimental treatment, either an explanation of the scientific judgment for the determination, applying the Plan's terms to your medical circumstance, or a statement that such an explanation will be provided of charge upon request.

2. Appeals of Adverse Benefit Determinations
If you are not satisfied with the reason or reasons why your claim was denied, then you may appeal to the Board of Trustees.

   a. Time Frames

      i. Medical Claims
      To appeal an adverse benefit determination of any benefit claim, you must write to the Trustees within 180 days after you receive this Plan's initial determination.

ii.   <u>Disability Claims</u>
To appeal an adverse benefit determination of any benefit claim, you must write to the Trustees within 180 days after you receive this Plan's initial determination.

iii.   <u>Employee Life Insurance and Employee Accidental Death and Dismemberment Benefit Claims</u>
To appeal an adverse benefit determination of any benefit claim, you must write to the Trustees within 60 days after you receive this Plan's initial determination.

For appeals to the Board of Trustees, your correspondence (or your representative's correspondence) must include the following statement: "I AM WRITING IN ORDER TO APPEAL YOUR DECISION TO DENY ME BENEFITS. YOUR ADVERSE BENEFIT DETERMINATION WAS DATED _____, 20____." If this statement is not included, then the Trustees may not understand that you are making an appeal, as opposed to a general inquiry.

If you have chosen someone to represent you in making your appeal, then your letter (or your representative's letter) must state that you have authorized him or her to represent you with respect to your appeal, and you must sign such statement. Otherwise, the Trustees may not be sure that you have actually authorized someone to represent you, and the Trustees do not want to communicate about your situation to someone unless they are sure he or she is your chosen representative.

In an appeal from an adverse health insurance benefit expense involving urgent care, a health care professional with knowledge of your medical condition shall be permitted to act as your authorized representative.

You shall have the opportunity to submit written documents, records and other information related to the claim for benefits. You shall also be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim for benefits. The review will take into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

In addition, in regard to all appeals other than those involving Employee Life Insurance and Employee Accidental Death and Dismemberment Benefits: (1) the review will not afford deference to the initial adverse benefit determination and will be conducted by an appropriate named fiduciary of the Plan who is neither the individual who made the adverse benefit determination nor the subordinate of such individual, (2) insofar as the adverse benefit

determination is based on medical judgment, the Board will consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment, (3) such health care professional shall not be the individual, if any, who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual, and (4) medical or vocational experts whose advice was obtained on behalf of the Plan, without regard to whether the advice was relied upon in making the adverse benefit determination, will be identified.

*Special Rule Regarding Urgent Care Claims:*  For urgent care claims, you may request an expedited appeal, either orally or in writing, and all necessary information, including the Plan's benefit determination on review, shall be transmitted between you and the Plan by telephone, facsimile or other similarly expeditious method.

3.  Determination on Appeal

   a.  Time Frames

      *Medical Benefit Claims:*  You will be notified of the decision within a reasonable period of time appropriate to the medical circumstances, but not later than 30 days after receipt of the request for review.

      *All Other Claims:*  The Trustees at their next regularly scheduled meeting will make a determination of the appeal.  However, if the appeal is received less than 30 days before the meeting, the decision may be made at the second meeting following receipt of the request.  If special circumstances require an extension of time for processing, then a decision may be made at the third meeting following the date the appeal is made.  Before an extension of time commences, you will receive written notice of the extension, describing the special circumstances requiring the extension and the date by which the determination will be made.  The Plan will notify you of the benefit determination not later than five days after the determination is made.

   b.  Content of Adverse Benefit Determination on Review

      The Plan's written notice of the Board's decision will include the following:

     i.  The specific reasons for the adverse benefit determination,

     ii.  Reference to specific Plan provisions on which the determination is based,

iii.     A statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim for benefits,

iv.     A statement describing any voluntary appeal procedures offered by the Plan and a statement of your right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act (ERISA),

v.      If an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse benefit determination, the notice will provide either the specific rule, protocol, or other similar criterion relied upon in making the adverse benefit determination and that a copy of such rule, guideline, protocol or other similar criterion will be provided free of charge upon request, and

vi.     If the adverse benefit determination is based on medical necessity or experimental treatment or similar exclusion or limit, the written notice shall contain an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the claimant's medical circumstances, or a statement that such explanation will be provided upon request.

**The Trustees' Decision is Final and Binding**

The Trustees' final decision with respect to their review of any appeal will be final and binding upon you because the Trustees have exclusive authority and discretion to determine all questions of eligibility and entitlement under the Plan. Any legal action against this Plan must be started within 90 days from the date the adverse benefit determination denying your appeal is deposited in the mail to your last known address.

## Section Fifteen – Privacy and Security of Protected Health Information

A.  This section of the Plan, effective April 14, 2003, is adopted to effect compliance with the Health Insurance Portability and Accountability Act of 1996 and the Regulations issued thereunder by the Secretary of Health & Human Services concerning the privacy of protected health information (together referred to herein as The Privacy Rule).  The Privacy Rule is incorporated herein by reference.

B.  All capitalized terms have the meaning as stated in this combination Plan Document and Summary Plan Description or The Privacy Rule.

C.  This section establishes the required and permitted uses and disclosures of Protected Health Information (PHI) by the Plan Sponsor, which is the Board of Trustees.  The Board of Trustees is the Plan Administrator under the Employee Retirement Income Security Act of 1974 (ERISA).

D.  PHI may be used by and disclosed to the Board of Trustees or individual Trustees for purposes of general administration of the Plan, as follows:

   1.  Underwriting and budgeting (but may not include the disclosure of PHI that is genetic information for underwriting purposes as this is prohibited by the Genetic Information Nondiscrimination Act (GINA)),

   2.  Claims review and processing,

   3.  Amending or modifying the Plan of Benefits (plan design,

   4.  Claims assistance,

   5.  Eligibility review,

   6.  Any and all general administration of the Plan.

E.  PHI may be disclosed to the Board of Trustees or to individual Trustees as authorized by an individual.

F.  The Iron Workers Local 12 Health Insurance Fund shall make reasonable efforts to limit disclosure and use of PHI to the Board of Trustees to the minimum necessary to accomplish the intended use or disclosure.

G.  The Board of Trustees:

   1.  Shall not use or further disclose PHI other than as permitted or required by this Plan Document or as required by law.

   2.  Shall comply with verification procedures of the group health plan.

3.   Shall ensure adequate separation between the group health plan and the Plan Sponsor as follows:

   a.   Describe those employees or classes of employees or other persons under the control of the plan sponsor to be given access to the PHI to be disclosed, provided that any employee or person who receives PHI relating to treatment, payment under, health care operations of, or other matters pertaining to the group health plan in the ordinary course of business must be included in such description,

   b.   Restrict the access to and use by such employees and other persons described in Subsection G., 3.a. of this Section to the Plan administration functions that the Plan Sponsor performs for the group health plan,and

   c.   Provide an effective mechanism for resolving any issues of noncompliance by persons described in Subsection G., 3.a. of this Section with the Plan Document provisions required by this paragraph.

4.   Shall not use or disclose PHI for employment related decisions.

5.   Ensure that any agents, including a subcontractor, to whom the Plan Sponsor provides PHI received from the Plan agree to the same restrictions and conditions that apply to the Plan Sponsor with respect to such information.

6.   Not use or disclose the information in connection with any other benefit or employee benefit plan of the Plan Sponsor unless authorized by the individual or pursuant to a Business Associate contract.

7.   Report to the Plan any use or disclosure of the information that is inconsistent with the allowed uses or disclosures of which it becomes aware.

8.   Make PHI available to the Plan when the Plan is requested by an individual to gain access to PHI in accordance with the access requirements of HIPAA.

9.   Make PHI available to the Plan when the Plan is requested by an individual for amendment and incorporate any amendments to PHI in accordance with HIPAA.

10.  Make available to the Plan the information required to provide an accounting of disclosures.

11.  Make internal practices, books and records relating to the use and disclosure of PHI received from the group health Plan available to the Secretary of HHS for the purposes of determining compliance by the Plan with HIPAA, and

12. Return or destroy all PHI received from the Plan that the Plan Sponsor maintains in any form and retain no copies of such information when no longer needed for the purpose for which disclosure was made. If return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction infeasible.

H. Each Trustee shall certify compliance with the Privacy Rule and the Privacy Policy of the Iron Workers Local 12 Health Insurance Fund.

I. Effective April 20, 2006, the Board of Trustees shall:

1. Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic protected health information that it creates, receives, maintains, or transmits on behalf of the Plan,

2. Ensure that the adequate separation required by §164.504(f)(2)(iii) of the Privacy Rule is supported by reasonable and appropriate security measures,

3. Ensure that any agent, including a subcontractor, to whom it provides this information agrees to implement reasonable and appropriate security measures to protect the information,

4. Report to the Plan any security incident of which it becomes aware, and

5. If unsecured PHI is acquired, used or disclosed in a manner that is not permitted under the Privacy Rules and in a manner that poses a significant risk of financial, reputational, or other harm to the individuals whose PHI was acquired, used disclosed (referred to as a "Breach"), the Fund is required to provide appropriate Notice as defined by law without unreasonable delay and in no case later than 60 days after the discovery of the Breach by the Fund or the receipt of information of the Breach.

## Section Sixteen – Administrative Information

The following topics are discussed under this Section on Administrative Information:

| | | | |
|---|---|---|---|
| A. | Coordination of Benefits | K. | Plan Interpretations and Determinations |
| B. | Determination of Benefits | | |
| C. | Employer Rights to Contributions | L. | Important Notice |
| D. | Encumbrance of Benefits | M. | Required Disclosures |
| E. | Facility of Payment | N. | Modification of Benefits and Eligibility Rules for Retired Employees and Their Eligible Dependents |
| F. | Reciprocity and Portability | | |
| G. | Termination of Plan | | |
| H. | Right to Release or Request Information | | |
| | | O. | Medicare Required Disclosures |
| I. | Subrogation of Benefits | P. | Dependent Documentation |
| J. | Communications | Q. | Fraudulent Claim Warning |

A.  <u>Coordination of Benefits</u>

Some individuals have coverage in addition to the Benefits provided by the Plan. When this happens, the amount of Benefits payable under this Plan will take into account any coverage you or a family member has under "other plans" so the combined benefits under this Plan and the "other plan" will not be more than the total expenses involved. Information necessary to the administration of this Coordination of Benefits provision will be required at the time a claim is submitted.

If you are a person with multiple benefit coverage, when filing a claim with this Plan you must make full disclosure. If you fail to disclose "other plan" information, this may be considered a fraudulent claim which may result in you being disqualified from receiving Benefits from this Plan.

For coordinating benefits of multiple coverage, "Plan" means any of the following that provides benefits or services for, or because of, medical or dental care or treatment: Group insurance or group remittance subscriber contracts, whether insured or uninsured, Employer sponsored Blue Cross, Blue Shield or other prepayment coverage, Group contracts other than individual insurance issued on a franchise basis, Coverage under a governmental plan, Coverage required or provided by law, and Medical benefits coverage in group and individual mandatory automobile "no-fault" and traditional mandatory automobile "fault" contracts.

"Plan" does not include: a state plan under Medicaid or Medicare, benefits under a law or plan when, by law, its benefits are excess to those of any private insurance plan, individual insurance for which the person is the policyholder and pays 100% of the premium.

85

This Plan will pay its regular benefits in full, or in a reduced amount which when added to the benefits provided by other plans, will equal 100% of the "allowable expenses" incurred. "Allowable expenses" means any necessary, reasonable and customary expenses incurred while eligible under this Plan, part or all of which would be covered under any other plans. Expenses with no coverage by this Plan or any other plan are not allowable expenses.

In coordinating benefits for an individual having multiple coverage, the "primary" plan pays first and the "secondary" plan pays next. The total benefits paid by this Plan when it is "secondary", when added to the total benefits paid by another plan which is "primary", will not exceed 100% of the allowable expenses incurred. In addition, this Plan will not pay more benefits than it would normally provide without this special coordinating provision.

When duplicate coverage arises, and both plans contain a Coordination of Benefits provision, the plan covering the person incurring the claim as an Employee is the primary plan. If an individual is covered under two plans through two jobs, the plan which the Employee is currently eligible to receive benefits and contributions are being made on his or her behalf in that plan will pay first (primary). When another plan does not contain a Coordination of Benefits provision, it will always be considered the primary plan. Payment under the secondary plan is made after the amount payable by the primary plan has been determined.

The order of payment rules used when coordinating benefits of an Eligible Dependent child who is covered by both parents' group plans are as follows:

1.  Under the "birth date" coordination rule, the plan which covers the parent whose date of birth, excluding year of birth, occurs earlier in a calendar year, will be the "primary" plan for the child. The plan which covers the parent whose date of birth, excluding year of birth, occurs later in a calendar year, will be the "secondary" plan for the child.

    A plan which does not have the "birth date" coordination rule but the "gender" coordination rule will always be considered the primary plan.

2.  When the parents are divorced or legally separated (per a judgment of separation or a duly executed and acknowledged separation agreement), the order of payment is:

    a.  The plan of the parent with custody is "primary" for payment and the plan of the parent without custody is "secondary" for payment, and

    b.  If the parent with custody is remarried, the order of payment is:

        i.  The plan of the parent with custody,

    ii.   The plan of the step-parent, and

    iii.   The plan of the parent without custody.

3.    If there is a court decree stating that one of the parents is responsible for the child's health care expense, the plan of that parent will pay first. That order will supersede any other given in 1. or 2.

If a husband and wife are both covered as eligible Employees under this Plan, benefits will be provided for both persons and their Eligible Dependent children on the same coordinated basis as if two separate plans were involved.

Whenever payments are made by another plan that were to be made by this Plan according to the Coordination of Benefit rules, this Plan will have the right to pay that plan to satisfy the intent of the Coordination of Benefits rules.

Payments made and the amounts paid are exercisable alone by this Plan and in its sole discretion. They are considered as Benefits paid by this Plan and, to the extent of these payments, this Plan is fully discharged from liability.

<u>For Coordination of Benefits with HMOs and Other Managed Care Plans</u>
The Plan Manager will determine the order of payment ("primary vs. secondary") pursuant to the specific terms of the Plan Document.

For those eligible members and their Eligible Dependents who have primary coverage as an employee or dependent in another plan, which is an HMO or a Managed Care Plan, "Allowable Expenses" will be based on the allowable expenses or covered expenses as determined by the primary plan and documented in the Explanation of Benefits (EOB). These "Allowable Expenses" will be the basis for benefit determination under this Plan.

Under no circumstances will penalty deductibles or co-payments, which are imposed by the primary plan be recognized by this Plan as "Allowable Expenses". These amounts will be deducted from the "Allowable Expenses" before determination of regular benefits under this Plan are determined and any secondary benefits are paid.

An HMO or Managed Care Plan will be defined as any plan of benefits requiring the use of a specified panel of providers, compliance with utilization review standards, prior authorization for access to providers or services, or any other program which the Plan Manager deems to be consistent with HMO/Managed Care operations.

Special "Benefits Deductible" Coordinating Provisions

1.   Should a person who has primary coverage as an employee or dependent in another plan or is denied benefits under that plan because he or she elected not to comply with its rules, elect not to use the benefits available under that plan, then this Plan will apply a "benefits deductible" to such expenses incurred before any secondary benefits are paid by this Plan. The "benefits deductible" will be the equivalent of those benefits that would have been payable by the other plan.

2.   Should a person who qualifies for benefit coverage as a dependent spouse under this Plan:

   a.   Also qualify for individual Employee non-contributory primary coverage under the plan of his or her Employer and "waive out" or "opt out" of such coverage under the Employer's plan, or

   b.   Also qualify for individual Employee contributory primary coverage under the primary plan of his or her Employer and "waive out" or "opt out" of such coverage under the Employer's plan and for such waiver of coverage receive a financial incentive from the Employer,

   Then this Plan will apply a "benefits deductible" to any expense incurred by such person before any secondary dependent benefits are payable by this Plan. The "benefits deductible" will be the equivalent of the individual Employee benefits that would have been payable by the other plan of his or her Employer.

Coordination of Benefits Claim Filing Information
Whether this Plan is primary or secondary, Blue Shield of Northeastern New York (the Plan's TPA) needs all necessary information about other coverage completed on your claim before payment will be made for any claim involving coordination of benefits.

If this Plan is primary, send the TPA your original itemized bills along with your completed claim form.

If this Plan is secondary, send your bills to your primary plan first.  After you receive payment or rejection of your claim from the primary plan, send the TPA a copy of your bills, the payment or rejection statement from the primary plan, and your completed claim form.

B.   Determination of Benefits
The Trustees have full authority and sole discretion to make determinations of entitlements to and amounts of Benefits.  Subject to the right of appeal, the determination shall be final and binding upon all parties claiming Benefits under the Plan.

C.   Employer Rights to Contributions

Except in the case of mistaken contributions, the Employers shall have no right, title or interest in the contributions made by them to the Fund and no part of the Fund shall revert to the Employers in the event of a termination of the Fund.

D.   Encumbrance of Benefits

No monies, property or equity of any nature whatsoever in the Fund, policies, Benefits or monies payable therefrom, shall be subject in any manner by a Covered Person or person claiming through a Covered Person, to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, garnishment, mortgage, lien or charge and any attempt to cause any Benefit to be subject thereto shall be null and void; provided however, that Benefits may be assigned by the Covered Person or Beneficiary to the health care provider who furnished the services or supplies for which a Benefit is payable.

E.   Facility of Payment

Whenever payments which should have been made under this Plan in accordance herewith have been made under any other plans, the Trustees have the right, exercisable alone and in their sole discretion, to pay to the other organization making such payments any amounts which they determine to be warranted in order to satisfy the intent of this provision.  Any amounts paid shall be deemed to be Benefits paid under this Plan and the Trustees shall be fully discharged from any future liability.

F.   Reciprocity and Portability

The Trustees may enter into or amend portability or reciprocity agreements with other welfare funds.

G.   Termination of Plan

The Benefits provided under this Plan are NOT vested Benefits and the Trustees have the authority to terminate any Benefit, including Retiree Benefits, or the entire Plan, at any time.

In the event of termination of the Plan, the Trustees shall apply the Fund to pay or provide the payment of any and all obligations of the Fund and shall distribute and apply any remaining surplus in such manner as will, in their opinion, best effectuate the purposes of the Fund.  No part of the corpus or income of the Fund will be used for or diverted to purposes other than for the expenses of the Fund or for other payments in accordance with the provisions of the Fund.  Under no circumstances will any portion of the corpus or income of the Fund, directly or indirectly, revert to or accrue to the Benefit of the Employers, the Association or the Union.

Upon final liquidation of the Plan, Participants and Beneficiaries will not have any further rights or vested interest in the Plan.

H.   Right to Release or Request Information

For the purpose of determining the applicability and implementing the Coordination of Benefits and/or Subrogation provisions or any similar provisions in other plans, to the extent allowed by law, the Trustees may, without the consent of or notice to any person, release to or obtain from any insurance company or other organization or person, any information with respect to any person which the Trustees deem necessary for such purposes.  In so acting the Trustees shall be free from any liability that may arise in relation to such action. Any person claiming Benefits under this Plan must furnish such information as the Trustees may reasonably deem necessary in order to implement this provision.

> **THE TRUSTEES WILL HAVE NO OBLIGATION TO FURNISH ANY BENEFIT UNDER THE PLAN UNTIL ALL ADDITIONAL INFORMATION REQUESTED HAS BEEN RECEIVED.**

I.   Subrogation of Benefits

For claims involving third party liability, this subrogation provision applies to all Employees (and Retirees) and Eligible Dependents, with respect to all of the Benefits provided under this Plan.  For the purposes of this provision, the terms "you" and "your" refer to all Employees, Retirees and Eligible Dependents.

General

Occasionally, a third party may be liable for your medical expenses.  This may occur when a third party is responsible for causing your Illness or Accident or is otherwise responsible for your medical bills.  The rules in this Section govern how this Plan pays Benefits in such situations.

These rules have two purposes.  First, the rules ensure that your Benefits will be paid promptly.  Often, where there is a question of third party liability, many months pass before the third party actually pays.  These rules permit this Plan to pay your Covered Charges until your dispute with the third party is resolved.

Second, the rules protect this Plan from bearing the full expense in situations where a third party is liable.  Under these rules, once it is determined that a third party is liable in any way for the Accident or Illness giving rise to these expenses, this Plan shall have a lien for and must be reimbursed for the relevant Benefits it has advanced to you out of any recovery whatsoever that you receive that is in any way related to the event which caused you to incur the medical expenses.

Rights of Subrogation and Lien

If you incur Covered Charges for which a third party may be liable, you must contact the Fund office and provide full details.  The Fund office will provide you with a copy of the Plan's subrogation and lien agreement.

Before any Benefits are paid, the Plan's subrogation and lien agreement requires you to agree to reimburse the Plan for any Benefit payments made on your behalf if recovery is obtained as the result of action taken against a third party. The Plan will also be subrogated to the rights against the third party, and shall have the right, but not the obligation, to proceed directly against the third party for recovery of expenses by the Plan.

In addition to its subrogation rights, the Plan has the right to be reimbursed for payments made on your behalf under these circumstances. The Plan shall have a lien for and must be reimbursed from any settlement, judgment or other payment that you obtain from or on behalf of the liable third party, before any other expenses, including attorney's fees, are taken out of the payment. ***The Plan's rights of subrogation and reimbursement will not be affected, reduced or eliminated by the make-whole doctrine, comparative fault or the common fund doctrine.***

You shall not settle any claim or case or sign any release in connection with the claim or case without the prior written approval of the Trustees. If you do, the Trustees have the right to deny you any further Benefits and to hold you personally responsible for reimbursement of any Benefits paid in connection with the third party claim or case.

The Trustees reserve the right, in their sole and absolute discretion, to require the execution of this Plan's lien and subrogation form by you (or your authorized representative if you are a minor or if you cannot sign) before this Plan pays you any Benefits related to such expenses. If the Trustees have required execution of the Plan's subrogation and lien form, no Benefits will be provided unless you and your attorney (if any) sign the form. You must also notify the Plan before you retain another attorney or an additional attorney since that attorney must also execute the form. In no event shall the failure of the trustees to require execution of the lien forms diminish or be considered a waiver of the Plan's rights of subrogation and reimbursement.

Assignment of Claim
***You may not assign any rights or causes of action that you may have against any third party tortfeasor without the express written consent of the Plan.*** The Trustees, in their sole discretion, may require you to assign your entire claim against the third party to this Plan. If this Plan recovers from the third party any amount in excess of the Benefits paid to you, plus the expenses incurred in making the recovery, then the excess will be paid to you.

Credit Against Future Benefits
The Plan's obligation to pay Benefits arising from the third party's conduct or culpability shall be reduced by the amount of the net proceeds recovered by you through settlement, judgment or otherwise as a result of your action against the third party. In addition to satisfaction of the existing lien from any recovery received by the Participant, spouse and/or dependent, the Plan is also entitled to a

future credit for future related plan expenses equal to the net monies received by the Participant, spouse and/or dependent.  As such, the Participant, spouse and/or dependent must spend the net recovery on related plan expenses until the amount of said net recovery is exhausted.  It is only at that point that the Participant's, spouse's and/or dependent's further related plan benefits would again be the financial responsibility of the Plan.  The Fund Office will determine the net monies available for a future credit.

Failure to Disclose and/or Cooperate
If you fail to tell this Plan that you have a claim against a third party, or if you fail to assign your claim against the third party to this Plan when required to do so (and to cooperate with the Plan's subsequent recovery efforts), or if you fail to require any attorney you subsequently retain to sign the Plan's subrogation and lien form, or if you and/or your attorneys fail to reimburse this Plan out of any payment you obtain from the third party, and/or if you fail to fully reimburse the Plan (out of any settlement you receive, or otherwise, even if this Plan reduces the amount of its lien or otherwise limits its rights), then you are personally liable to this Plan for the reimbursement to this Plan for the Benefits paid on your behalf.  This Plan may offset the amount you owe from any future Benefits for claim submitted on behalf of you or your Eligible Dependents, whether or not such other claim is related to the Accident or Illness giving rise to the third party claim. *You will also be personally liable to the Plan for the Plan's attorney's fees and costs incurred in recovering the reimbursement amount.*

J.  Communications
If you have a question about any aspect of your participation in the Plan, you should write to the Fund Office.  You will then receive a written reply which will provide you with a permanent reference.

Contact the Fund Office if you have any questions about the terms of the Plan or payment of Benefits.

This booklet and the personnel in the Fund Office are authorized sources for Plan information for you.

K.  Plan Interpretations and Determination
As of the effective date, this Summary Plan Description supersedes and replaces all previous materials.

The Board of Trustees is responsible for interpreting the Plan and for making determinations under the Plan.  In order to carry out their responsibility the Trustees have exclusive authority and full discretion:  to determine whether an individual is eligible for any Benefits under the Plan, to determine the amount of Benefits, if any, an individual is entitled to from the Plan, to determine or find facts that are relevant to any claim for Benefits from the Plan, to interpret all of the Plan's provisions, to interpret all the provisions of the Summary Plan Description, to interpret the

provisions of the Trust Agreement governing the operation of the Plan, to interpret any other document or instrument involving or having impact upon the Plan, and to interpret all of the terms used in the Plan, the Summary Plan Description and in all of the other previously mentioned agreements, documents and instruments.

Because you receive services or submit a claim is not a guarantee that you are eligible for Benefits or that you will receive Benefit payment.

This booklet describes the main features of our Plan. If there is a conflict between any provisions in this Summary Plan Description and the provisions of the Plan or any underlying insurance contract, the relevant provisions of the Plan or of the insurance contract shall control and be deemed the official governing language.

All such interpretations and determinations made by the Trustees, or their designee, in good faith shall: be final and binding upon any individual claiming Benefits under the Plan and upon all Employees, all Employers, the Union, and any party who has executed any agreement with the Trustees or the Union will; be given deference in all courts of law, to the greatest extent allowed by applicable law; and not be overturned or set aside by any court of law unless the court finds that the Trustees, or their designee, abused their discretion in making such determination or rendering such interpretation.

L.  Important Notice
    This Summary Plan Description (SPD) describes the provisions and components of the Health Insurance Fund, as it exists on the effective date of the document. From time to time these provisions may be amended. To the extent the provisions described in these pages are amended, you will receive updated information in a timely manner.

M.  Required Disclosures
    If at any time there is a material reduction in covered services under the Plan, you will be notified through a Summary of Material Modifications which will be issued within 60 days following the date that the modification is adopted. Alternatively, the Fund Office will notify you of any changes to the Plan.

N.  Modification of Benefits and Eligibility Rules for Retired Employees and their Eligible Dependents
    This Summary Plan Description includes information concerning the Benefits provided by the Trustees to retired Employees and their Eligible Dependents and the circumstances which may result in disqualification, ineligibility or denial of Benefits that a retired Employee or Eligible Dependent might otherwise reasonably expect the Plan to provide.

    The Benefits and eligibility rules applicable to retired Employees and their Eligible Dependents have been established by the Trustees as part of an overall Benefit program. The right to amend or modify the eligibility rules and plan of Benefits for

retired Employees and their Eligible Dependents is reserved by the Board of Trustees, in accordance with the rules of the Trust Agreement. The continuance of Benefits for retired Employees and their Eligible Dependents and the eligibility rules relating thereto are subject to modification and revision by the Board of Trustees in accordance with their responsibilities and authorities contained in the Trust Agreement.

In accordance with the rules and regulations and the Trust Agreement, no person has a vested interest in the Benefits provided for retired Employees and their Eligible Dependents. In the event of termination of the Plan, as stated in Subsection G. of this Section, the Trustees reserve the right to terminate the program of Benefits for retired Employees and there shall not be any vested right by any retired Employee or Eligible Dependent or Beneficiary nor contractual rights after the disposition of all Plan assets and the termination of the Plan. Retired Employees and their Eligible Dependents will not have any priority with respect to the disposition of assets in connection with the termination of this Health Insurance Fund.

O.  Required Disclosures
There are special rules for coverage of Covered Employees (and dependent spouses of Covered Employees) who are:

1.  age 65 or over,

2.  eligible for Medicare benefits, and

3.  eligible for Fund coverage.

If you are a person meeting these conditions:

1.  This Fund's benefit plan is your "primary" health insurance plan for hospital and doctor services. This means you continue to submit all your claims to the Fund Office and/or the TPA and receive the same benefit as any younger eligible Covered Employee or dependent spouse.

2.  Medicare is your "secondary" health insurance plan for hospital and doctor services. After this Plan pays "primary" benefits, for any remaining expenses you should submit a claim to Medicare.

This Plan ceases to be "primary" health insurance plan on the earlier of:

1.  The date a Covered Employee age 65 and over retires, or

2.  For a dependent spouse age 65 or over, the date the members' spouse retires.

At the date of 1 or 2 above, Medicare becomes the "primary" health insurance plan for hospital services covered under Medicare Part A and for doctor's services

covered under Medicare Part B. You should submit your hospital and doctor claims to Medicare for payment of any "primary" benefits.

Those receiving monthly Social Security Disability benefits will become eligible for Medicare benefits 24 months after the date of entitlement of their Social Security award.

With respect to Covered Employees (and dependent spouses of Covered Employees) who qualify for Medicare benefits by reason of receiving hemodialysis care, Medicare is always their "primary" health insurance plan with this Plan being their "secondary" health insurance plan.

Once you are retired and eligible for Medicare benefits, the Plan will not pay benefits that you could get from Medicare. Once you are retired and your dependent spouse becomes eligible for Medicare, the Plan will not pay benefits your dependent spouse could receive from Medicare.

P.   Dependent Documentation

Following are the items to be furnished to the Fund Office as proof and verification of eligibility for Dependents:

**For A Dependent Spouse**
Spouse's Social Security Number, a copy of Certificate of Marriage and a copy of the birth certificate.

**For the Employee's Dependent Child Under Age 19:**

1. For a natural born child of an Employee:

   a.   Copy of the child's birth certificate, plus

   b.   Child's Social Security Number.

2. For an adopted child:

   a.   Copy of court order of adoption, plus

   b.   Copy of the child's birth certificate, plus

3. Child's Social Security Number.
4. For a non-adopted child acquired through marriage to a previously divorced/widowed parent of such child:

   a.   Copy of the child's birth certificate, plus

   b.   Child's Social Security Number, plus

c. Employee's notarized statement (in the form furnished by the Fund Office upon request): that the named child resides in the Employee's household, that there exists a true parent-child relationship, that the Employee accepts the responsibility for payment of the child's medical expenses, and that the Employee provides not less than 75% of the child's support and maintenance. In addition, legal documentation that the child's natural parent is not required to provide coverage for the child's medical expenses and that the Employee has accepted the responsibility for payment of the child's medical expenses.

**For the Employee's Dependent Child Ages 19 to 26:**

1. Copy of child's birth certificate, plus

2. Child's Social Security Number, plus

3. Letter from the Registrar of the accredited school or college that the child is attending the institution on a continuous basis as a full-time student in a degree program of not less than 12 credit hours per semester, or is attending a qualified trade school (registered and certified by the Department of Education of New York State) on a continuous basis as a full-time student, plus

4. Dependent Child Enrollment Form for children who do not have other health care coverage available via their employment or their spouse's employment.

*Dependent claims submitted without the proper documentation will be delayed for payment until the Fund Office can determine whether dependent coverage is valid.*

Q. Fraudulent Claim Warning
Any person who knowingly and with intent to defraud files a statement of claim or assists anyone else in filing such a statement of claim which contains any material with false information, or conceals for the purpose of misleading information concerning any fact material hereto, which is determined to be fraudulent commits a fraudulent act which is a crime. In the event that such a claim is submitted by a Participant or anyone else, the claim would be denied, the full sanctions under the law would be followed, and the eligibility of such person suspended for a minimum period of one year with reinstatement subject to review and approval by the Board of Trustees. In the event any claim is paid as the result of such a fraudulent statement or submission, which is determined as fraudulent, the full penalty of the law will be applied, the amount of the claim paid will be recovered with interest and the Employee's eligibility for all benefits under the Fund would be indefinitely suspended.

## Section Seventeen – Your Rights Under Federal Law

**READ THIS SECTION CAREFULLY.** This is the only way to ensure that you have the information you need to protect your rights and your best interests under this Plan.

### Your ERISA Rights as a Participant
As a Participant of the Iron Workers Local 12 Health Insurance Fund you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all Plan Participants shall be entitled to:

A.  Receive Information About Your Plan and Benefits
    Examine, without charge, at the Plan administrator's office and at other specified locations, such as worksites and union halls, all documents governing the Plan, including insurance contracts and Collective Bargaining Agreements, and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

    Obtain, upon written request to the Plan administrator, copies of documents governing the operation of the Plan, including insurance contracts and Collective Bargaining Agreements, and copies of the latest annual report (Form 5500 Series) and updated Summary Plan Description. The administrator may make a reasonable charge for the copies.

    Receive a summary of the Plan's annual financial report. The Plan administrator is required by law to furnish each Participant with a copy of this summary annual report.

    Be informed that under the Health Insurance Portability and Accountability Act (HIPAA), the Plan must provide you with a "Certificate of Creditable Coverage" if you lose health care coverage under the Plan for any reason. This Certificate reports data on prior periods of health coverage under the Plan compiled in accordance with federal regulations. Participants should retain this "Certificate of Creditable Coverage" and submit it to a new employer if the new employer maintains a group health care plan. The new employer may be required under federal law to credit such coverage toward any waiting period for coverage of pre-existing conditions under the new employer's plan.

    Be informed that the Plan is in compliance with the non-discrimination requirements set forth in Section 2590.701-2 of the DOL's HIPAA regulations. These regulations state that a group health care plan may NOT establish eligibility rules based on any of the following factors: (1) health status, (2) medical condition (including both physical Illness and Mental Disorder), (3) prior claims experience, (4) actual receipt of health care, (5) medical history, (6) genetic information, (7) evidence of insurability (including conditions arising out of domestic violence), or, (8) disability.

Be informed that under the Newborns' and Mothers' Health Protection Act, group health plans and health insurance issuers offering group health insurance coverage generally may NOT restrict benefits for any Hospital stay in connection with childbirth for the mother or newborn child to less than 48 hours following vaginal delivery, or less than 96 hours following a delivery by cesarean section. However, the plan, or issuer, may pay for a shorter stay if the attending provider (e.g., your Physician, nurse midwife, or Physician assistant), after consultation with the mother, discharges the mother or newborn earlier. Under federal law, plans and issuers may not set the level of benefits or out-of-pocket costs so that any later portion of the 48 hour or 96 hour stay is treated in a manner less favorable to the mother or newborn than any earlier portion of the stay. In addition, a plan or issuer may not, under federal law, require that a Physician or other health care provider obtain authorization for prescribing a length of stay of up to 48 hours or 96 hours, as applicable. However, to use certain providers or facilities, or to reduce your out-of-pocket costs, you may be required to obtain pre-certification. For information on pre-certification, contact your Plan administrator.

Be informed that under the Women's Health and Cancer Rights Act, group health plans and health insurance issuers offering group health insurance coverage that includes medical and surgical benefits with respect to mastectomies shall include medical and surgical benefits for breast reconstructive surgery as part of a mastectomy procedure. Breast reconstructive surgery benefits in connection with a mastectomy shall at a minimum provide coverage for: (1) reconstruction of the breast on which the mastectomy has been performed, (2) surgery and reconstruction of the other breast to produce a symmetrical appearance, (3) prostheses, and, (4) physical complications for all stages of mastectomy, including lymphedemas. Such surgery shall be in a manner determined in consultation with the attending Physician and the patient. As part of the Plan's Schedule of Benefits, such Benefits are subject to the Plan's appropriate cost control provisions, such as Deductibles and coinsurance.

B.   Continued Group Health Plan Coverage
Continued health care coverage for yourself, spouse or dependents if there is a loss of coverage under the Plan as a result of a qualifying event. You or your dependents may have to pay for such coverage. Review this Summary Plan Description and the documents governing the Plan on the rules governing your COBRA Continuation Coverage rights.

Exclusionary periods of coverage for pre-existing conditions under the Plan may be reduced or eliminated if you have creditable coverage from another plan. You should be provided a Certificate of Creditable Coverage, free of charge, from this Plan (any other group health plan), or health insurance issuer when you lose coverage under the Plan, when you become entitled to elect COBRA Continuation Coverage, when your COBRA Continuation Coverage ceases, if you request it before losing coverage, or if you request it up to 24 months after losing coverage. Without evidence of creditable coverage, you may be subject to a pre-existing

condition exclusion for 12 months (18 months for late enrollees) after your enrollment date in your coverage.

C.   Prudent Actions by Plan Fiduciaries

In addition to creating rights for plan participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan Participants and Beneficiaries. No one, including your Employer, your Union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

D.   Enforce Your Rights

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the Plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for Benefits which is denied or ignored, in whole or in part, you may file suit in a State or Federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a medical child support order, you may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

However, all review and appeal procedures described in the Plan usually must be followed and exhausted before a claimant may institute any legal action including any action or proceedings before any court, administrative agency or arbitrator ("legal bodies"). Generally, such legal bodies require a claimant to follow and exhaust the Fund's review procedures before allowing a claimant's legal action to proceed. If a claimant files a legal action before following and exhausting the Fund's review procedures, this may result in a negative ruling by the relevant legal body and impair or cause the loss of the right to bring any further legal action.

E.   <u>Assistance with your Questions</u>

If you have any questions about your Plan, you should contact the Plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Plan administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## Section Eighteen – Other Important Information

One of the main goals of the Employee Retirement Income Security Act of 1974 (ERISA) is expanded reporting and disclosure of benefit plan operations and provisions, that is, reporting to the Department of Labor, Internal Revenue Service and to the Plan Participants and Beneficiaries.

It is the intention of the Trustees to comply with all aspects of ERISA. Thus the required information in this Section has been reported to the appropriate federal agencies and is hereby "disclosed" to you.

A. Administration of Plan

The Plan Sponsor and Plan Administrator is the Joint Board of Trustees, one-half of whom are appointed by the Union and one-half of whom are appointed by the Association. The names and addresses of the Trustees are listed on page 1. The Board, together with such persons or firms to whom authority for administering the Plan has been delegated, is responsible for managing the Plan and interpreting its provisions. You may contact the Fund Office at:

> Iron Workers Local No. 12 Health Insurance Fund
> 890 Third Street
> Albany, NY 12206
> Telephone:   (518) 434-1206
> Fax:   (518) 434-3466

The Trustees have hired an Administrative Manager to perform the day-to-day operations of the Plan, such as maintaining records, making Benefit payments and handling general administrative matters. You may contact the Administrative Manager at the address and telephone numbers above.

B. Employer Identification Number

The Employer Identification Number assigned to the Plan by the Internal Revenue Service is 14-1512728.

C. Funding Medium for the Accumulation of Plan Assets

All contributions and investment earnings of the Plan are accumulated in a Trust Fund which is utilized to pay Benefits to eligible individuals and to defray reasonable costs of administration.

D. Method of Funding Benefits

The Medical, Dental, Vision and Prescription Drug Benefits are provided on a self-insured basis. The Employee Life Insurance and Accidental Death and Dismemberment Benefits are provided under a group contract issued by Amalgamated Life Insurance Company.

E.   Name of Plan
     The full legal name of the Plan is the Iron Workers Local 12 Health Insurance
     Fund.

F.   Plan Advisors

     *Fund Attorney (Person to Receive Service of Legal Process)*
     Blitman & King, LLP
     Franklin Center, Suite 300
     443 North Franklin Street
     Syracuse, NY  13204

     Service may also be made on any Plan Trustee or Plan Administrator

     *Plan Consultant and Plan Actuary*
     United Actuarial Services, Inc.
     11590 North Meridian Street, Suite 610
     Carmel, IN 46032-4529

G.   Plan Year
     July 1 of each year and ends on June 30 of the following year

H.   Plan Number
     The Plan Number is 501

I.   Sources of Contributions
     This Plan is funded through contributions by the Employers on behalf of their
     Employees, under the terms of a Collective Bargaining Agreement or other
     participation agreement, and by investment income earned on a portion of the
     Fund's assets.  In some cases, a Covered Person will be entitled to make self-
     payments in order to maintain eligibility for Benefits.

J.   Type of Plan
     This Plan provides hospitalization, medical, vision, supplemental weekly disability,
     death Benefits, maternity, dental and other related health care Benefits to active and
     retired Employees and their Eligible Dependents.  It is maintained pursuant to a
     Collective Bargaining Agreement between the Union and the Association which is
     available for examination at the Fund Office.  A copy of the agreement may be
     obtained upon written request to the Fund Office.  Upon request, the Fund Office
     will also inform you if a particular employer or union participates in the Plan and, if
     so, the address of that employer or union.

     This Plan believes this is a "grandfathered health plan" under the Patient Protection
     and Affordable Care Act (the Affordable Care Act). As permitted by the Affordable
     Care Act, a grandfathered health plan can preserve certain basic health coverage
     that was already in effect when that law was enacted. Being a grandfathered health

plan means that your Plan may not include certain consumer protections of the Affordable Care Act that apply to other plans, for example, the requirement for the provision of preventive health services without any cost sharing. However, grandfathered health plans must comply with certain other consumer protections in the Affordable Care Act, for example, the elimination of lifetime limits on benefits.

Questions regarding which protections apply and which protections do not apply to a grandfathered health plan and what might cause a plan to change from grandfathered health plan status can be directed to the Plan administrator at the Fund Office.

You may also contact the Employee Benefits Security Administration, U.S. Department of Labor at (866) 444-3272 or www.dol.gov/ebsa/healthreform. This website has a table summarizing which protections do and do not apply to grandfathered health plans.

K.   Amendment
The Trustees reserve the right to amend, modify or terminate this Plan as circumstances dictate.

L.   Circumstances Which May Affect Benefits
Circumstances that may result in disqualification, ineligibility, denial, loss, forfeiture or suspension of any Benefits are:

1.   The Employee's failure to work the hours required to maintain eligibility.

2.   In the case of persons who are Eligible Dependents, they may become ineligible if they no longer meet the Plan's definition of Eligible Dependent.

3.   The Employee or Eligible Dependent files a claim for services not covered under the Plan.

4.   The failure of the Employee or Eligible Dependent to file a claim within 90 days of the date he or she incurred the expense for which Benefits are payable.

5.   The failure of the Employee or Eligible Dependent to file a complete and truthful claim.

6.   Where the Employee or Eligible Dependent has other group insurance coverage, it is possible that Benefits payable under this Plan may be reduced or denied due to "Coordination of Benefits" between the two plans.

## Section Nineteen – Definitions

> **THE FOLLOWING WORDS HAVE SPECIFIC MEANINGS WHEN USED IN THE PLAN.   IT IS IMPORTANT TO UNDERSTAND THE MEANINGS OF THESE DEFINED TERMS WHILE USING THIS BOOKLET.**

| | | | |
|---|---|---|---|
| A. | Accident | S. | In-Patient |
| B. | Beneficiary | T. | Medically Necessary |
| C. | Benefits | U. | Mental Disorder |
| D. | COBRA Continuation Coverage | V. | No-Fault Motor Vehicle Plan |
| E. | Collective Bargaining Agreement | W. | Out-Patient |
| F. | Covered Charges | X. | Participant |
| G. | Covered Employee | Y. | Physician |
| H. | Covered Person | Z. | Plan |
| I. | Custodial Care | AA. | Retiree |
| J. | Eligible Dependent | BB. | Skilled Nursing Facility |
| K. | Employee | CC. | Temporary Disability or Temporarily Disabled |
| L. | Employer | | |
| M. | ERISA | DD. | Trust Agreement |
| N. | Expense Incurred | EE. | Trust Fund |
| O. | Hospice | FF. | Trustees |
| P. | Hospital | GG. | Union |
| Q. | Illness | HH. | Usual, Customary and Reasonable Charge (UCR Charge) |
| R. | In-Network | | |

A.   Accident
The term **"Accident"** means a physical injury, such as a cut, break, sprain or bruise, occurring from an unexpected, undesirable and unavoidable act.   This does NOT include overuse of muscles resulting in strains or aching arms and legs or employment-related injuries.  **Intentionally inflicted injuries are excluded, unless such intentionally inflicted injury is the result of a medical condition.**

B.   Beneficiary
The term **"Beneficiary"** means a person designated by an Employee or by the terms of the Plan of Benefits established pursuant to the Trust Agreement who is, or who may become, entitled to receive any type of Benefit from the Fund.  When a Benefit is payable to a Beneficiary, it will be paid to the Employee-designated Beneficiary on file at the Fund Office.   In the event the Employee fails to designate a Beneficiary or if the designated Beneficiary dies before the Employee, the Benefit shall be payable to the first of the following, if living:

1.   To the legal spouse, or

2.   If no legal spouse is living, to the living children in equal shares, or

3.   If none of the above are living, to the Employee's estate.

The Employee may designate a new Beneficiary at any time by filing a <u>written</u> request with the Fund Office.

C.   <u>Benefits</u>
The term **"Benefits"** means the health insurance benefits to be provided pursuant to the Plan together with any amendments, modifications or interpretations adopted by the Board of Trustees.

D.   <u>COBRA Continuation Coverage</u>
The term **"COBRA Continuation Coverage"** means the Consolidated Omnibus Budget Reconciliation Act of 1985, and any amendments thereto and any governmental regulations, guidance or interpretations issued thereto, requiring that health and welfare plans offer Employees and their families the opportunity for a temporary extension of health coverage.

E.   <u>Collective Bargaining Agreement</u>
The term **"Collective Bargaining Agreement"** means the labor agreement between the Union and the Association and any other employer, group of employers or association of employers.

F.   <u>Covered Charges</u>
The term **"Covered Charges"** means the reasonable and customary charges for services and treatments which are:  covered under this Plan, for medical conditions covered under this Plan, and based on valid medical need according to accepted standards of medical practice.

G.   <u>Covered Employee</u>
The term **"Covered Employee"** means an Employee for whom Payments are made to the Fund as provided by a Collective Bargaining Agreement or other written agreement approved by the Trustees and who is covered according to the provisions set forth under the Eligibility Rules.

H.   <u>Covered Person</u>
The term **"Covered Person"** means either the Covered Employee or Retiree and their Eligible Dependent.

I.   <u>Custodial Care</u>
The term **"Custodial Care"** means treatment, services or confinement, regardless of who recommends, prescribes or performs them, or where they are provided, which could be rendered safely and reasonably by a person not medically skilled,

and are designed mainly to help the patient with daily living activities. Custodial Care includes personal care such as help in: walking, getting in and out of bed, bathing, eating (including tube or gastrostomy), exercising, dressing, using the restroom or administration of an enema, homemaking such as preparing meals or special diets; moving the patient, acting as companion or sitter, and supervising medication which can usually be self-administered.

The determination of Custodial Care in no way implies that the care being rendered is not required by the patient, it only means that it is the kind of care that is not covered under the Plan.

J.    Eligible Dependent

The term **"Eligible Dependent"** means any of the following:

1.    The lawful spouse of the Covered Employee or Retiree.

2.    Child or children, including stepchildren and legally adopted children, including children placed for adoption, from the date of birth to the end of the 26th year, unless the child has employer-sponsored health care coverage available through his or her employer or, if married, through his or her spouse's employer, in which case coverage shall run through the end of the 19th year.

3.    The Covered Employee's or Retiree's unmarried children between 19 and 26 years of age if enrolled as a full-time student in an accredited junior college, college, university or a vocational school of not less than 12 credit hours per semester, or trade school approved by the Department of Education of New York State, depends upon the Employee for at least 60% of his or her support and maintenance, and has a legal domicile at the Employee's household, even if the child has employer-sponsored health care coverage available through his or her employer or, if married, through his or her spouse's employer.

A student who satisfies these qualifications will be an Eligible Dependent until the earlier of: the date the child ceases to be a full-time undergraduate student, the date the child attains age 26, the date the Employee provides less than 60% of the child's support and maintenance, or the date the child no longer has legal domicile in the Employee's household.

4.    The Covered Employee's or Retiree's unmarried child over 26 years of age who would otherwise qualify as an Eligible Dependent per number 2. above and who receives no government support (Medicaid, Social Security Income, etc.) and who is physically handicapped or mentally retarded and incapable of self-sustaining employment because of mental retardation or physical handicap, became so incapable before attaining age 26, and the Employee furnished proof of such incapacity at no expense to the Fund within 31 days of

the date such child's coverage would ordinarily terminate due to attainment of age 26. Such Eligible Dependent's coverage shall be continued as long as the Employee remains eligible under the Fund and such Eligible Dependent remains in such condition.

5. A child for whom coverage must be provided because of a Qualified Medical Child Support Order ("QMCSO"). A QMCSO is a court order, administrative order pursuant to state law or court decree relating to child support under the Plan. To be qualified, the QMCSO must be approved by the Board of Trustees. A copy of the Plan's QMCSO qualification procedures is available from the Fund Office upon request, free of charge.

6. For dependents working full-time under the age of 19, living at home and having their own health care coverage who receive at least 50% of their support from the Employee, this Plan will coordinate and be the secondary payer.

7. In the event that two Employees are married to each other, Benefits will be paid at the rate of 80% as an Employee and an additional 20% as an Eligible Dependent.

K. Employee
The term **"Employee"** means:

1. Any person who is employed by an Employer, as that term is defined in the Plan, and for whom the Employer is required to make contributions into the Trust Fund:

2. Any full time Employee of the Union or of a participating union,

3. Any full time Employee of the Association,

4. Any full time Employee of the Board of Trustees, and

5. Any other Employee of any Employer who has been accepted as such by the parties to the Trust Agreement.

L. Employer
The term **"Employer"** means:

1. Any member of the Association who is a party to, or otherwise bound by a Collective Bargaining Agreement with the Union requiring Payments to the Trust Fund with respect to Employees represented by the Union.

2. Any other employer, association of employers or group of employers who have been accepted and approved by the Board of Trustees.

3.    The Trustees as to its Employees, the participating unions as to Employees of participating unions, the Association as to Employees of the Association, and related funds as to the Employees of the related funds.  Such status of the Union, participating unions, the Trustees and related funds shall be solely for the purpose of making the required contributions to the Trust Fund.

M.    ERISA
The term **"ERISA"** means the Employee Retirement Income Security Act of 1974, any amendments as may from time to time be made, and any regulations promulgated pursuant to the provisions of said Act.

N.    Expense Incurred
The term **"Expense Incurred"** includes only those charges made for services and supplies which are reasonably priced and are appropriate and consistent with the diagnosis according to accepted standards of community practice, and could not have been omitted without adversely affecting the person's condition or the quality of medical care.  All expenses incurred will be considered on a Usual, Customary and Reasonable Charge basis in the given geographical area which shall be no higher than the 90th percentile of prevailing health care charges data.

O.    Hospice
The term **"Hospice"** means a licensed agency that provides counseling and medical services to the terminally ill and which meets **all** of the following tests:

1.    Has obtained certification pursuant to Article 40 of the New York Public Health Law, or if located outside New York State, under a similar certification process required by the state in which the organization is located,

2.    Provides services on a 24 hour, 7 day a week basis,

3.    Is under the direct supervision of a Physician,

4.    Has a nurse coordinator who is a Registered Nurse (R.N.),

5.    Has a social service coordinator who is licensed,

6.    Is an agency that has as its primary purpose the provision of Hospice services,

7.    Has a full time administrator,

8.    Maintains written records of services provided to the patients, and

9.    Is licensed in the jurisdiction in which it is located, if licensing is required.

P.   Hospital

The term **"Hospital"** means only a facility which meets **all** of the following criteria:

1.   Is licensed as a hospital by the state, county or municipality where it is located,

2.   Operates primarily for the active care of the sick and injured and not for Custodial Care or educational service,

3.   Provides 24 hour a day, on the premises, nursing services by registered nurses (R.N.),

4.   Has a staff of one or more Physicians available at all times,

5.   Provides organized facilities for diagnosis and surgery on its premises,

6.   Is not primarily a clinic, nursing, rest or convalescent home or extended care facility, and is not a place for substance abuse treatment including but not limited to drug addiction, alcoholism, etc.,

7.   Maintains permanent and full time facilities for bed care of 50 or more resident patients.

8.   For purposes of Alcohol and Drug Treatment Benefits and Mental Health Benefits, Hospital means: (a) facilities or institutions as defined in Subsection 1, above, or (b) a facility licensed by the appropriate state governmental authority and certified under Medicare as a participating hospital for the treatment of mental and nervous disorders or alcohol or substance abuse disorders. The facility described in (b) shall be located within the State of New York if a duly accredited facility exists therein, or otherwise shall be approved as a qualified facility by the Trustees prior to treatment.

Q.   Illness

The term **"Illness"** means a non-employment-related Illness, disorder or disease of the Covered Person. Pregnancy is treated in the same manner as an Illness under this Plan.

R.   In-Network

"In-Network" means that the medical service sought by the Covered Employee or Eligible Dependent is provided by a medical care provider or entity that is part of the PPO network that the Plan contracts with to provide medical care at a discount or the services rendered were in a geographical jurisdiction inside of the Plan's PPO network coverage area.

Notwithstanding the foregoing, if an In-Network facility or provider sub-contracts services to an Out-of-Network facility or provider and the Covered Employee or

Eligible Dependent had no choice in the provider of such medical service, the medical service shall be considered to be In-Network for purposes of the benefit payment level.

S.   In-Patient
The term **"In-Patient"** means a person who is a resident patient using and being charged for the room and board facilities of a Hospital.

T.   Medically Necessary
The term **"Medically Necessary"** means only those services, treatments or supplies provided by a Hospital, a Physician, or other qualified provider of medical services or supplies that are required, in the judgment of the Trustees based upon the opinion of a qualified medical professional, to identify or treat a Covered Person's Accident or Illness and which:

1.   Are consistent with the symptoms or diagnosis and treatment of the eligible individual's condition, disease, ailment, or injury,

2.   Are appropriate according to standards of good medical practice,

3.   Are not solely for the convenience of the Covered Person, Physician or Hospital,

4.   Are the most appropriate which can be safely provided to the Covered Person,

5.   Are not deemed to be Experimental or Investigative, and

6.   Are not furnished in connection with medical or other research.

For purposes of this Plan, the use of any treatment (which includes use of any treatment, procedure, facility, drug equipment, device, or supply) is considered to be "Experimental" or "Investigative" if the use is not yet generally recognized as accepted medical practice, or if the use of any such item requires federal or other governmental agency approval which has not been granted at the time the service or supply is provided, or if the service, supply or procedure is not supported by Reliable Evidence which shows that, as applied to a particular condition, it:

1.   Is generally recognized as a safe and effective treatment of the condition by those practicing the appropriate medical specialty,

2.   Has a definite positive effect on health outcome,

3.   Over time leads to improvement in health outcomes under standard means of treatment under standard conditions of medical practice outside clinical investigatory settings (i.e. the beneficial effects outweigh the harmful effects), and

4.  Is at least as effective as standard means of treatment in improving health outcomes, or is usable in appropriate clinical contexts in which standard treatment is not employable.

**"Reliable Evidence"** includes only the following:

1.  Published reports and articles in authoritative medical and scientific literature,

2.  The written investigational or research protocols and/or written informed consent used by the treating facility or another facility which is studying the same service, supply or procedure, and

3.  Compilations, conclusions, and other information which is available and may be drawn or inferred from 1. or 2. above.

Consideration may be given to any or all of the following factors:

1.  If the drug or device cannot be lawfully marketed without approval of the U.S. Food and Drug Administration and approval for marketing has not been given at the time the drug or device is furnished, and

2.  If Reliable Evidence shows that the treatment is the subject of ongoing Phase I, II or III clinical trials to determine its maximum tolerated dosage, its toxicity, its safety, its effectiveness, or its effectiveness as compared with standard means of treatment or diagnosis, or

3.  If Reliable Evidence shows that consensus among experts regarding the treatment is that further studies or clinical trials are necessary to determine tolerated doses, its toxicity, its safety, its effectiveness, or its effectiveness as compared with standard means of treatment or diagnosis.

4.  Final determination of whether the use of a treatment is Experimental or Investigative shall rest solely in the discretion of the Trustees.

U.  Mental Disorder
The term **"Mental Disorder"** means any disease or condition, regardless of whether the cause is organic, that is classified as a Mental Disorder in the current edition of International Classification of Diseases, published by the U.S. Department of Health and Human Services or is listed in the current edition of Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association.

V.  No-Fault Motor Vehicle Plan
The term "No-Fault Motor Vehicle Plan" means a motor vehicle plan required by law that provides medical or dental care payments that are made, in whole or in

part, without regard to fault. A person subject to but not complying with a No-Fault law will be deemed as having received the benefits required by the law.

With respect to the Plan's benefit position for claims normally covered by No-Fault Insurance but which are initially rejected by the No-Fault carrier, claims rejected by a No-Fault Insurance carrier will be accepted for possible Plan consideration only if, and after, the individual submits evidence that he or she has exhausted all the appeal remedies of the No-Fault Insurance Law and the Claimant signs the Plan's subrogation agreement.

W.  Out-Patient
    The term **"Out-Patient"** means a person who receives services and treatments in a Hospital (provided that there is no charge for room and board), ambulatory clinic, free-standing surgical unit, or Physician's office.

X.  Participant
    The term **"Participant"** means an Employee or former Employee of an Employer who is, or may become, eligible to receive any type of Benefit from this Fund or whose Beneficiaries may become eligible to receive any such Benefit.

Y.  Physician
    The term **"Physician"** means medical doctors, osteopaths, surgeons, dentists, podiatrists, chiropractors, psychologists with a Ph.D., psychologists, certified social workers and other mental health counselors, when practicing within the scope of their license.

Z.  Plan
    The term **"Plan"** means the Schedule of Benefits and the rules and regulations of the Iron Workers Local 12 Health Insurance Fund and the Trust Fund as established heretofore, or as shall be established from time to time by amendments, modifications or interpretations by the Trustees for the administration of the Trust Fund and Plan.

    The Plan was established as of May 1970, in accordance with the provisions of the Trust Agreement.

AA. Retiree

    The term **"Retiree"** means a Covered Employee who has retired from active employment and who meets the eligibility requirements for Retirees as explained in Section One, Subsection D.

BB. Skilled Nursing Facility
    The term **"Skilled Nursing Facility"** means a certified skilled nursing home or convalescent wing of a Hospital which provides:

    1.   Semi-private room and board,

2.   General nursing care,

3.   Physical, occupational and speech therapy furnished directly by the facility or by others where arrangements for payment are made through the facility,

4.   Drugs ordinarily furnished by such a facility, and

5.   Medical supplies.

CC. Temporary Disability or Temporarily Disabled
The term **"Temporary Disability" or "Temporarily Disabled"** unless otherwise specifically defined, refers to a disability resulting solely from an Illness or Accident which prevents the Covered Employee from performing the Ironworkers' Trade work as defined in the work jurisdiction definition of the Collective Bargaining Agreement. The Covered Employee must be under the regular care and actual attendance of a Physician.

DD. Trust Agreement
The term **"Trust Agreement"** means the amended Agreement and Declaration of Trust effective July 1987, including the original Trust Agreement.

EE. Trust Fund
The term **"Trust Fund"** means the Trust Fund created pursuant to the Trust Agreement and generally the monies or other things of value which comprise the corpus and additions to the Trust Fund.

FF. Trustees
The term **"Trustees"** means the persons designated in the Trust Agreement, their predecessors or their successors designated and appointed in accordance with the terms of the Trust Agreement. The Trustees shall constitute the "Administrator", the "Plan Sponsor" and the "Named Fiduciaries" of the Trust Fund and of the Plan established and maintained under the authority of the Trust Agreement.

GG. Union
The term **"Union"** means Local 12 of the Ironworkers Unions and other Unions which may become parties to the Trust.

HH. Usual, Customary and Reasonable Charge (UCR Charge)
The term **"Usual, Customary and Reasonable Charge (UCR Charge)"** means that the charge by any provider for a service must be similar to all other like providers of the same service in that geographical area. The "geographical area" reference is the zip code for the general level of charges being made by a Physician of similar training and experience.

**Iron Workers Local No. 12 Health Insurance Fund**

*Restated Plan Document and Summary Plan Description, 2011 Edition*

## Amendment 1

In accordance with Article X, Section 10.01 of the Restated Agreement and Declaration of Trust of the Iron Workers Local No. 12 Health Insurance Fund, the Iron Workers Local No. 12 Health Insurance Fund Restated Plan Document and Summary Plan Description, 2011 Edition, is hereby amended, effective July 1, 2011 as follows:

### Section Four – Medical Benefits

Section Four shall be amended at subsection W. Wellness Benefit under the section on the *Child Wellness Benefit* by adding the following paragraph as paragraph four before the section on Maximum Well Child Benefit.

> The Plan will also pay 100% of the Covered Charge for immunizations for Dependent children ages 19 through 26 that are required for admission to an accredited junior college, college, university, vocational or trade school. The office visit to obtain the immunization is not payable under the terms of the Plan.

This is to certify that the above Amendment to the Restated Plan Document and Summary Plan Description, 2011 Edition, of the Iron Workers Local No. 12 Health Insurance Fund is duly adopted by the Board of Trustees on this 19th day of January, 2012.

5·11·2012
_____
Date

Union Trustee
_____

5·11·2012
_____
Date

Employer Trustee
_____



**Iron Workers Local No. 12 Health Insurance Fund**

*Restated Plan Document and Summary Plan Description, 2011 Edition*

## Amendment 2

In accordance with Article X, Section 10.01 of the Restated Agreement and Declaration of Trust of the Iron Workers Local No. 12 Health Insurance Fund, the Iron Workers Local No. 12 Health Insurance Fund Restated Plan Document and Summary Plan Description, 2011 Edition, is hereby amended, effective November 1, 2013 as follows:

### Section Five – Prescription Drug Benefit

Section Five shall be amended at subsection G. "Medications Not Covered" by deleting the exclusion for smoking cessation products at subsection 5 and replacing with the following language:

5.  Over the counter smoking cessation products.

Section Five shall be amended at subsection E. "Covered Services" by adding the following language under "Additional covered medications include:":

3.  Smoking cessation products by written prescription only.

This is to certify that the above Amendment to the Restated Plan Document and Summary Plan Description, 2011 Edition, of the Iron Workers Local No. 12 Health Insurance Fund is duly adopted by the Board of Trustees on this 11th day of July, 2013.

10-16-13
Date

Union Trustee

10-16-13
Date

Employer Trustee

**Iron Workers Local No. 12 Health Insurance Fund**

*Restated Plan Document and Summary Plan Description, 2011 Edition*

## Amendment 3

In accordance with Article X, Section 10.01 of the Restated Agreement and Declaration of Trust of the Iron Workers Local No. 12 Health Insurance Fund, the Iron Workers Local No. 12 Health Insurance Fund Restated Plan Document and Summary Plan Description, 2011 Edition, is hereby amended, effective March 1, 2014 as follows:

### SECTION THREE – SCHEDULES OF BENEFITS

The Plan shall be amended at the Section Three at the *Schedule of Benefits Active Employees and Eligible Dependents,* by adding the following sentence to the end of the Prescription Drug Benefit schedule:

All benefits under the Prescription Drug Benefit are subject to the SAV-Rx Step Therapy Program effective March 1, 2014. If, as of March 1, 2014, a Participant is taking a prescription drug contained in the medication classes outlined in the Step Therapy Program, the Participant will not be mandated to participate in this program for that specific prescription. Any new prescription will be subject to the Step Therapy Program.

### SECTION FIVE – PRESCRIPTION DRUG BENEFIT

Section Five shall be amended by adding the following sentence to the end of paragraph one:

Notwithstanding the foregoing, all benefits under the Prescription Drug Benefit shown below in Subsections A-H are subject to the SAV-Rx Step Therapy Program in Subsection I. effective March 1, 2014. However, if a Participant is taking a prescription drug contained in the medication classes outlined in the Step Therapy Program, the Participant will not be mandated to participate in this program for that specific prescription. Any new prescription will be subject to the Step Therapy Program.

Section Five shall be amended by adding the following Subsection I:

I. **Prescription Drug Card Benefit – Step Therapy**

The Plan has elected to implement the SAV-Rx Step Therapy Program in an effort to maintain and preserve a high quality and cost-effective program for you. This program is mandatory for certain medication classes. The Step Therapy Program through SAV-Rx is designed to ensure you take the most cost-effective medications to treat certain conditions. The program promotes the use of generic medications because they are proven to be as safe and effective as brand name medications for most patients, but cost much less.



The Step Therapy Program groups certain medications into "steps". Generic medications, which are the most cost effective, fall into the "first-step" category, preferred brand-name medications fall within the "second-step" category and non-preferred brand-name medications, which are the least cost effective, fall into the "third-step" category. The Step Therapy Program steers members to take first-step medications prior to coverage of a second step medication and to take a second step medication prior to coverage of a third step medication.

The medication classes which qualify for the Step Therapy Program include but are not limited to: Proton Pump Inhibitors, ARB antihypertensives, oral osteoporosis medications, cholesterol-lowering statins, sleep aids, SSRI/SNRI antidepressants, overactive bladder medications, Cox 2 and NSAID Anti-Inflammatories, migraine medications and steroid nasal sprays. A full list of medications subject to the Step Therapy Program can be obtained by calling SAV-Rx.

You will be required to use the following procedures if you begin taking any newly prescribed "second-step" or "third-step" prescriptions of the above medication classes on or after March 1, 2014:

1. Contact your physician and share the step therapy information contained in your letter. Your physician can decide which first-step medication is right for you.

2. If you have already tried one of the first-step medications and your physician has determined that you require a different medication for medical reasons, then your physician can call SAV-Rx at 1-800-228-3108 to request a prior authorization for you to continue taking the medication. The SAV-Rx Clinical Department can advise your physician if a second-step medication is required. Just remember that you pay a higher co-pay for brand medications.

3. You have the option to take any medication that your physician prescribes, however it may not be covered under the benefit plan if the proper steps are not taken first.

This is to certify that the above Amendment to the Restated Plan Document and Summary Plan Description, 2011 Edition, of the Iron Workers Local No. 12 Health Insurance Fund is duly adopted by the Board of Trustees on this _1st_ day of _May_, 2014.

_5-1-14_
Date

_5-1-14_
Date

Union Trustee

Employer Trustee

**Iron Workers Local No. 12 Health Insurance Fund**

*Restated Plan Document and Summary Plan Description, 2011 Edition*

### Amendment 4

In accordance with Article X, Section 10.01 of the Restated Agreement and Declaration of Trust of the Iron Workers Local No. 12 Health Insurance Fund, the Iron Workers Local No. 12 Health Insurance Fund Restated Plan Document and Summary Plan Description, 2011 Edition, is hereby amended, effective July 1, 2014, unless stated otherwise as follows:

### Section Three – Schedules Of Benefits

The Plan shall be amended at the Section Three at the *Schedule of Benefits Active Employees and Eligible Dependents,* by deleting the current Calendar Year Maximum text box and replacing it with the following sentence:

"The Plan has no calendar year maximums on essential health benefits."

and by deleting the following sentence on the same page:

"The Plan has a $200,000 calendar year maximum Benefit per person, for active Eligible Employees and their Eligible Dependents."

### Section Three – Schedules Of Benefits

The Plan shall be amended at the Section Three at the *Schedule of Benefits Active Employees and Eligible Dependents,* by deleting the current Vision Benefit schedule and replacing it with the following schedule:

**Vision Benefit**
Maximum Benefit (Normal) ....................................... $200 every two calendar years
Maximum Benefit (Sub-Normal) ................................ $300 every two calendar years

A transitional provision allows an individual who has reached the prior $100 vision benefit limit as of May 1, 2014 to be eligible to receive an additional $100 in normal vision benefits over the remainder of the individual's applicable two-year vision benefit period.

The above maximums do not apply to pediatric vision benefits, as listed below.

**Pediatric Vision Benefit (ages 5-18)**
Pediatric Eye Exams ............................................. one routine eye exam per plan year
Pediatric Eyeglass Lenses ........................... one pair of eyeglass lenses per plan year

**Plan Allowance:** You are responsible for charges billed over the amounts shown.

1

| Services/Materials | Plan Pays |
|---|---|
| Exam | Up to $50 |
| Single Vision Lenses | Up to $72 |
| Bifocal Lenses | Up to $109 |
| Trifocal Lenses | Up to $136 |
| Lenticular Lenses | Up to $136 |
| Contact Lenses | Up to $130 |
| Medically Necessary Contact Lenses | Up to $600 |
| Frames | Up to $130 |

## Section Three – Schedules Of Benefits

The Plan shall be amended at the Section Three at the *Schedule of Benefits Active Employees and Eligible Dependents,* under the *Wellness Benefit* by deleting the schedules for the Routine Physical Exam and Other Covered Exams and replacing with the following schedules:

### Wellness Benefit (Adult & Child)

Maximum Benefit (Calendar Year) *Routine Physical Exam* ........... $300 per person*
(* This benefit is paid at 100% up to $300 (after $20 copay) and any charges over $300 are paid at 90%)

Maximum Benefit (Calendar Year) *Other Covered Exams* ............. $200 per person*
**(for services other than annual routine mammographic screening)**
(* This benefit is paid at 100% up to $200 (after $20 copay) and any charges over $200 are paid at 90%)

## Section Six – Vision Benefit

Section Six shall be amended effective May 1, 2014 at Benefit Limitations by deleting the current Benefit Limitations section and replacing it with the following:

Benefit Limitations

Normal Vision Care ..................................................... $200 every two calendar years
Sub-Normal Vision Care ............................................. $300 every two calendar years

Benefit payment under the Vision Care Plan for any Expense Incurred for the following **will not be a Covered Expense**:

1. Any medical or surgical treatment or supplies furnished for treatment of any eye injury or eye disease,

2. Vision training or aniseikonia, and

2

3. Services performed or supplies furnished by other than a licensed Optician, Optometrist or Ophthalmologist.

A transitional provision allows an individual who has reached the prior $100 vision benefit limit as of May 1, 2014 to be eligible to receive an additional $100 in vision benefits over the remainder of the individual's applicable two-year vision benefit period.

The dollar benefit limitations do not apply to pediatric vision benefits (ages 5-18). Pediatric vision benefits are paid according to the fee schedule under the Schedule of Benefits.

<strong>Section Nineteen – Definitions</strong>

Section Nineteen shall be amended at subsection J. by replacing the current definition of Eligible Dependent with the following:

J.   *Eligible Dependent*

The term **"Eligible Dependent"** means any of the following:

1.   The lawful spouse of the Covered Employee or Retiree.

2.   Child or children, including stepchildren and legally adopted children, including children placed for adoption, from the date of birth to the end of the 26th year.

3.   The Covered Employee's or Retiree's unmarried child over 26 years of age who would otherwise qualify as an Eligible Dependent per number 2. above and who receives no government support (Medicaid, Social Security Income, etc.) and who is physically handicapped or mentally retarded and incapable of self-sustaining employment because of mental retardation or physical handicap, became so incapable before attaining age 26, and the Employee furnished proof of such incapacity at no expense to the Fund within 31 days of the date such child's coverage would ordinarily terminate due to attainment of age 26. Such Eligible Dependent's coverage shall be continued as long as the Employee remains eligible under the Fund and such Eligible Dependent remains in such condition.

4.   A child for whom coverage must be provided because of a Qualified Medical Child Support Order ("QMCSO"). A QMCSO is a court order, administrative order pursuant to state law or court decree relating to child support under the Plan. To be qualified, the QMCSO must be approved by the Board of Trustees. A copy of the Plan's QMCSO qualification procedures is available from the Fund Office upon request, free of charge.

5.   For dependents working full-time under the age of 19, living at home and having their own health care coverage who receive at least 50% of their support from the Employee, this Plan will coordinate and be the secondary payer.

3

6.   In the event that two Employees are married to each other, Benefits will be paid at the rate of 80% as an Employee and an additional 20% as an Eligible Dependent.

This is to certify that the above Amendment to the Restated Plan Document and Summary Plan Description, 2011 Edition, of the Iron Workers Local No. 12 Health Insurance Fund is duly adopted by the Board of Trustees on this _14 th_ day of _August_, 2014.

_8/14/14_
Date

_8/14/14_
Date

_____
Union Trustee

_____
Employer Trustee

4

**Iron Workers Local No. 12 Health Insurance Fund**
*Restated Plan Document and Summary Plan Description, 2011 Edition*

### Amendment 5

In accordance with Article X, Section 10.01 of the Restated Agreement and Declaration of Trust of the Iron Workers Local No. 12 Health Insurance Fund, the Iron Workers Local No. 12 Health Insurance Fund Restated Plan Document and Summary Plan Description, 2011 Edition, is hereby amended, effective January 1, 2016, unless otherwise stated:

### Section Five – Prescription Drug Benefit

Section Five shall be amended effective December 15, 2015 at subsection E. *Covered Service* by replacing item 4 with the following item 4:

4. Be a drug or device approved by the Food and Drug Administration (FDA), a legend medication, including FDA approved prescription contraceptive drugs or devices.

### Section Five – Prescription Drug Benefit

Section Five shall be amended effective December 15, 2015 at subsection F. *Medications Requiring Prior Authorization* by deleting item 4. Oral contraceptives.

Section Five shall be further amended effective December 15, 2015 at subsection G. *Medications Not Covered* by deleting item 1 "Contraceptives (oral contraceptives may be covered if Medically Necessary, as stated in Subsection F.)"

### Section Thirteen – Benefit Exclusions and Limitations

Section Thirteen shall be amended effective December 15, 2015 by deleting exclusion 22 "Expenses Incurred for contraceptives and related supplies which are not deemed to be Medically Necessary."

### Section Nineteen – Definitions

Section Nineteen shall be amended at subsection J. by deleting the current paragraph 2 and replacing it with the following:

2. Child or children, including stepchildren and legally adopted children, including children placed for adoption, from the date of birth to the end of the month in which they turn age 26.

This is to certify that the above Amendment to the Restated Plan Document and Summary Plan Description, 2011 Edition, of the Iron Workers Local No. 12 Health Insurance Fund is duly adopted by the Board of Trustees on this 15th day of December 2015.

12/15/15
_____
Date

_____
Union Trustee

12/15/15
_____
Date

_____
Employer Trustee

1

**Iron Workers Local No. 12 Health Insurance Fund**
*Restated Plan Document and Summary Plan Description, 2011 Edition*

# Amendment 6

In accordance with Article X, Section 10.01 of the Restated Agreement and Declaration of Trust of the Iron Workers Local No. 12 Health Insurance Fund, the Iron Workers Local No. 12 Health Insurance Fund Restated Plan Document and Summary Plan Description, 2011 Edition, is hereby amended, effective October 13, 2016, unless otherwise stated:

## Section Three – Schedules Of Benefits

Section Three shall be amended at the *Schedule of Benefits Active Employees and Eligible Dependents – Prescription Drug Benefit* by adding the following as the last comment under the heading, just above "Retail Co-Payment *(Covered Person Pays)*":

*See Section Five, subsection J for information on the High Impact Advocacy Program which may assist with EpiPens.*

## Section Five – Prescription Drug Benefit

Section Five shall be amended by adding a subsection "J. High Impact Advocacy Program"" as follows:

J   High Impact Advocacy Program
The Plan has programs in place that may require participation in the High Impact Advocacy Program (HIAP). This program manages the use of selected specialty medications to reduce or eliminate your out of pocket expense, as well as reducing the cost to the Plan Sponsor. In order to continue receiving your medication at the most affordable cost, your prescription will be filled at the Sav-Rx Specialty Pharmacy. Sav-Rx will facilitate your enrollment into a manufacturer sponsored coupon program. If for any reason the manufacturer sponsored coupon program is no longer available, the Co-Payment amounts as listed in the Schedule of Benefits will apply.

Yes, absolutely! If, for any reason the coupon is no longer eligible we will revert the benefit back to the SPD and reach out to the member to help them anticipate their next copay. The plan copay.

Under the High Impact Advocacy Program, the EpiPen is available with a $10 copay.

1

This is to certify that the above Amendment to the Restated Plan Document and Summary Plan Description, 2011 Edition, of the Iron Workers Local No. 12 Health Insurance Fund is duly adopted by the Board of Trustees on this 15th day of December 2016.

12/15/16
_____
Date

12|15|16
_____
Date

_____
Union Trustee

_____
Employer Trustee

2

**C**

## ADMINISTRATIVE SERVICES AGREEMENT

THIS AGREEMENT ("Agreement") entered the 1st day of January, 2009 by and between Iron Workers Local No. 12 Health Insurance Fund (the "Fund") and BlueShield of Northeastern New York ("BSNENY")[1]:

WHEREAS, the Fund has arranged to provide certain health care benefits for certain employees and former employees of the Fund and of companies affiliated with the Fund ("Affiliated Funds") on a self-funded basis under the Fund's and/or Affiliated Fund's Health Care Plan ("Plan"); and

WHEREAS, BSNENY has expertise in various aspects of health plan administration and claims adjudication; and

WHEREAS, it is desired by the Fund and BSNENY ("Parties") that BSNENY provide certain services with respect to the Plan in accordance with the terms and conditions hereinafter set forth:

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, Parties hereto agree as follows:

### SECTION 1
### DEFINITIONS

For purposes of this Agreement, the following terms have the meanings set forth below unless the context or use clearly indicates another meaning or intent. Other terms are defined where they first appear in the Agreement.

1.1 *"Affiliate"* means any entity that controls, is controlled by, or is under common control with BSNENY.

1.2 *"BlueCard Program"* means the Blue Cross and Blue Shield Association ("BCBSA")- administered program under which BSNENY may process claims for services received by Participants outside of BSNENY's service area while accessing the reimbursement arrangement between a provider and another Blue Cross and/or Blue Shield Plan.

1.3 *"COBRA"* means the continuation of coverage provisions of Title *X of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended*, and regulations promulgated thereunder.

1.4 *"Effective Date"* means the date described in the first paragraph of this Agreement.

1.5 *"ERISA"* means *the Employee Retirement Income Security Act of 1974, as amended*, and regulations promulgated thereunder.

1.6 *"Host Plan"* means a Blue Cross and/or Blue Shield Plan participating in the BlueCard Program whose contracting providers render care to customers of BSNENY.

1.7 *"Plan Document"* means the plan document, summary plan description or other written description of the Plan that the Fund provides to BSNENY and designates as the controlling document for purposes of claim adjudications under the Plan, including any amendments thereto.

---

[1] BlueShield of Northeastern New York is an assumed name of HealthNow New York Inc., an independent licensee of the BlueCross BlueShield Association.
Legal #74245v6
Matter #08-07552
Contract # _____

1

## SECTION 2
## RESPONSIBILITIES OF THE FUND

**2.1**    *Enrollment Data.*

A.    The Fund shall provide to BSNENY enrollment data for each Participant who becomes covered under the Plan as of or after the effective date of this Agreement. "Participant" means: (i) any employee or former employee of the Fund or an Affiliated Fund who is covered under the Plan; (ii) any individual who is covered under the Plan as a "qualified beneficiary" pursuant to COBRA; and (iii) any individual who is covered under the Plan as the spouse, child, or qualified domestic partner of an individual who is a Participant under (i) or (ii). A list of Affiliated Funds is set forth in Exhibit A. "Enrollment data" means, for each Participant:

1.    full name and address;

2.    marital status;

3.    date of birth;

4.    effective date of coverage;

5.    names and birth dates of dependents to be covered;

6.    date of employment;

7.    Social Security number;

8.    information regarding the coverage of the Participant and any covered dependents under any other group health plan other than the Plan;

9.    Primary Care Physician (PCP) information, if any; and

10.    Participant gender.

B.    "Enrollment data" shall include all information required by the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder. "Enrollment data" shall also include such information regarding a Participant's coverage under the Plan prior to the Effective Date as is needed by BSNENY in order to process claims for benefits under the Plan, including, but not limited to, the Participant's claims history, preexisting conditions, satisfaction of deductible and co-payment limits, and status with respect to benefit limitations under the Plan. Enrollment data shall be in a form acceptable to BSNENY. BSNENY reserves the right to, in its sole discretion, modify, expand or restrict the definition of "Enrollment Data."

C.    Enrollment data with respect to an individual who will be a Participant as of the Effective Date shall be provided to BSNENY not later than ten (10) business days prior to such Effective Date. Enrollment data with respect to an individual who first becomes a Participant after the Effective Date shall be provided to BSNENY not later than five (5) business days after the date said individual becomes a Participant. Notwithstanding the foregoing, the Fund may provide enrollment data via BSNENY's on-line portal at any time during the month as long as the effective date of the Participant is the 1st day of the following calendar month.

D.    The Fund shall provide BSNENY with notice of any change to the enrollment data with respect to a Participant not later than five (5) business days after the Fund is aware of such change.

E.   The Fund shall provide BSNENY with notice of a Participant's ineligibility for coverage under the Plan not less than seven (7) days prior to the date of such ineligibility. The Fund may provide ineligibility information via BSNENY's on-line portal at any time during the month. The Fund agrees that, in the event BSNENY is not provided with such prior notice of a Participant's ineligibility, the Fund will fund benefit claims of such individuals which are incurred by the individual and authorized by BSNENY under the Plan after the date of such ineligibility and until seven (7) days after the date BSNENY receives notice of the individual's ineligibility. Upon proper notification by the Fund of a Participant's ineligibility, the Administrative Fee defined in Exhibit C shall be adjusted effective the month following notification of the Participant's ineligibility. The Administrative Fee shall not be adjusted retroactively due to the ineligibility of a Participant.

F.   BSNENY shall rely upon such information in processing claims for benefits under the Plan and in making certain filings with New York State on behalf of the Fund in accordance with Section 3.7 of this Agreement. To the extent that the Fund has failed to provide Enrollment Data to BSNENY, BSNENY shall not be liable for any action it has taken or failed to take on behalf of the Fund or any Participant if its receipt of information would have caused a different action by BSNENY.

2.2   **Other Data.** The Fund shall provide BSNENY with all other materials, documents and information relating to the Plan and its Participants needed by BSNENY to perform the benefit payment function and other services in accordance with this Agreement, including, but not limited to, the Plan Document and other communications to Participants regarding the Plan. The Plan Document shall be attached hereto as Exhibit B and shall be the basis on which BSNENY processes benefit claims under the Plan.

2.3   **Establishment of Bank Account.**

A.   On the first business day of each week, BSNENY shall notify the Fund of the amount of funds necessary to pay benefit claims which were processed by BSNENY during the previous week, and the Fund shall transfer via ACH such amount to BSNENY by Friday. Additionally, at the end of each month, BSNENY shall notify the Fund of the amount of the surcharge and covered lives assessment payable by the Plan for such month under sections 2807-j and 2807-s of the New York Public Health Law, in accordance with Section 3.7 of this Agreement. If the Fund fails to make any payment within five (5) days of its receipt of initial notification from BSNENY, BSNENY shall provide the Fund with a second notice of the amount due. The second notice shall include a late fee of 2% of the amount due as set forth on Exhibit C. If the Fund fails to make any payment, including any applicable late fees, within two (2) days of receipt of the second notice, BSNENY may cease payment of Participant claims, may cease processing Participant claims, and shall have the right to terminate this Agreement as provided in Section Six. In no event shall BSNENY be responsible for payment of Participant claims for benefits or other authorized expenses of the Plan in excess of the amount of funds provided to BSNENY by the Fund. If BSNENY does make payment of Participant claims for benefits or other authorized expenses for which the Fund has failed to transfer Funds to BSNENY, BSNENY shall be entitled to full reimbursement by the Fund and said payment by BSNENY shall not constitute a waiver or prejudice of its right to full reimbursement. Funds transferred to BSNENY by the Fund shall be used for the following in the order indicated:

1.   disbursement of benefit payments to providers and Participants in accordance with the terms of the Plan; and

2.   payment of all other authorized expenses of the Plan.

B.   The Fund shall designate employees to serve as authorized contacts for BSNENY regarding transfers, transactions or other issues under this Section 2.3.

**2.4**     ***Benefit Claim Forms.***  The Fund will maintain a supply of benefit claim forms supplied by BSNENY in accordance with Section 3.3 of this Agreement.  The Fund will distribute or otherwise make claim forms available to Participants.

**2.5**     ***Compliance with ERISA.***  If the Plan is subject to ERISA, the Fund shall be solely responsible for ensuring that the Plan satisfies the applicable requirements of ERISA. The Fund, not BSNENY, shall be the administrator of the Plan as that term is defined in ERISA.  The Fund shall be responsible for determining whether the Plan is subject to ERISA and shall provide written notice of its determination to BSNENY.

**2.6**     ***Compliance with Internal Revenue Code.***  The Fund shall be solely responsible for the Plan's compliance with any applicable requirements of the Internal Revenue Code.

**2.7**     ***Reporting and Disclosure.***  The Fund is responsible for any and all reporting and disclosure requirements imposed on the Plan pursuant to federal law, which may include, but is not limited to, the annual preparation of Internal Revenue Service ("IRS") Form 5500 and related schedules. BSNENY may, at the request of the Fund and for an additional fee as agreed by the Parties, assist the Fund in compliance with applicable reporting and disclosure requirements.

**2.8**     ***Participant Contributions.***  The Fund shall collect any contributions required by the Plan from the Participants.  If required by law, the Fund shall establish and maintain a trust to which Participant contributions shall be deposited in accordance with applicable laws and regulations and the Fund shall hold BSNENY harmless from any failure by the Fund to do so.

**2.9**     ***Stop-Loss Insurance.***  The Fund, not BSNENY, shall be responsible for securing stop-loss insurance if such coverage is desired by the Fund.  The Fund shall be responsible for providing the stop-loss insurance carrier(s) with accurate information required or necessary for the underwriting of any insurance issued to the Fund.  BSNENY, in its sole discretion, may provide data and reports regarding the Fund's Participants' claims to the Fund's stop-loss carrier subject to the provisions of Section 4.7.   BSNENY may require the Fund's stop-loss carrier to execute a Confidentiality/Indemnification Agreement.  If mutually agreed to by the Parties, BSNENY shall provide Stop Loss coverage under a Stop Loss Policy.

**2.10**    ***Liability.***  The Fund shall be responsible for any delay in the performance of the administrative and claims service caused by the failure of the Fund to promptly furnish any required information or claim funds to BSNENY.

**2.11**    ***Fees.***  The Fund shall pay fees to BSNENY as set forth in Section 7 of this Agreement.

**2.12**    ***Plan Document.***  The Fund shall be responsible for preparing the Plan Document and for ensuring that the Plan Document complies with applicable laws and regulations. If the Fund amends the Plan Document to change the benefits provided under the Plan, it must provide BSNENY with written notice of such change not less than 90 days prior to the effective date of such change, and the Fund shall be responsible for notifying Participants of any change in benefits.  the Fund may not amend the Plan in a way that would require BSNENY to process claims in a manner that would violate applicable law.  If BSNENY reasonably determines that a Plan amendment would modify the Fund's anticipated claims or administration expenses, BSNENY may modify the fees described in Exhibit C.

**2.13**    ***Electronic Transactions.***  If BSNENY and the Fund conduct an electronic transaction that is a Standard Transaction as defined in 45 C.F.R. 162.103, the parties agree that the transaction will be conducted in accordance with the applicable requirements of ASC X12N ("Transaction Standards"). The parties agree to cooperate in testing their respective operating systems to ensure compliance with such requirements.  the Fund further agrees that it will not: (i) change the definition, data condition or use of a data element or standard in the Transaction Standards; (ii) add any data elements or segments to the maximum defined data set forth in the Transaction Standards; (iii) use

any code or data elements that are either marked "not used" in the Transaction Standards; or (iv) change the meaning or intent of the Transaction Standards.

2.14   *Security Standards for Electronic Protected Health Information.* The parties shall comply with the requirements for the protection of electronic protected health information set forth in 45 C.F.R. Part 164 ("Security Standards") on or before the required compliance date for the Security Standards.

### SECTION 3
### ADMINISTRATIVE SERVICES

3.1   *Identification Cards.* BSNENY will prepare and distribute a Plan identification card to each Participant.

3.2   *Data Base.* BSNENY shall maintain appropriate records on each Participant for the proper administration of the Plan. The records maintained on each Participant shall include, but not be limited to:

    A.   full name and last known mailing address;

    B.   marital status;

    C.   date of birth;

    D.   effective date of coverage;

    E.   election of dependent coverage, names and birth dates of dependents covered by the Plan;

    F.   date of employment;

    G.   Social Security number; and

    H.   information regarding the coverage of the Participant and any covered dependents under any other group health plan other than the Plan.

3.3   *Forms and Administrative Documents.* BSNENY will prepare and provide to the Fund pertinent paperwork for the administration of the Plan, including benefit claim and enrollment forms.

3.4   *Providers.* BSNENY will, to the extent possible, establish and maintain for the Plan the network of providers available under the BSNENY insured product(s) listed in Exhibit C. The Fund acknowledges and agrees that BSNENY's network of Participating Providers will change from time to time. BSNENY reserves the right to, consistent with applicable laws and regulations, add and/or remove providers from its network of Participating Providers at its discretion and to determine which coverage plans and/or products a particular participating provider is eligible to provide services for. The Fund agrees to pay any applicable network access fees as set forth in Exhibit C.

3.5   *Retention of Participants' Records.* Participants' records maintained by BSNENY shall be available for inspection by the Fund during normal business hours subject to the Confidentiality Provisions in Section 4.7.

3.6   *Compliance with New York State Health Care Reform Act.* If the Fund so elects, BSNENY shall make a filing with the New York State Department of Health ("DOH") on behalf of the Fund to elect for the Plan to make direct payments to the DOH of the Plan's obligations under sections 2807-j and 2807-s of the New York Public Health Law. For each month in which the Plan's direct payment election is in effect with the DOH, BSNENY shall notify the Fund of the amount of the required surcharge and covered lives assessment for such month and shall file appropriate reports with the

DOH and make the required payments to the DOH in accordance with the procedure under Section 2.3 of this Agreement. For purposes of Section 2.3, such surcharges and covered lives assessments shall be considered authorized expenses of the Plan. BSNENY shall not be liable for any surcharge or covered lives assessment payable by the Plan under section 2807-j or 2807-s of the New York Public Health Law and shall not be liable for any interest or penalties assessed against the Plan or the Fund as a result of late or insufficient payment of such surcharges and assessments.

3.7     ***Other Taxes or Assessments, or Charges to the Plan.*** In the event that a State or jurisdiction imposes upon BSNENY the duty to act as agent for the collection of any tax, payment, surcharge or assessment imposed on the Plan, the Fund or an Affiliated the Fund in connection with the Plan or this Agreement, the Fund will pay over such amount to BSNENY when requested to do so. In the event BSNENY incurs any charge, expense or assessment in connection with any third party agreement including, but not limited to, Coordination of Benefits or Subrogation Vendor Agreements, which apply to claims processed by BSNENY for Participants under this Agreement, the Fund agrees said amounts are authorized expenses of the Plan and shall, to the extent required, pay over such amount to BSNENY when requested to do so.

3.8     ***Certificates of Creditable Coverage.*** If directed by the Fund in writing, BSNENY shall furnish certificates of creditable coverage with respect to Participants in the Plan in accordance with Internal Revenue Code section 9801, ERISA section 701, and Public Health Service Act section 2701(e) and regulations promulgated thereunder; provided, such certificates shall report only a Participant's period of coverage under the Plan during the period in which this Agreement is in effect and shall not report on a Participant's coverage under the Plan prior to the Effective Date or under any other coverage option offered under the Plan.

3.9     ***Compliance with Prompt Payment Law.*** To the extent required by New York State Insurance Law or as required by BSNENY's Agreements with Participating Providers, BSNENY shall pay interest on benefit claims processed under this Agreement in accordance with §3224-a of the Insurance Law. Any interest paid pursuant to this Section 3.9 shall be considered authorized expenses of the Plan.

3.10    ***Relationship with Other Service Providers.*** BSNENY shall not be responsible for furnishing Participant data or other information regarding the Plan to any other individual or entity that provides services with respect to the Plan.

3.11    ***COBRA Compliance.*** BSNENY is not responsible for the Plan's compliance with COBRA. If directed by the Fund in writing, BSNENY shall accept COBRA payments made by or on behalf of qualified beneficiaries and shall remit such payments to the Fund or apply them as a credit against the fees payable to BSNENY by the Fund under Section 7.

In the event that the Fund has directed to have BSNENY accept COBRA payments, if a qualified beneficiary (or other person on behalf of a qualified beneficiary) does not remit a COBRA payment by the due date (including any applicable grace period for payment) or remits less than the required payment amount, BSNENY shall notify the Fund. The Fund, in its sole discretion, shall determine whether a qualified beneficiary's continuation coverage shall terminate due to failure to timely make a COBRA payment or payment of less than the required amount, and shall notify BSNENY of any such termination in accordance with Section 2.1. BSNENY shall not be required to attempt to collect unpaid COBRA payments from any qualified beneficiary and shall not be required to notify the qualified beneficiary that his coverage has terminated.

3.12    ***Participant Disclosure.*** BSNENY is required by the Blue Cross and Blue Shield Association to disseminate to the Fund a Participant Disclosure Statement ("Disclosure Statement"). The Fund agrees to disseminate the Disclosure Statement to Participants after receipt of the Disclosure Statement set forth in Exhibit G. The Fund may incorporate the terms of the Disclosure Statement in another document, provided that such other document is provided to Participants.

**SECTION 4**
**CLAIMS PROCESSING AND PAYMENT**

4.1    *Eligibility to Participate.*   The Fund, in its sole discretion, shall determine the eligibility of employees and dependents to participate in the Plan in accordance with the terms thereof.

4.2    *Initial Benefit Claim Determinations.*   BSNENY shall make the initial determination as to whether benefit claims submitted by Participants qualify for payment under the Plan and shall determine the amount of benefits due and payable pursuant to the terms of the Plan.   In making initial determinations as to whether benefit claims qualify for payment under the Plan, BSNENY shall follow its standard claim processing procedures and protocols, including, but not limited to, utilization management.   If BSNENY determines that a claim is payable under the terms of the Plan, BSNENY shall issue a check for payment or otherwise credit the appropriate party with the amount of the benefit payable.   Benefit claims shall be funded in accordance with Section 2.3 of this Agreement.   If BSNENY determines that a benefit claim is not payable under the terms of the Plan, BSNENY shall notify the claimant of the denial and of the claimant's right to appeal the denial.   If the Plan is subject to ERISA, BSNENY shall comply with the applicable claim procedure rules promulgated at 29 C.F.R. section 2560.503-1 ("ERISA Claim Regulation") in making initial benefit claim determinations.

4.3    *Contested Claims.*   Fund shall receive and review appeals of denied benefit claims under the Plan in accordance with the procedure set forth in the Plan, and shall make final decisions with respect to all appeals of denied benefit claims..

4.4    *Record Retention.*   BSNENY will maintain current, accurate, and complete records and files of all claim submissions and payments on each Participant for a period of at least six years after the claim was submitted.

4.5    *Coordination of Benefits.*   In processing claims for benefits, BSNENY shall apply the coordination of benefit provisions set forth in the Plan Document and shall forward to the Fund any funds which BSNENY recovers through coordination of benefits.   Any funds recovered by BSNENY pursuant to the Plan's Coordination of Benefits provisions shall be subject to any reduction required in BSNENY's Agreement with any Third Party retained by BSNENY to conduct Coordination of Benefits.

4.6    *Subrogation.*   The Fund may have certain rights of subrogation against Participants or third parties to pay for services already paid by the Plan.   Nothing in this Agreement shall require BSNENY to engage in the practice of law or to take any legal action to enforce any subrogation rights which the Fund may have.   Upon BSNENY's knowledge of any subrogation issues, BSNENY shall promptly notify the Fund.   BSNENY may pursue the Fund's subrogation rights as provided in the Plan upon separate written agreement by the Parties and upon an adjustment of the Administrative Fees referenced in Section 7 and Exhibit C.

4.7    *Confidentiality.*

A.    General.   Each Party shall maintain the confidentiality of information in its possession or contained in the records of Participants in accordance with applicable state and federal laws, regulations and rulings, and shall not release such information, either to each other or to any other person or entity, except as permitted by law.   All files, data and other information relating to the business of either Party in the possession of the other Party will be deemed confidential and will not be disclosed except upon (i) lawful order of a court or public authority, which order compels obedience under penalty of contempt, fine, or impairment or loss of the right to do business; or (ii) as may otherwise be required under applicable law.   In the event of such disclosure, the disclosing Party shall immediately notify the other Party in writing detailing the circumstances and extent of such disclosure.

B.   Protected Health Information.  Notwithstanding the foregoing, the Fund recognizes and acknowledges that the Plan is a "covered entity" and BSNENY is a "business associate" of the Plan pursuant to the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder.  BSNENY has entered or will enter into an agreement with the Plan (the "Business Associate Agreement") which limits the information and data which BSNENY may provide to the Fund.  BSNENY will disclose "protected health information" (as such term is defined in 45 C.F.R. 160.103) to the Fund only to the extent such disclosure is allowed under the terms of the Business Associate Agreement.

**4.8**   *Overpayments.*  If BSNENY determines that a benefit payment has been made to or on behalf of an ineligible individual or that a benefit payment exceeded the amount payable under the Plan, BSNENY will make reasonable efforts to recover any such overpayment on behalf of the Fund, in accordance with BSNENY's policies and procedures; provided, however, that BSNENY shall not be required to initiate any legal or arbitration proceeding for the recovery of any such overpayment. BSNENY shall not be financially responsible for any overpayment under the Plan.

**4.9**   *Fiduciary Responsibilities.* The Fund delegates to BSNENY the discretionary authority to make initial benefit claim determinations under the Plan, including, but not limited to, the authority to interpret the terms of the Plan Document, to make factual findings and to determine what constitutes a reasonable and customary charge for benefits covered under the Plan.  If the Fund has elected under Section 4.3 to delegate to BSNENY the authority to make final determinations on appeals of denied benefit claims, BSNENY shall have full discretionary authority to make such determinations, including, but not limited to, the authority to interpret the terms of the Plan Document, to make factual findings and to determine what constitutes a reasonable and customary charge for benefits covered under the Plan.  BSNENY shall have the right to rely upon the Plan Document in the performance of its duties hereunder.  The Fund acknowledges that BSNENY shall not consider the payment or adjudication of any claim for benefits on an extra-contractual basis.  BSNENY's decisions shall be conclusive and binding and not subject to further review.

Notwithstanding the foregoing, to the extent that with respect to a particular claim or appeal, any of the duties delegated to BSNENY are otherwise assumed or acted upon by the Fund or any agent of the Fund or other third party including any vendor, or if not delegated to BSNENY are otherwise to be assumed or acted upon by the Fund or such agent or third party, then in any such event, BSNENY shall not have any fiduciary duties or discretionary authority under the Plan or this Agreement with respect to such claim or appeal, and the Fund or such other party, as the case may be, shall be deemed to have such fiduciary duties and discretionary authority regarding such claim or appeal.

It is acknowledged and agreed that any services provided by BSNENY under the Plan or this Agreement shall not affect the Fund's acknowledged status plan administrator of the Plan (if the Plan is subject to ERISA) and that the Fund shall retain sole fiduciary duties and discretionary authority in connection with its role and duties as plan administrator.  The Fund shall also retain sole fiduciary duties and discretionary authority with respect to those duties not delegated to BSNENY hereunder or otherwise assumed by BSNENY.

BSNENY shall have no fiduciary duties under the Plan or this Agreement other than those it has explicitly agreed to assume herein.

**4.10**   *Benefit Payments Directed By The Fund.*  Notwithstanding anything herein to the contrary, the Fund may direct BSNENY to approve for payment any benefit claim with respect to which BSNENY has made a decision to deny payment pursuant to the provisions of Section 4.2 or Section 4.3. BSNENY shall not be required to notify the Fund prior to communicating an initial or final denial to a Participant under Section 4.2 or Section 4.3. Any direction from the Fund to pay benefit claims under this Section 4.10 shall be in writing. Benefit payments processed by BSNENY at the Fund's direction under this Section 4.10 shall not be subject to the fiduciary standards of this Section 4, and, as specified in Section 8.3A, the Fund shall indemnify and hold harmless BSNENY and its affiliates from any and all liability and loss that arise out of or in connection with benefit payments made at the

Fund's direction.  Payments made pursuant to this Section 4.10 shall be subject to the fees set forth in Exhibit C.

**4.11**   *Modification or Suspension of BSNENY Policies and Procedures.*  Notwithstanding anything herein to the contrary, the Fund may direct BSNENY to modify or suspend its policies, procedures and routine edits regarding, but not limited to, utilization management, prescription drugs, claims processing, enrollment and eligibility and general operations.  Any direction from the Fund under this Section 4.11 shall be in writing.  Benefit claims processed by BSNENY in accordance with any modification or suspension of policies, procedures or edits shall not be subject to the fiduciary standards of this Section 4 and, as specified in Section 8.3A, the Fund shall indemnify and hold harmless BSNENY and its affiliates from any and all liability or loss that arises out of or in connection with modification or suspension of BSNENY policies, procedures or edits.  Payments made pursuant to this Section 4.11 shall be subject to the fees set forth in Exhibit C.

**4.12**   *Disclosure Provisions.*  Exhibit F specifies the additional/alternative provisions that apply to the Fund with respect to claims that are processed under the BlueCard Program.  Exhibit G contains language that must be included in the Fund's Summary Plan Description so that Participants are made aware of the additional/alternative provisions that apply to them with respect to claims that are processed under the BlueCard Program.

**4.13**   *Rebates and Settlements.*

A.   BSNENY or its vendors may have reimbursement contracts with certain providers for the provision of and payment for health care services and supplies administered for, among others, Participants pursuant to this Agreement.  Under some of these contracts there may be settlements which require BSNENY to pay the providers or vendors additional money (which may or may not be solely funded by BSNENY) or which require the providers or vendors to return a portion of volume discounts, rebates, or excess money paid.  Such providers or vendors may include entities affiliated with BSNENY.  In addition to such settlements, additional amounts may be payable to providers or vendors as a result of claim adjustments made after initial claim payments have been made.  Any additional amounts payable to providers or vendors, whether as a result of settlements or claim adjustments, that are attributable to benefit claims properly payable pursuant to the Plan during the term of this Agreement or any temporary service period under Section 6.7 shall be considered authorized expenses of the Plan and shall be paid by the Fund, whether such amounts are payable during or after the term of this Agreement. This provision shall survive the termination of this Agreement.  Unless the parties otherwise agree in writing, the Fund shall have no right to any discounts, rebates, or excess money received from vendors.

B.   Under the BlueCard Program, the amounts that the Fund and Participant pay is a final price and will not be affected by any future adjustments resulting from any of the non-BlueCard rebates or settlements described in Section 4.13(A), above.

## SECTION 5
## MANAGEMENT REPORTS

**5.1**   *Monthly Claims Report.*  BSNENY will provide the Fund, upon request, a monthly claims report of all claims processed during that month.  Such report will list:
A.   the amounts paid; and

B.   any additional classification that is reasonably required or requested by the Fund, subject to Section 4.7 and 5.4.

This report will be mailed to the Fund within thirty (30) days following the close of the period covered by the report.

**5.2**    *Quarterly Report.* BSNENY will provide, upon request, at the close of each quarter of the Plan, an analysis of the claims processed during that period.

Such report will be furnished within thirty (30) days following the close of the period covered and will include an analysis of claims paid subject to Section 4.7.

**5.3**    *Annual Report.* BSNENY will provide, upon request, at the close of each plan year of the Plan, an analysis of the claims processed during that period subject to Section 4.7. Such report will be furnished within thirty (30) days following the close of the period covered and will include

    A.    an analysis of claims paid by:
        1.    type of service,
        2.    medical provider, and

    B.    amounts not covered by the Plan, including coordination of benefits savings.

**5.4**    *Standard Reports.* The Standard Reports which shall be provided by BSNENY at no added cost are listed on Exhibit D. All such Reports are subject to Section 4.7.

**5.5**    *Additional Reports.* At the request of the Fund, BSNENY may provide additional claim data or reports, in a format or time frame other than that described in Sections 5.1, 5.2, 5.3 or 5.4. If additional reports are requested, additional fees may be required.

### SECTION 6
### COMMENCEMENT, DURATION AND TERMINATION

**6.1**    *Effective Date.* The Effective Date shall be the date described in the first paragraph of this Agreement and shall continue for a period of twelve (12) calendar months ("Initial Term") unless terminated earlier in accordance with Section 6.3.

**6.2**    *Automatic Renewal.* Unless terminated earlier in accordance with Section 6.3, this Agreement shall be automatically renewed for successive twelve (12) calendar month periods ("Succeeding Terms") at the expiration of the Initial Term or any Succeeding Term; provided, that either party may terminate the Agreement on the last day of the Initial Term or any Succeeding Term by giving at least 45 days prior written notice by registered mail to that effect to the other party.

**6.3**    *Early Termination.* Except as otherwise provided below, this Agreement shall immediately terminate at the earliest time specified below:

    A.    Upon the Fund's failure to pay the fees provided in Exhibit C within ten (10) days of their due date, provided BSNENY gives the Fund notice required under Section 7.4;

    B.    Upon bankruptcy or insolvency of the Fund;

    C.    Upon failure of the Fund to deliver to BSNENY within thirty (30) days of any written request by BSNENY any required data necessary for the proper performance of BSNENY's duties unless the Fund's failure to deliver such data is due to matters reasonably beyond the control of the Fund;

    D.    Upon a merger, sale or consolidation of the Fund, unless the successor to the Fund as a result of the transaction assumes this Agreement;

    E.    Upon the Fund's failure to fund benefit claims pursuant to Section 2.3 within two (2) days of BSNENY's second request;

F.    Upon the enactment of any law or regulation which makes the continuance of this Agreement illegal;

G.    At BSNENY's option, upon twenty (20) days prior written notice to the Fund.

H.    By agreement of the Parties.

I.    At the Fund's option, upon thirty (30) days prior written notice to BSNENY.

6.4    *Change in the Fund Condition.* If BSNENY reasonably determines that there has been any change in the condition (financial or otherwise) of the Fund that, in the reasonable opinion of BSNENY, has a material adverse effect upon the validity, performance, or enforceability of this Agreement, on the financial condition or business operation of the Fund, or on the ability of the Fund to fulfill its obligations under this Agreement, then BSNENY shall have the right to require the Fund to provide adequate assurance of future performance. Such assurance may, at BSNENY's sole option, include payment of a deposit. Examples of such a change include but are not limited to: voluntary or involuntary insolvency proceedings under Title 11 of the United States Code, the sale of all or substantially all of the Fund's assets, or a change in control of the Fund's management or operations.

In the event such further assurance is required by BSNENY as provided herein, BSNENY may, at any time after the date of notice to the Fund of such requirement, suspend its performance of its obligations under this Agreement until the date of receipt by BSNENY of such adequate assurance without being liable to the Fund or to any Participant for such suspension. In the event such adequate assurance is not received within a reasonable period of time as determined by BSNENY, BSNENY may terminate this Agreement immediately upon written notice to the Fund.

6.5    *Limited Discontinuance.* In the event that either Party reasonably believes that any State or other jurisdiction will penalize it for proceeding with its performance under this Agreement, the Party may immediately discontinue the application of the Agreement in such State or jurisdiction by providing written notice to that effect to the other Party. In such a case, the Agreement shall continue in force in all other States and jurisdictions.

6.6    *BSNENY Responsibilities Upon Termination.* Except as provided in Sections 6.6 and 6.7 hereof, all obligations of BSNENY under this Agreement, including the processing of claims and disbursement of benefit amounts, will be terminated and extinguished on the effective date of termination of this Agreement. Claims for Plan benefits for expenses incurred by Participants prior to such termination date shall be processed only for the period up to such termination date and shall be paid only to the extent that the Fund provides BSNENY with the required funds in accordance with Section 2.3 of this Agreement. Any such claims which remain unprocessed or unpaid as of such termination date shall be surrendered to the Fund.

6.7    *Temporary Provision of Services.* In the event this Agreement is terminated, the Fund may arrange for BSNENY to continue to provide services covered by this Agreement for a period not to exceed one (1) year beyond such termination, (unless the Parties agree to a longer period), provided that:

A.    BSNENY agrees in writing with the Fund to such continued provision of services; and

B.    charges shall be payable to BSNENY in accordance with Exhibit C or as otherwise agreed to in writing by the Parties.

6.8    *Final Accounting and Report.* BSNENY shall, upon request, within ninety (90) days of the termination of this Agreement, deliver to the Fund a final accounting and report of the financial status of the Plan.

## SECTION 7
## FEES

7.1 **Implementation and Administration of Fees.** The Fund agrees to pay BSNENY the fees set forth in Exhibit C including all applicable Access Fees and late fees. Access Fees are charged by a BlueCard Host Plan/Par licensee for delivering the benefits of its provider contracts or networks to BSNENY. Such fees shall be due and payable to BSNENY on the last day of each month, or as otherwise specified in Exhibit C.

7.2 **Modification to Fee Schedule.** BSNENY reserves the right to change the required payments set forth in Exhibit C under this Agreement:

    A. as of the first day of any Succeeding Term with at least thirty (30) days prior written notice to the Fund; or

    B. as of the date of any benefit change or other material change requested by the Fund or required by law which significantly alters any obligation of BSNENY under this Agreement.

7.3 **Automatic Adjustment.** If during the term of this Agreement, any tax (other than local, state or federal income taxes) or any other assessment, premium charge, penalty or fine shall be assessed against BSNENY, directly arising under and to the extent attributable to this Agreement, BSNENY shall report the payment to the Fund and the Fund shall reimburse BSNENY for the same unless said tax (other than local, state or federal income taxes) or any other assessment, premium charge, penalty or fine was assessed against BSNENY because of its misconduct. BSNENY shall have sole discretion in determining whether any such tax or assessment shall be paid, compromised, litigated or appealed and as to all matters or procedure, compromise, defense or appeal of any such tax or assessment concerning its liability.

7.4 **Failure to Perform.** If the Fund, for any reason whatsoever, fails to make a required payment on a timely basis, BSNENY may suspend the performance of its services until such time as the Fund makes the proper remittance and may charge a late fee as set forth on Exhibit C. BSNENY shall provide the Fund with notice of its intent to take such action.

7.5 **Additional Services.** Nothing in this Section 7 or Exhibit C shall prohibit BSNENY from performing any service not enumerated in this Agreement for a reasonable fee. Any such services will require the prior approval of the Fund. Any such service and corresponding fee will be paid by the Fund upon request by BSNENY.

## SECTION 8
## MISCELLANEOUS

8.1 **Tax and ERISA.** The legal and tax status of the Plan under applicable law is a matter for determination by the Fund and not by BSNENY, which is not responsible therefore.

8.2 **BSNENY Does Not Insure the Plan.** BSNENY provides Administrative Services and network access only and does not insure or underwrite the liability of the Fund under the Plan, does not assume any financial risk or obligation with respect to claims and shall not advance its own funds for the payment of any claims or expenses under the Plan. The Fund retains the ultimate responsibility for the payment of benefit claims made under the Plan and all authorized expenses incident to the Plan including responsibility for payment of claims to any BSNENY Participating Providers or any other provider.

8.3 **Liability and Indemnification.**

    A. The Fund agrees to indemnify and hold harmless BSNENY and its affiliates from any and all liability, loss, damages, fines, penalties and costs, including but not limited to, expenses and

Legal #74245v6
Matter #08-07552
Contract #____

12

reasonable attorneys' fees, which BSNENY or its affiliates shall sustain arising out of or in connection with any function of BSNENY under this Agreement, including, but not limited to, any legal action by or on behalf of a Participant, unless it is determined by a court or regulatory agency having jurisdiction of the matter that the liability therefore was the direct consequence of criminal conduct or fraud on the part of BSNENY or of BSNENY's material breach of its obligations under this Agreement. Notwithstanding the above, the Fund agrees to indemnify and hold harmless BSNENY and its affiliates from any and all liability, loss, damages, fines, penalties and costs, including, but not limited to, expenses and reasonable attorneys' fees, which BSNENY or its affiliates shall sustain arising out of or in connection with any payment made by BSNENY at the direction of the Fund pursuant to Section 4.10 or Section 4.11.

B.    BSNENY and the Fund shall advise each other as to matters which come to their respective attentions involving potential legal actions or regulatory enforcement activity which involve the Plan or are related to the activities of either Party with respect to the Plan or this Agreement and shall advise each other of legal actions or administrative proceedings which have actually commenced. Notice of legal actions or other administrative proceedings which have actually commenced shall be provided not later than five (5) days after a Party has knowledge of such commencement.

C.    In the event that a lawsuit or administrative proceeding is brought against the Fund or the Plan but not BSNENY, the defense and associated costs of such action or proceeding shall be the responsibility of the Fund. BSNENY shall cooperate fully with the Fund in the defense of any such action or proceeding arising out of matters related to this Agreement. The Fund agrees not to oppose any attempt made by BSNENY to intervene in such action or proceeding.

D.    In the event that a lawsuit or administrative proceeding is brought against BSNENY arising out of the performance of its duties under this Agreement, the defense and any associated costs of such action or proceeding shall be the responsibility of BSNENY, provided that the costs, including attorneys' fees, of such defense shall be reimbursed to BSNENY by the Fund to the extent BSNENY is entitled to indemnification by the Fund under subsection A of this Section 8.3. The Fund shall cooperate fully with BSNENY in the defense of any such action or proceeding arising out of matters related to this Agreement. BSNENY agrees not to oppose any attempt made by the Fund to intervene in such action or proceeding. If the Fund or the Plan is also named as a party in such action or proceeding, the Fund may request that the counsel engaged by BSNENY also provide for the defense of the Fund and/or the Plan. If there is no conflict of interest, BSNENY shall take all reasonable measures to comply with the Fund's request. If such counsel does not provide for the Fund's or Plan's defense, then the Fund and Plan shall be responsible for the defense and associated costs as provided in subsection C of this Section.

E.    Notwithstanding the foregoing, in no event, shall BSNENY be liable to the Fund for indirect, consequential or special damages of any nature, lost profits or savings, punitive damages, injury to reputation or loss of business.

F.    The provisions of this Section 8.3 shall survive termination or discontinuance of this Agreement.

**8.4**    *Modification and Amendment.* No alteration or modification of the terms and conditions of this Agreement shall be valid or of any force or effect unless it is expressed in a written memorandum executed for Parties by persons duly authorized to do so. Notwithstanding the foregoing, this Agreement may be amended automatically upon written notice to the Fund if necessary in order to comply with applicable federal or state laws, regulations and other authority including, but not limited to, those issued by the U.S. Department of Labor.

**8.5**    *Entire Agreement.* This Agreement constitutes the entire contract between the Parties relative to the administration of the Plan and cancels, replaces and supersedes any and all previous

agreements relating to such administration. Notwithstanding the foregoing, the Parties have executed or will execute a Business Associate Agreement relative to the administration of the Plan, which is not canceled, replaced, or superseded by this Agreement.

8.6     **Assignment.** The Fund may assign this Agreement or any of its rights or obligations hereunder to any successor through merger, sale or consolidation with prior written notice to and approval of BSNENY. BSNENY may assign this Agreement or any of its rights or obligations hereunder with prior written notice to and approval of the Fund, which approval shall not be unreasonably withheld.

8.7     **Plan to Control Benefits.** Unless otherwise required by law, BSNENY shall have no power to add to, subtract from or modify any terms of the Plan, or to change or add any benefit provided under the Plan or to waive or fail to apply any requirements for eligibility for a benefit under the Plan except pursuant to a formal written amendment of the Plan by the Fund which has been provided to BSNENY.

8.8     **Right to Audit.**

A.     Subject to the provisions of this Section 8.8, the Fund may audit BSNENY's compliance with its obligations under this Agreement and BSNENY shall supply the Fund with access to information acquired or maintained by BSNENY in performing services under this Agreement subject to the provisions of Section 4.7. BSNENY shall be required to supply only such information which is in its possession and which is reasonably necessary for the Fund to audit the Plan, provided that such disclosure is not prohibited by any third-party contracts to which BSNENY is a signatory or any requirements of law.

B.     The Fund shall give BSNENY ninety (90) days prior written notice of its intent to perform such an audit and its need for such information and shall represent to BSNENY that the information which will be disclosed therein is reasonably necessary for the administration of the Plan. All audits and information disclosures shall occur at a reasonable time and place and at the Fund's expense. The Fund agrees to execute any reasonable audit agreement presented by BSNENY prior to performing any audit under this Section. Unless otherwise agreed to by the Parties, the Fund shall be limited to one audit per year.

C.     The Fund may designate a representative to conduct or participate in the audit, or to receive access to such information, provided that the Fund and the representative enter into a written agreement with BSNENY under which the representative agrees to use any disclosed information solely for purposes of administering the Plan, to keep such information confidential and not to disclose the information to any other entity or person.

D.     Any reports, information or documentation provided, made available, or learned by either of the parties to this Agreement which contains personally identifiable or health information about any Participant or health care provider or which contain information about either party's business or operations which is not available to the public, or which contain information which has been designated as proprietary or confidential by either party shall be held in the strictest confidence, used solely to perform obligations under this Agreement or to administer the Plan, not be disclosed to any other entity or person, and maintained in accordance with the requirements of all applicable laws.

8.9     **Rights Upon State or Federal Audit.** In the event the Fund or the Plan is investigated or audited by any state or federal governmental agency, BSNENY shall supply to the Fund any information which the Fund shall require or request in connection with such investigation or audit.

8.10   **ERISA Audit.** In the event that an examination of the Plan by an independent qualified public accountant is required under section 103 of ERISA, the cost of such examination shall be borne by the Fund.

Legal #74245v6
Matter #08-07552
Contract #_____                                                14

8.11   **Claims Disputes.**  The expense of and defense of any legal action against the Fund involving a claim dispute under the Plan shall not be the obligation or responsibility of BSNENY.

8.12   **Proprietary Rights.**  The Fund acknowledges that BSNENY has developed, and may develop in connection with this Agreement, certain symbols, trademarks, service marks, designs, data, processes, systems, computer software, manuals, lists, programs, plans, procedures and information, all of which are proprietary information and trade secrets of BSNENY (collectively "Materials"). Such Materials are the property of BSNENY during the term hereof and thereafter. The Fund shall not use the Materials, except as expressly contemplated by this Agreement, without the prior written consent of BSNENY, and shall cease any and all usage of the Materials immediately upon the termination of this Agreement.  In addition, BSNENY shall have the right to safeguard the secrecy of its systems and programs, and shall not be required to make such proprietary information available to the Fund or anyone else. Unless otherwise agreed to in writing by both parties, pursuant to the Business Associate Agreement, BSNENY shall in no case be required to provide information to the Fund or any Participant which is provider-specific or which discloses or leads to the disclosure of the specific amount of a negotiated fee with any provider.

8.13   **Relationship of the Parties.**  In the performance of the work, duties and obligations of the Parties pursuant to this Agreement, BSNENY shall at all times be acting and performing as an independent contractor.  No relationship of employer and employee, or partners or joint venturers between BSNENY and the Fund is created by this Agreement, and neither Party may therefore make any claim against the other Party for social security benefits, workers' compensation benefits, unemployment insurance benefits, vacation pay, sick leave or any other employee benefit of any kind.  In addition, neither Party shall have any power or authority to act for or on behalf of, or to bind, the other except as herein expressly granted, and no other or greater power or authority shall be implied by the grant or denial of power or authority specifically mentioned herein.

8.14   **Headings.**  The headings of the various sections of this Agreement are inserted merely for the purpose of convenience and do not expressly or by implication limit, define or extend the specific terms of the section so designated.

8.15   **Names, Symbols, Trademarks.**  The Fund hereby consents to lawful references to the Fund in any marketing, advertising or solicitation campaigns initiated by BSNENY or any third party on behalf of BSNENY, and to references to the Fund by BSNENY in informing contracting physicians and other health professionals regarding the organizations, employers, funds, and plans with whom BSNENY has agreements. The Fund shall not use BSNENY's name, symbols, trademarks or service marks in advertising or promotional materials or otherwise, without the prior written consent of BSNENY, and shall cease any such usage immediately upon written notice of BSNENY or on termination of this Agreement, whichever is sooner.

8.16   **Counterpart Copies.**  This Agreement may be executed in two counterparts, each of which shall be an original, but such counterparts shall constitute one and the same instrument.

8.17   **Force Majeure.**  In the event the operations of BSNENY's facilities or any substantial portion thereof, are interrupted by war, fire, explosion, insurrection, labor troubles, riots, government requirement, civil or military authority, flood, the elements, earthquakes, acts of God, act or omission of transportation companies, or other similar causes beyond its control, the provisions of this Agreement (or such portions hereof as BSNENY is thereby rendered incapable of performing) shall be suspended for the duration of such interruption.

8.18   **Exhibits.**  The exhibits attached to this Agreement are an integral part of this Agreement and are incorporated herein by reference.

8.19   **No Third Party Beneficiary.**  This Agreement is entered into by and between the Fund and BSNENY and for their benefit. There is no intent by either party to create or establish third party beneficiary status or rights or their equivalent in any person covered by the Plan, subcontractor, or

Legal #74245v6
Matter #08-07552
Contract # _____

15

other third party to this Agreement, and no such third party shall have any right to enforce any right or enjoy any benefit created or established under this Agreement.

8.20    **Effect on Other Parties.** Nothing in this Agreement or in the Plan shall be construed to affect any right that a provider of services to a Participant may have to take legal action against the Fund or the Participant for payment for such services.

8.21    **Enforceability.** Failure of either Party hereto to insist upon compliance with any provision of this Agreement at any given time or under any given set of circumstances shall not operate to waive or modify such provision or in any manner render it unenforceable, as to any other time or as to any other occurrence, whether the circumstances are, or are not the same; and no waiver of any of the terms or conditions of this Agreement shall be valid or of any force or effect unless contained in a written memorandum specifically expressing such waiver and signed by a person duly authorized to sign such waiver.

8.22    **Severability.** In the event that any portion of this Agreement is found to be void or illegal, the validity or enforceability of any other portion shall not be affected.

8.23    **Governing Law.** To the extent not superseded by Federal law, the rights and obligations of the Parties hereto under this Agreement shall be governed by the laws of the State of New York.

8.24    **Jurisdiction.** Except for actions over which the district courts of the United States have jurisdiction, the courts of the State of New York shall have exclusive jurisdiction over any and all matters or disputes arising from this Agreement.

8.25    **Arbitration.** Upon the written mutual agreement of the Parties, any claim or controversy arising out of or relating to this Agreement or the breach of this Agreement shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") using one arbitrator selected by mutual agreement of the Parties. The Parties agree to divide equally the AAA's administrative fee as well as the arbitrator's fee, if any, unless otherwise assessed by the arbitrator. The administrative fee shall be advanced by the initiating party subject to final apportionment by the arbitrator in his/her award. The arbitrator's award may be enforced in any court having jurisdiction thereof by the filing of a petition to enforce said award. The cost of filing may be recovered by the party which initiates such action to have an award enforced. Arbitration shall take place in Erie County, New York. The parties shall have the rights to discovery provided by the laws of the State of New York. Nothing contained in this Agreement shall require mandatory arbitration by the parties and any arbitration must be agreed to in writing by both parties.

8.26    **Notice.** Notices under this Agreement shall be in writing and sent via postage-paid Certified Mail, Return Receipt Requested to the following addresses, or to any other address specified in writing by a Party:

If to the Fund:

Iron Workers Local No. 12 Health Insurance Fund
890 Third Street
Albany, New York 12206
Attention: __Barbara Warn__

If to BlueShield of Northeastern New York:

257 West Genesee Street
Buffalo, New York 14202-2657
Attention: General Counsel's Office

Legal #74245v6
Matter #08-07552
Contract # ____

16

## SECTION 9
## ACCEPTANCE OF AGREEMENT

Notwithstanding the failure of either or both Parties to sign this Agreement, all the terms, covenants and conditions contained herein shall be valid and binding on both parties upon BSNENY processing a claim for benefits of a Participant under the Plan for which the Fund is liable on a self-funded basis.

IN WITNESS WHEREOF, the undersigned Parties have executed this Agreement.

IRON WORKERS LOCAL NO. 12
HEALTH INSURANCE FUND

By:

Title:  FUND TRUSTEE

Dated:  12/17/2008

HEALTHNOW NEW YORK INC.

By: _Ron K McGuire_

Title: _Sr VP ASO Accounts_

Dated: _12/29/08_

Legal #74245v6
Matter #08-07552
Contract # _____

17

## EXHIBIT A

**AFFILIATED FUNDS PARTICIPATING IN THE PLAN**

## EXHIBIT B

**[PLAN DOCUMENT]**

## EXHIBIT C

### PROVIDER NETWORKS AND FEES

1. **NETWORK MAINTENANCE:**
   Pursuant to Section 3.4, BSNENY will, to the extent possible, establish and maintain for the Plan the network of providers available under BSNENY's insured Preferred Provider Organization ("PPO").

2. **FEES:**

   **A. ADMINISTRATIVE FEES (INCLUDES VENDOR MANAGEMENT FEES AND ADMINISTRATION FEES FOR MEDICAL AND RX:**

   $32.50 per month for each employee, former employee, or COBRA qualified employee under the Plan during any part of the month (includes all BlueCard-related fees, except for Access Fees and AEA fees as set forth below).

   **B. BLUE CARD FEES*:**

       **NATIONAL ACCESS FEES**

   7.16% of the discounted savings, not to exceed $2000 per claim (maximum) under the BlueCard Program

       **ADMINISTRATIVE EXPENSES ALLOWANCE FEES**

   **$11.00 per facility claim**
   **$5.00 per professional claim**

   **C. LATE FEES:**

   If Fund fails to make payment on a timely basis as indicated in Sections 2.3 and 7 of the Agreement, Fund shall be responsible for a late fee of 2% of the amount due.

   **D. ONE-TIME SET UP FEE:**

   $5,000.00

**\* Subject to change as required by the BlueCross BlueShield Association.**

Legal #74245
Matter #08-07552
Contract #

## EXHIBIT D

## STANDARD REPORTS

**REPORTS AS AGREED UPON BETWEEN THE FUND AND BSNENY**

Legal #74245
Matter #08-07552
Contract #

## EXHIBIT E

## AUTHORIZED CONTACTS

**For BSNENY the following employees are authorized to make transfers pursuant to Section 2.3:**

Jonathan Huber                                      Senior Accountant, Corporate Treasury
                                                    (716) 887-6956

Ginger Kolesar                                      Senior Accountant, Financial Services
                                                    (716) 887-7511


**The Fund Authorized Contacts:**

[          Barbara Warn              FUND MANAGER (518)434-1206          ]
           Bernice McCullough        FUND REPRESENTATIVE (518)434-1206

Legal #74245
Matter #08-07552
Contract #

## EXHIBIT F

### BLUECARD PROGRAM PROVISIONS

The following provisions are applicable when a claim is processed under the BlueCard Program:

**PPO/Traditional Disclosure Requirement**
**Self-Funded Plans**

**BlueCard**
Like all Blue Cross and Blue Shield Licensees, HealthNow New York Inc. d/b/a BlueCross BlueShield of Western New York and BlueShield of Northeastern New York ("HealthNow") participates in a program called "BlueCard." Whenever Participants access health care services outside the geographic area HealthNow serves, the claim for those services may be processed through BlueCard and presented to HealthNow for payment in conformity with network access rules of the BlueCard Policies then in effect ("Policies"). Under BlueCard, when Participants receive covered health care services within the geographic area served by an on-site Blue Cross and/or Blue Shield Licensee ("Host Blue"), HealthNow will remain responsible to Fund for fulfilling HealthNow's contract obligations. However, the Host Blue will only be responsible, in accordance with applicable BlueCard Policies, if any, for providing such services as contracting with its participating providers and handling all interaction with its participating providers. The financial terms of BlueCard are described generally below.

**Liability Calculation Method Per Claim**
The calculation of Participants' liability on claims for covered health care services incurred outside the geographic area HealthNow serves and processed through BlueCard will be based on the lower of the provider's billed charges or the negotiated price HealthNow pays the Host Blue.

The calculation of Fund's liability on claims for covered health care services incurred outside the geographic area HealthNow serves and processed through BlueCard will be based on the negotiated price HealthNow pays the Host Blue.

The methods employed by a Host Blue to determine a negotiated price will vary among Host Blues based on the terms of each Host Blue's provider contracts. The negotiated price paid to a Host Blue by HealthNow on a claim for health care services processed through BlueCard may represent:

(i)   the actual price paid on the claim by the Host Blue to the health care provider ("Actual Price"), or

(ii)   an estimated price, determined by the Host Blue in accordance with BlueCard Policies, based on the Actual Price increased or reduced to reflect aggregate payments expected to result from settlements, withholds, any other contingent payment arrangements and non-claims transactions with all of the Host Blue's health care providers or one or more particular providers ("Estimated Price"), or

(iii)   an average price, determined by the Host Blue in accordance with BlueCard Policies, based on a billed charges discount representing the Host Blue's average savings expected after settlements, withholds, any other contingent payment arrangements and non-claims transactions for all of its providers or for a specified group of providers ("Average Price"). An Average Price may result in greater variation to the Participant and Fund from the Actual Price than would an Estimated Price.

Host Blues using either the Estimated Price or Average Price will, in accordance with BlueCard Policies, prospectively increase or reduce the Estimated Price or Average Price to correct for over- or underestimation of past prices. However, the amount paid by the Participant and Fund is a final price and will not be affected by such prospective adjustment. In addition, the use of a liability calculation method of Estimated Price or Average Price may result in some portion of the amount paid by Fund being held in a variance account by the

Legal #74245
Matter #08-07552
Contract #

Host Blue, pending settlement with its participating providers. Because all amounts paid are final, the funds held in a variance account, if any, do not belong to Fund and are eventually exhausted by provider settlements and through prospective adjustment to the negotiated prices.

Statutes in a small number of states may require a Host Blue either (1) to use a basis for calculating Participant liability for covered health care services that does not reflect the entire savings realized, or expected to be realized, on a particular claim or (2) to add a surcharge. Should any state statutes mandate liability calculation methods that differ from the negotiated price methodology or require a surcharge, the Host Blue would then calculate Participant liability and Fund's liability for any covered health care services consistent with the applicable state statute in effect at the time the Participant received those services.

**Return of Overpayments**
Under BlueCard, recoveries from a Host Blue or from participating providers of a Host Blue can arise in several ways including, but not limited to, anti-fraud and abuse audits, provider/hospital audits, credit balance audits, utilization review refunds, and unsolicited refunds. In some cases, the Host Blue will engage third parties to assist in discovery or collection of recovery amounts. The fees of such a third party are netted against the recovery. Recovery amounts, net of fees, if any, will be applied in accordance with applicable BlueCard Policies, which generally require correction on a claim-by-claim or prospective basis.

**BlueCard Fees and Compensation**
Fund understands and agrees (1) to pay certain fees and compensation to HealthNow which we are obligated under BlueCard to pay to the Host Blue, to the BlueCross and BlueShield Association, or to the BlueCard vendors, unless our contract obligations to Fund require those fees and compensation to be paid only by HealthNow and (2) that fees and compensation under BlueCard may be revised from time to time without Fund's prior approval in accordance with the standard procedures for revising fees and compensation under BlueCard. Some of these fees and compensation are charged each time a claim is processed through BlueCard and include, but are not limited to, access fees, administrative expense allowance fees, Central Financial Agency Fees, and ITS Transaction Fees. Also, some of these claim-based fees, such as the access fee and the administrative expense allowance fee, may be passed on to Fund as an additional claim liability. Other fees include, but are not limited to, an 800 number fee and a fee for providing PPO provider directories. If you do not have a complete listing, or want an updated listing, of these types of fees or the amount of these fees paid directly by Fund, you should contact your Marketing Department account representative.

Legal #74245
Matter #08-07552
Contract #

## EXHIBIT G

### PARTICIPANT DISCLOSURE

#### PPO/Traditional Disclosure Requirement

#### Model Member Benefit Booklet Language/Summary Plan Description Language

When you obtain health care services through BlueCard outside the geographic area BSNENY serves, the amount you pay for covered services is calculated on the **lower** of:

- The billed charges for your covered services, or

- The negotiated price that the on-site Blue Cross and/or Blue Shield Licensee ("Host Blue") passes on to us.

Often, this "negotiated price" will consist of a simple discount which reflects the actual price paid by the Host Blue. But sometimes it is an estimated price that factors into the actual price expected settlements, withholds, any other contingent payment arrangements and non-claims transactions with your health care provider or with a specified group of providers. The negotiated price may also be billed charges reduced to reflect an **average** expected savings with your health care provider or with a specified group of providers. The price that reflects average savings may result in greater variation (more or less) from the actual price paid than will the estimated price. The negotiated price will also be adjusted in the future to correct for over- or underestimation of past prices. However, the amount you pay is considered a final price.

Statutes in a small number of states may require the Host Blue to use a basis for calculating Participant liability for covered services that does not reflect the entire savings realized, or expected to be realized, on a particular claim or to add a surcharge. Should any state statutes mandate Participant liability calculation methods that differ from the usual BlueCard method noted above in paragraph one of this Exhibit or require a surcharge, BSNENY would then calculate your liability for any covered health care services in accordance with the applicable state statute in effect at the time you received your care.

Legal #74245
Matter #08-07552
Contract #